

Not Reported in A.2d                                                                                                                Page 1

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

Gilbert v. El Paso Co.Del.Ch.,1988.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
Peter **GILBERT** and William Steiner, Plaintiffs,
v.
The EL PASO COMPANY and Burlington Northern, Inc., et al., Defendants.
Herbert BREITMAN, as sole Trustee of Ed Rosenthal Neckwear, Inc. Profit Sharing Plan, and all other parties similarly situated and circumstanced, Plaintiff,
v.
BURLINGTON NORTHERN, INC., et al., Defendants.
**CIV. A. Nos. 7075, 7079, and 7078.**

Nov. 21, 1988.

**\*\*731** William Prickett, and Vernon R. Proctor, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Abraham G. Levin, Martin A. Coleman, Stephen A. Marshall, and Serene K. Nakano, of Rubin Baum Levin Constant & Friedman, and Mordecai Rosenfeld, Esquire, New York City, for plaintiffs.
Robert K. Payson, and James F. Burnett, of Potter Anderson & Corroon, Wilmington, and Howard W. Goldstein, and Robert J. Gunther, Jr., of MUDGE ROSE Guthrie Alexander & Ferdon, New York City, for defendant, the El Paso Company and the individual defendants.
A. Gilchrist Sparks, III, and Lawrence A. Hamermesh, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Marc P. Cherno, Stephen D. Alexander, Lisa Klein Wager, and Deborah L. Stein, of Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendant, Burlington Northern, Inc.

OPINION
JACOBS, Vice Chancellor.

**\*1** Presently pending are the defendants' motions to dismiss or for summary judgment, and also the plaintiffs' cross motion for summary judgment. These consolidated class actions were brought in 1983 on behalf of a class of stockholders of the El Paso Company ("El Paso") who tendered their shares into a tender offer that Burlington Northern, Inc. ("Burlington") initiated on December 21, 1982. Named as defendants are (i) El Paso, a Delaware corporation; (ii) the directors of El Paso at the time of the transactions complained of (referred to as " the directors" or the "individual defendants") and (iii) **\*\*732** Burlington and its wholly owned subsidiary, R-H Holdings Corporation, also Delaware corporations (collectively, "Burlington").

The complaint, as initially filed, had seven counts. On September 14, 1983, Burlington filed a motion to dismiss or for summary judgment as to all counts. Neither El Paso nor the individual defendants joined in that motion. Then Vice Chancellor (now Justice) Walsh dismissed the complaint as to Burlington, except for Count V (the conspiracy claim). *Gilbert v. El Paso Co.,* Del.Ch., 490 A.2d 1050 (1984). Three years of discovery then ensued. Thereafter, El Paso and the individual defendants moved to dismiss or, alternatively, for summary judgment as to all counts; Burlington moved for summary judgment as to Count V; and the plaintiffs filed a cross motion for summary judgment. All motions were briefed and argued on April 26, 1988.

At issue on those motions is the validity of the plaintiffs' claims: (1) against the El Paso directors for self-dealing and breaching their fiduciary duties of fairness and loyalty to the class; (2) against all defendants, *i.e.,* El Paso, its directors, and Burlington, for conspiracy; and (3) against El Paso and its directors for tortious interference with business relationships. [FN1] The plaintiffs' cross motion for summary judgment also concerns the measure and amount of damages sustained by the class. This is the Opinion of the Court on all

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 2

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

dismissal and summary judgment motions. For the reasons now discussed, the defendants' motions will be granted and the plaintiffs' motion will be denied.

I.

On a motion to dismiss, or for summary judgment, the moving party must demonstrate that the nonmoving party cannot prevail under any state of facts that could be proved in support of its claim, or that no material question of fact exists and that the moving party is entitled to relief as a matter of law. In deciding a motion for summary judgment, all permissible factual inferences must be resolved in favor of the nonmoving party. *Gilbert v. El Paso Co., supra,* at 1053. As thus viewed, the undisputed pertinent facts are now set forth.

In 1982, El Paso was a diversified energy company engaged in the exploration, production, and marketing of natural gas and oil **\*\*733** products. As of December 20, 1982, El Paso had ten directors, three of whom were "inside" directors: Travis R. Petty, El Paso's President and Chief Executive Officer; Richard S. Morris, El Paso's Executive Vice President; and William V. Holik, Jr., President of the El Paso Natural Gas Company, an El Paso subsidiary. The seven remaining directors were independent, none being an officer or employee of El Paso or any of its subsidiaries.

**\*2** On December 21, 1982, Burlington commenced a partial tender offer (the "December offer") for up to 25,100,000 shares of El Paso's common stock at $24 per share. If that offer was oversubscribed, the tendered shares were to be purchased on a prorated basis. The proration period would terminate on December 30, 1982, the period in which tendering shareholders could withdraw their tenders would conclude on January 12, 1983, and the offer itself would expire on January 19, 1983.

The stated purpose for Burlington's December offer was to acquire the majority of El Paso's outstanding shares. If the offer were totally successful, Burlington would own 51.8% of El Paso's outstanding shares and control El Paso. In its offering materials, Burlington disclosed no plans to purchase the remaining, nontendered shares. Nor did those materials disclose any price or other protections in the event of a "second step" acquisition of nontendered shares, *i.e.,* shares owned by those persons who would remain as minority shareholders in a Burlington controlled enterprise. To the contrary, Burlington specifically cautioned that "[a]ny possible transactions [with the minority shareholders] might be on terms (including the consideration offered per share) the same as, or more or less favorable than, those of the offer." FN2

In response, El Paso immediately took steps to evaluate the Burlington offer. The directors engaged Merrill Lynch, which for many years had served as El Paso's investment banker, to advise the Board and render an opinion on the adequacy of the December offer. El Paso's regular outside counsel, Mudge Rose Guthrie Alexander & Ferdon, was engaged to render legal advice concerning Burlington's offer, and the law firm of Wachtell, Lipton, Rosen & Katz was also specially retained for that purpose.

**\*\*734** On December 23, 1982, the El Paso Board held a special meeting. Merrill Lynch advised the directors that the Burlington offer was subject to certain complex, restrictive financing arrangements that could inhibit Burlington's ability to acquire the balance (49%) of El Paso's shares. Those arrangements included the requirement of bank consents if Burlington spent more than $750 million to acquire El Paso. Merrill Lynch also explained the nature of partial tender offers, and pointed out that after the completion of the December offer, El Paso's shareholders would remain vulnerable as minority shareholders in a Burlington-controlled enterprise.

Merrill Lynch concluded that the Burlington's $24 per share offering price was inadequate, and advised that the Board explore the possible alternative transactions that might achieve greater value for shareholders. El Paso's management then reviewed the company's financial condition and its prospects in the natural gas business, and reported that El Paso's financial prospects were attractive and that the company was well positioned to take

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 3

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

advantage of anticipated favorable developments in the natural gas market.

**\*3** The above information prompted the Board unanimously to conclude that Burlington's offer was not in El Paso's or its shareholders' best interests, and that the offer should be rejected. The directors' principal concerns were the inadequacy of the $24 offering price, the "partial" nature of the offer, and its potential adverse impact upon the minority shareholders remaining after the completion of the offer.

By a letter dated December 23, 1982, the shareholders were informed of the Board's conclusions and its recommendation that the shareholders not tender to Burlington. Specifically, the stockholders were advised that the Board had reached its decision, because: (i) the $24 per share offering price was too low; (ii) the Board was committed to maximizing the value of the company for all shareholders, and management had been authorized to pursue financial alternatives; (iii) Burlington might have difficulty acquiring the remaining El Paso common stock on terms that would be fair to the remaining El Paso stockholders; (iv) because such stockholders would remain as minority stockholders in a Burlington-controlled enterprise, the value of their shares might be adversely affected; and (v) the financing restrictions applicable to Burlington's offer might induce Burlington to engage in transactions that would not be in the minority stockholders' best interests, in order to enable Burlington to service its debt or increase its investment in El Paso.

**\*\*735** The Board subsequently authorized various defensive measures. Various litigations were commenced; employment agreements involving key personnel were executed or authorized; amendments to El Paso's by-laws, Employees Savings Plan, and Employees Stock Ownership Plan were adopted; and the Board also authorized a new series of Preferred stock to be issued as a stock dividend. The Preferred dividend would preclude a merger or other business combination between El Paso and a 25% or more shareholder for less than the highest price paid by the 25% shareholder, unless 90% of the outstanding Preferred shares approved the transaction.

After the December 23, 1982 Board meeting, El Paso's management and advisors intensively searched for superior alternatives to the Burlington offer. Specifically, management explored: a possible sale of the assets of El Paso natural Gas Company with Houston Natural Gas Corporation, a possible sale of the assets of El Paso Hydrocarbons Company with another firm; and a possible sale of the assets of El Paso Exploration Company with Sohio Petroleum Company, Shell, American Petrofina and Texaco. Management also explored a possible sale of the entire company with Houston Natural Gas, Mid-Con, InterNorth, and Texas Eastern. All told, representatives of management and Merrill Lynch spoke or met with dozens of companies, including almost all major pipeline firms, in an effort to develop a better offer.

This activity, for all its intensity, produced disappointing results. Despite Merrill Lynch's opinion that El Paso stock was worth more than $24 per share, the lamentable reality was that $24 was all that the market would bear. As Mr. Petty testified:

**\*4** On January 7th, I believed that $24 [per share] did not reflect the full value of El Paso shares, but I also believed that within the severe time constraints that we were operating under, we had tested the market and within those time constraints the $24 [per share] was probably all we could expect.

The El Paso Board held another special meeting on January 7, 1983. By that point, over 25 million El Paso shares had been tendered to Burlington. The directors did not (and never did) tender their own shares into the December offer. In these circumstances, everyone recognized that it was inevitable that Burlington would acquire control of El Paso unless an alternative could quickly be found. As to price, it was apparent that the Burlington offer was the highest price likely attainable. The Board still believed, nonetheless, that the Burlington **\*\*736** offer was inadequate because of its partial nature and its lack of " back-end" protection. The critical issue was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 4

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

whether in the remaining few days, El Paso could achieve greater protection for its shareholders, either by developing an alternative transaction or by negotiating with Burlington.

At the January 7 meeting, the Board reaffirmed that El Paso's management should continue pursuing all avenues that promised to produce superior value and protection for potential minority shareholders. That meant continuing ongoing negotiations with other potential bidders. In addition, however, the Board directed El Paso's management to initiate discussions with Burlington to explore whether its offer could be improved.

Accordingly, over the next two days (January 8 and 9, 1983) Messrs. Petty and Morris met with members of Burlington senior management. Mr. Petty advised Burlington's representatives that El Paso was pursuing other alternatives designed to produce maximum benefit to its shareholders, but that El Paso was willing to discuss a possible acquisition by Burlington on terms superior to its current offer. Mr. Petty then informed Burlington of El Paso's main concerns with Burlington's offer, *i.e.,* the inadequacy of the $24 per share price, the fact that the offer was partial, and risks that the remaining minority shareholders would be treated unfairly in any "second step" transaction. Petty also shared the Board's concerns over El Paso's substantial debt and its critical need for an infusion of additional capital.

Burlington's representatives responded that the $24 per share offering price was fair and would not be increased. But Burlington was more sympathetic to El Paso's concerns about the adverse impact of its partial offer on the remaining minority shareholders, as well as El Paso's capital needs. Arms length negotiations then followed. As a result, Burlington ultimately agreed that any merger it subsequently proposed would be made subject to the approval of the five El Paso directors who would continue to serve after Burlington acquired control (the "continuing directors"). Moreover, any subsequent merger proposal would be approved by a majority of the minority (*i.e.,* non-Burlington) shareholders. Finally, Burlington ultimately agreed, as part of its acquisition of the majority stock interest, to purchase, directly from El Paso, 4,166,667 shares of newly issued treasury stock for $100 million.

**\*5** In these negotiations, Messrs. Petty and Morris took a position that became the basis for this litigation, namely, that all of El Paso's shareholders should be given the opportunity to participate in the **\*\*737** improved transaction that the parties had negotiated. That objective was accomplished by an agreement whereby Burlington would withdraw its December offer and would substitute a new tender offer, at the same $24 price but for fewer shares, in its place.[FN3]

On January 10, 1983, the El Paso Board again met, this time to consider the accord reached between El Paso and Burlington. As finally negotiated, that agreement had the following principal terms: (a) Burlington's December tender offer would be terminated, and Burlington would initiate a new tender offer for 21 million El Paso shares at $24 per share; (b) Burlington covenanted to elect five El Paso "continuing directors"; (c) Burlington agreed that any future proposal to acquire the minority El Paso shares must be approved by a majority of the continuing directors, as well as by a majority of the minority (non-Burlington) shares; (d) Burlington agreed to purchase 4,166,667 shares of El Paso's newly authorized treasury stock for $100 million; and (e) Burlington would have an option to acquire an additional 4,950,000 of El Paso's authorized but unissued common stock.

The El Paso Board approved the El Paso/Burlington agreement at that meeting. Both corporations then executed it on that same day, January 10, 1983.

In accordance with the agreement, Burlington terminated its December offer on January 10, 1983. The next day, January 11, 1983, Burlington instituted a new offer (the "January offer") for 21 million shares at $24 per share. In response to the January offer, 40,246,853 shares, including most of the shares owned by the directors, were tendered.[FN4] Burlington ultimately purchased, on a prorated basis, 21 million of the over 40 million shares tendered.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 5
Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

Eight months later, in August, 1983, Burlington proposed a merger to acquire the balance of El Paso's outstanding shares for the $24 per share price. El Paso's continuing directors unanimously approved that proposal on September 14, 1983, and the merger was **\*\*738** approved by both the Burlington and El Paso Boards on September 19, 1983. A special meeting of El Paso shareholders was held on December 13, 1983, at which the merger was formally approved by a majority of the non-Burlington shares. Burlington completed its acquisition of the remaining El Paso shares that same day.

II.

Plaintiffs challenge two aspects of the January 10, 1983 Burlington/El Paso agreement in this litigation: the substitution of the January offer for the December offer, and the direct purchase by Burlington of 4,166,667 treasury shares from El Paso. It is undisputed that the effect of those transactions was (i) to reduce by 4,100,000 shares the number of shares that Burlington would purchase directly from El Paso stockholders, and (ii) to dilute the "proration pool" established in the December offer, by allowing all shareholders, including those who were not members of the class, to tender into the January Burlington offer. It is claimed that those acts constituted a breach of two fiduciary duties owed by El Paso's directors to the class, *i.e.,* the duty to preserve the class' proration percentage achieved in the December offer, and the duty not to prefer their own personal interests over the interests of the class. Plaintiffs contend that Burlington knowingly conspired in those breaches of fiduciary duty, and that the directors' actions also tortiously interfered with a business opportunity of the class to have their shares purchased in the Burlington December offer.

**\*6** These claims are all bottomed upon the plaintiffs' contention that the class had a legally recognized right and expectancy to have their tendered shares purchased in Burlington's December offer. Consequently, plaintiffs argue, El Paso's directors had a fiduciary duty not to interfere with the proration arrangements applicable to those tendered shares. Plaintiffs contend that by negotiating the January 10, 1983 agreement, the El Paso defendants interfered with those arrangements, defeated that right and expectancy, and thereby breached their fiduciary duty. It is argued that it was unnecessary to eliminate the proration pool by substituting a new tender offer for the December offer. It is further argued that the directors insisted upon such actions solely to further their selfish interests, by enabling them to tender their shares, which otherwise could not be sold since the directors had not tendered their shares into the December offer.

The defendants vigorously insist that they breached no duty of any kind. They contend, first, that the class had no vested right to **\*\*739** have their tendered shares acquired in the Burlington tender offer, and that, therefore, the directors had no duty to preserve the proration arrangements applicable to that offer.

Second, the defendants argue that even if the class did have a legally protectible interest in preserving the December proration arrangements, the directors were permitted, in the valid exercise of their business judgment, to alter those arrangements in order to achieve a transaction that would benefit the corporation and all of its shareholders. Defendants argue that the January 10, 1983 agreement was such a transaction, because it was reasonable and approved in good faith by disinterested directors for the benefit of all shareholders. Defendants emphasize that although the directors were benefited by being afforded an opportunity to tender their El Paso shares to Burlington, that benefit was made equally available to all El Paso shareholders, and the directors' shares were acquired on the same prorated basis as all other tendered shares. Hence, the defendants conclude: (i) no fiduciary duty existed or was violated; (ii) the claim that Burlington knowingly participated in the directors' breach of duty therefore rests upon an invalid premise; and (iii) because the directors acts were not wrongful, those acts could not constitute a tortious interference with any business opportunity, right or expectancy of the class.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                     Page 6
Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

### III.

To address properly the contentions being advanced here, the applicable standards for evaluating the El Paso defendants' conduct must first be determined. That determination involves two separate but related inquiries: (a) the standard of judicial review under which the directors' actions must be scrutinized and (b) the nature of the duties owed by the directors to the class.

### A.

The applicable standard of judicial review is first addressed, because the parties invoke, at various points in their briefs, no less than three differing review standards: under *Unocal Corp. v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946 (1985), (" *Unocal* "); under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173 (1986), ("*Revlon* "); and the entire fairness standard under cases such as *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701 (1983), and *Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717 (1971).

**\*7 \*\*740** First, I reject the suggestion that the *Unocal* standard forms the appropriate analytical framework here. In highly general terms, *Unocal* prescribes the standard for evaluating the conduct of directors adopting antitakeover measures to defend against a threat to the corporate enterprise resulting from a potential change of control. The transactions complained of here are not of that character. They were agreed to as part of an overall rapprochement between Burlington and El Paso. The underlying premise of that agreement was that Burlington would be permitted to acquire control of El Paso with the express approval of El Paso's Board. Hence, the transactions under attack cannot properly be regarded as antitakeover defense measures that would trigger the enhanced judicial scrutiny mandated by *Unocal.*

Nor is the *Revlon* standard responsive to the contentions being advanced here. Under *Revlon,* El Paso's directors were obliged, as auctioneers, to obtain the best possible price or transaction for the stockholders in a sale of the company. *Revlon, supra; In Re J.P. Stevens & Co., Inc. Shareholders Litigation,* Del.Ch., 542 A.2d 770 (1988). Clearly those duties were satisfied in this instance, and plaintiffs do not seriously contend otherwise. Here the Board "shopped" the company in an effort to develop a bid superior to the Burlington offer. Only after those efforts proved unsuccessful did the Board feel itself compelled to negotiate an improved transaction with Burlington.

Plaintiffs do not challenge the ultimate transaction price of $24 per share. Nor do they claim that the directors wrongfully failed to obtain a higher available price. What they assail is the manner chosen for allocating the $24 per share consideration among El Paso's shareholders. That is, the plaintiffs contend that the directors structured the transaction so as improperly to allocate to themselves a portion of the consideration that rightfully belonged to the class. While that claim charges a breach of fiduciary duty, the duty that plaintiffs invoke does not arise under *Revlon.*

Lastly, the plaintiffs contend that the challenged transaction must be evaluated in accordance with the entire fairness standard. That standard, firmly embedded in our corporate jurisprudence, requires that directors who engage in self-dealing-that is, who stand on both sides of the transaction, dictate its terms, and obtain a benefit not received by all stockholders generally-must prove the transaction's entire fairness to the satisfaction of a reviewing court. *Weinberger v. UOP, Inc., supra,* at 710; **\*\*741***Sinclair Oil Corp. v. Levien, supra,* at 720; *David J. Greene & Co. v. Dunhill International, Inc.,* Del.Ch., 249 A.2d 427, 430 (1968).

For this exacting standard to govern, the El Paso directors, in carrying out the acts complained of, must have engaged in self-dealing. The plaintiffs argue that self-dealing occurred, because (i) the January offer afforded the directors the opportunity-not otherwise available to them-to tender their El Paso shares into that offer, (ii) as a result, the proration pool was diluted to the complete detriment of the class; (iii) the total number of shares Burlington would acquire from the class was decreased by 4,166,667 shares, which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                Page 7
Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

also operated to the detriment of the class, and (iv) it was unnecessary to structure the transaction in that fashion.

**\*8** It cannot be doubted that the January offer benefited El Paso's directors insofar as it afforded them the opportunity to tender into a new offer. It must also be acknowledged that the transactions complained of adversely affected the interests of the class (*i.e.,* the tendering shareholders) since the total number of shares being purchased from shareholders was reduced, and the December proration pool was diluted insofar as all El Paso shareholders were allowed to tender into the January offer.

To engage in self-dealing, however, the directors must have stood on both sides of the transaction, dictated its terms, and derived a benefit to the exclusion of the shareholders. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984); *Sinclair Oil Corp. v. Levien, supra,* at 720. The plaintiffs have failed to show that that occurred here. The directors did not stand on both sides of the transaction; indeed, at all times their relationship to Burlington was adverse and the parties negotiated at arms length. Nor did the directors receive a benefit to the exclusion of the class. The opportunity to tender into the new offer was afforded equally to all shareholders, including the directors and the class, and the directors' stock was purchased on the same prorated basis as the stock tendered by all other stockholders. Accordingly, the transactions under attack cannot fairly be considered as "self-dealing" transactions of the kind that would implicate the rigorous entire fairness standard of review.

It must therefore be concluded that the challenged conduct will be evaluated from the standpoint of the business judgment rule, unless (as the plaintiffs contend) other circumstances, such as a breach of the duty of loyalty or of due care, would make that standard not applicable. That brings us to the second inquiry: the precise nature of the duty, if any, owed by the El Paso directors to the plaintiff class in these circumstances.

**\*\*742** B.

The defendants' primary position is that the El Paso directors owed no duty of any kind to the class. They argue that the class had no vested property or contract right, or any legally protected expectancy, to have their shares in the December proration pool acquired in Burlington's December offer. For the reasons now discussed, I agree that the class had no vested (*i.e.,* inviolate) right, arising under Delaware law, to have their proration position frozen in place. However, the class did have interests that El Paso's directors, as fiduciaries, were not free to interfere with absent some overriding or paramount corporate purpose.

This Court has previously found, in earlier proceedings, that the class had no vested right to have their shares purchased in the December offer. In *Gilbert v. El Paso Co., supra,* at 1054-1055, Justice Walsh held that because the December offer was made subject to certain conditions, Burlington was free to terminate that offer, and was therefore free to terminate its obligation to purchase any tendered shares, if one or more of those conditions occurred. The United States District Court for the District of Delaware has determined also, that the class had no vested rights arising under federal law. In *Brill v. Burlington Northern Inc.,* 590 F.Supp. 893 (D.Del.1984), that court held that Burlington did not violate the Williams Act by terminating the December offer and instituting the January offer. The court observed: "... Burlington and R-H, as the masters of the offer, had the right to terminate and withdraw the December offer as long as the offer did not specifically prohibit that action ..." It further held that the December offer "... could have been terminated and withdrawn any time after December 17, 1982, and prior to acceptance by Burlington ... for payment." *Id.* at 898.

**\*9** Nor do the plaintiffs' cited cases support their position that the class had a vested right to have their shares in the December proration pool acquired in the December offer.[FN5]

**\*\*743** Although the shareholder class did not have a vested contract or other property right, it does not follow that the class had no legally protectable interest. As now discussed, the members of the shareholder class did have a protectible interest in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                         Page 8
Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

the maintenance of their proration position. That interest, while not absolute, was one that the El Paso directors, under Delaware fiduciary principles, were not completely free to disregard. As Justice Walsh previously found, the El Paso directors owed

... a fiduciary duty to the plaintiff class not to prejudice their interests in the December tender offer. This does not mean that El Paso's management was not free to attempt to persuade its shareholders not to tender their shares or to engage in other defensive tactics, but El Paso could not interfere with the alienability of the tendered shares by pursuing its own interests ...

490 A.2d at 1057.

The defendants correctly argue that the directors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups. *See Phillips v. Insituform of North America, Inc.,* Del.Ch., C.A. No. 9173, Allen, C. (August 27, 1987); *Kors v. Carey,* Del.Ch., 158 A.2d 136, 143 (1960). However, from that general principle it cannot be concluded (as defendants seem to suggest) that the directors can never owe a duty to a particular shareholder subclass or group. **744** Manifestly that cannot be so. *See, e.g., Eisenberg v. Chicago Milwaukee Corp.,* Del.Ch., 537 A.2d 1051, 1062 (1987) (recognizing the fiduciary duty owed by corporate directors to preferred stockholders).

Corporate directors owe a fundamental, bedrock duty of loyalty not to put their personal interests ahead of the interests of their shareholders. *See Weinberger v. UOP, Inc., supra,* at 710; *Revlon, supra,* at 179; *Guth v. Loft, Inc.,* Del.Supr., 5 A.2d 503, 510 (1939). Thus (and to use an extreme example) suppose El Paso's directors had purposefully chosen to interfere with the proration position of the class solely to enable themselves to tender their shares. In such a case, can it be supposed that the directors could be heard to argue that they had no duty to the class, because its members consisted of less than the entire body of stockholders? Clearly not. At the very least, those directors had an absolute duty not to interfere with the proration interests of the class for an improper or selfish purpose. That duty, the plaintiffs contend, was violated here.

The defendants assiduously deny that they were actuated by any selfish or improper motive. They insist that in negotiating and later approving the January 10, 1983 agreement with Burlington, El Paso's directors intended to-and did-protect the interests of all El Paso shareholders. If that is correct, then the directors' fiduciary duty would not be absolute, but qualified. That is, the directors' duty not to prejudice the interests of the class would be subject to the qualification that they, in a proper exercise of their business judgment, could act to serve an overriding or paramount interest of the corporation or its shareholders as a group, even if, as an incidental result, the interests of a subgroup, such as the class, were adversely affected.

*10 That statement of the directors' fiduciary duty reveals little that is new or remarkable. It is, by-now, a commonplace phenomenon of corporate governance that corporate directors will confront situations involving conflicting interests of different shareholder groups. In such cases the directors are not enjoined to lie inert. Our case law recognizes that the directors may take whatever action that, in their proper exercise of business judgment, will best serve the interests of the corporation or the entire body of shareholders. That such action may adversely affect the interests of a particular shareholder subgroup, will, in certain instances, be unavoidable. Nonetheless, no wrongdoing will have occurred if the directors are able to justify the result as furthering a paramount or overriding corporate or shareholder interest. *See, e.g., Unocal, supra; Phillips v. Insituform of* **745** *North America, Inc., supra,* at 18-19; and *Eisenberg v. Chicago Milwaukee Corp., supra,* at 1062.

The foregoing analysis makes it possible to define the critical issues remaining to be decided. They are: (1) did the directors, in negotiating and approving the January 10, 1983 agreement with Burlington, act out of selfish motives or did they act to serve a paramount interest of the corporation and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 9

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

of all shareholders? (2) If the directors were motivated by the latter (*i.e.,* proper) set of considerations, are their actions protected under the business judgment rule? Those issues are now addressed.

IV.

A.

The essence of plaintiffs' position is that El Paso's directors intentionally breached their duty of loyalty by negotiating the termination of the December offer, the substitution of the January offer, and the direct sale of treasury shares to Burlington, all to benefit themselves at the expense of the class. In its earlier opinion, this Court indicated that as a pleading matter, that theory stated a cognizable claim for relief against the directors. *Gilbert v. El Paso Co., supra,* at 1057. Now that this matter has progressed beyond the pleading stage and the record has been amplified through discovery, the question is whether the record evidence is sufficient to create a triable issue of fact as to the directors' culpable intent. I conclude that it is not. There is no direct evidence that the directors were motivated by selfish concerns, or that they insisted on the substituted January tender offer to enable themselves to tender their El Paso shares to Burlington.[FN6]

Plaintiffs argue, nonetheless, that the undisputed facts compel an inference of improper intent. They emphasize that in opposing the December offer, the directors took the position that $24 per share price was inadequate and exhorted their shareholders not to tender. Yet only weeks later, in an about face, the directors took the opposite position, and tendered their shares into the January offer at the same "inadequate" $24 per share price. Moreover, plaintiffs emphasize, **746** it was unnecessary to replace the December offer with an entirely new offer that required undoing the December proration arrangements. All that was needed, plaintiffs say, was for Burlington to amend its December offer to reduce the number of shares to be purchased to 21,000,000 shares.

**\*11** The difficulty with these arguments is that they ignore other undisputed facts of record that, when also considered, dispel the adverse inferences that are said to be compelled. It is undisputed that the El Paso directors had significant reasons to be concerned about the December offer: it was partial, the offeror (Burlington) had made no commitment to acquire the remaining shares at all or for a fair price, and Burlington's financing arrangements created the risk that any "second step" acquisition of the minority shares would not be on fair terms. Finally, El Paso's investment banker had opined that the $24 per share offering price was too low in relation to the company's underlying values, and that nontendering shareholders would face significant risks as minority stockholders in an ongoing Burlington-controlled, highly leveraged company. The inherently coercive nature of partial offers of this kind, *i.e.,* offers that promise no guaranteed "second step" transaction at an adequate price, cannot be (and is not) seriously disputed. *See, e.g., Unocal, supra; CTS Corp. v. Dynamics Corp. of America,* 107 S.Ct., 1637, 1646 (1987).

By the time El Paso had reached its January 10, 1983 agreement with Burlington, most of the relevant circumstances had materially changed. By that point the market had been tested to determine if a superior bid or transaction was obtainable, and none was. For that reason, Merrill Lynch advised El Paso's Board that, although $24 per share was possibly less than El Paso's intrinsic worth, realistically it was all that the market would currently bear. On that basis the Board decided that in addition to exploring other alternatives, it must negotiate with Burlington.

It is true that, as a result of those negotiations, the Board approved a transaction at a price that it had previously rejected as being too low. It is also true that the directors ultimately tendered their shares to Burlington at that same $24 price. The parties do not dispute those facts, only their significance. In my view, the record, considered as a whole, permits only the inference that the directors' acceptance of the $24 price represented a pragmatic acknowledgement of, and accommodation to, the realities of the marketplace. No higher price was available. Unless a superior transaction could be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 10

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

negotiated with Burlington-and promptly-the coercive December offer, which already was over subscribed, would close **747 within a matter of days. The directors' consequent negotiating strategy was to seek concessions that hopefully would eliminate the risks inherent in the December offer. Although El Paso's representatives were unsuccessful in increasing the price, they did succeed in eliminating the offer's other coercive elements.[FN7]

That leads to the plaintiff's second argument, *viz.,* that improper director motivation must be inferred from the fact that it was unnecessary to dismantle the December offer, and (as a consequence) its proration pool, to accomplish the El Paso directors' objectives. Plaintiffs argue that if, in fact, it was necessary and proper to reduce the number of shares Burlington would acquire from the stockholders by having El Paso sell the same number of treasury shares directly,[FN8] Burlington could simply have amended its December offer to reduce the number of shares it would purchase. Since none of Burlington's "back-end" procedural concessions required undoing the December offer, with predictable adverse consequences to the shareholder class, and since the only beneficiaries of such actions would be the directors, plaintiffs conclude that the directors could only have intended to benefit themselves at the expense of the class.

*12 Concededly, from a purely mechanical standpoint these transactions could have structured differently. The defendants argue, however, that that fact, by itself, does not establish that the defendants acted wrongfully. *Robinson v. T.I.M.E.-DC, Inc.,* 566 F.Supp. 1077, 1084 (N.D.Tex.1983) (applying Delaware law); *Abelow v. Symonds,* Del.Ch., 184 A.2d 173, 176 (1962). They further contend that if the December offer had not been replaced with the January offer, the result would have been unfair to El Paso's nontendering shareholders.

I concur. At the time that El Paso's directors were actively opposing Burlington, they had a valid reasons for believing that the **748 December offer was for an inadequate price and lacked "back-end" protections. As previously stated, El Paso's representatives were able to obtain concessions that effectively eliminated the December offer's offensive aspects, other than price. Those concessions materially changed the environment in which the parties had been operating. The coercive elements of the December offer are what had motivated the directors to recommended against tendering. In reliance upon the directors' recommendation, many shareholders chose not to tender. Nothing of record shows otherwise, and the directors clearly so believed.

The negotiated elimination of those coercive aspects obviated the basis for recommending that shareholders ought not to tender. Accordingly, the directors concluded that it would be unfair to the nontendering shareholders if they were not afforded the opportunity to tender their shares into the improved offer. Consequently, the directors decided to structure the transaction as a new, substituted tender offer into which all El Paso shareholders could tender their shares, if they so chose. By that choice of transaction structure, the directors also stood to benefit personally in their capacity as shareholders, but only to the same extent as all other stockholders. The record establishes that any personal benefit to the directors was an incidental, secondary consideration, and not the primary motivation for their actions.

For these reasons the plaintiffs have failed to establish *prima facie* their claim for breach of fiduciary duty, based on their theory that the directors deliberately sought to serve their selfish interests at the expense of the tendering shareholder class.

B.

The second fiduciary duty issue is whether the directors' actions are protected under the business judgment rule. That rule, where applicable, creates a presumption that corporate directors, in making a business decision not involving self interest, acted on an informed basis, in good faith, and in the honest belief that their actions were in the best interests of the corporation. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 (1988); *Aronson v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                           Page 11

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

*Lewis, supra,* at 812. Where that presumption is applicable, the directors' judgment will be respected, unless the plaintiff demonstrates that the challenged transaction cannot be attributed to any rational business purpose. *Aronson v. Lewis, supra,* at 812.

*\*13* The evidence previously discussed establishes that the directors' actions in negotiating and approving the January 10, 1983 agreement **\*\*749** were the product of a valid business judgment that that agreement would serve a paramount, overriding corporate interest, as well as the interests of the stockholders as a group. The record demonstrates that in deciding upon the challenged transaction structure, the directors, a majority of whom were independent, acted in the honest, good faith belief that the corporation would benefit by receiving needed capital and that all shareholders, including those who had not tendered into the December offer, would benefit by having the opportunity to tender into a new offer with "back-end" procedural protections. [FN9] The actions of the El Paso directors must therefore be upheld as a valid exercise of business judgment.

Because the plaintiffs have failed to demonstrate that the El Paso directors violated any fiduciary duty owed to the class, summary judgment must be granted in favor of the defendants, and against the plaintiffs, on the breach of fiduciary duty claims.

V.

The plaintiffs next contend that all defendants conspired jointly to achieve their improper goals. Specifically, plaintiffs argue that Burlington, chargeable with knowledge that the El Paso directors were preferring their own interests over those of the shareholders who tendered into the December offer, knowingly participated in the El Paso directors' breach of fiduciary duties. That conspiracy claim necessarily depends upon the directors having committed a breach of fiduciary duty. Since no such breach of fiduciary duty has been established, summary judgment must be granted dismissing the conspiracy claim.

The plaintiffs' tortious interference claim must also be dismissed, because an essential element of that tort has not been established. To constitute tortious interference, the act that is claimed to have interfered with the contract relationship or business opportunity must itself have been wrongful. *DeBonaventura v. Nationwide Mut. Ins. Co.,* Del.Supr., 428 A.2d 1151 (1981). Because the El Paso directors committed no wrongful acts, the interference claim cannot stand.

**\*\*750** Finally, the plaintiffs contend that the amount of damages may be determined from the record as a matter of law. Because the plaintiffs have failed to establish that any of the defendants are liable as a result of the acts complained of, it becomes unnecessary to address the damages question.

For the foregoing reasons, the defendants' motions for summary judgment are granted, and the plaintiffs' cross motion for summary judgment is denied. IT IS SO ORDERED.

> FN1. Plaintiffs have elected not to pursue their claims for entrenchment and breach of fiduciary duty of candor against the El Paso defendants.
>
> FN2. The December offering materials also stated that Burlington did not intend to change El Paso's management. In a letter accompanying the offer, Burlington's chairman advised that Burlington expected that El Paso's "management would continue its service uninterrupted" and that El Paso's chairman, Mr. Petty, would be offered a position on Burlington's Board of Directors.
>
> FN3. Because Burlington agreed to purchase the treasury shares directly from El Paso, there would be a corresponding reduction of the number of shares Burlington would purchase from the shareholders in its January offer. Under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 12

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

the December offer, Burlington would have purchased up to 25,100,000 shares. In the January offer, that amount was reduced to 21,000,000 shares, for a net reduction of 4,100,000 shares. That amount was only 66,667 shares less than the number of treasury shares being sold directly by El Paso to Burlington.

FN4. Of the 40,246,854 El Paso shares tendered, nine of El Paso's ten directors tendered a total of 50,322 shares. Only one director, Mr. Noel, tendered a significant number of shares, *i.e.,* 534,285 shares.

FN5. Plaintiffs rely upon *San Francisco Real Estate Investors v. Real Estate Investment Trust of America,* 692 F.2d 814 (1st Cir.1982), wherein the First Circuit reversed an injunction that extended the proration period applicable to a partial tender offer. The Court of Appeals found the injunction unnecessary, because the offer had been conditioned upon the invalidation of a target company by-law. The offer could not be completed unless the challenged by-law was preliminarily enjoined. That court also held that the extension of the proration period was improper, because it took "... money from those who tendered within the original time limit and [gave] it to those who tendered later." 692 F.2d at 818. However, the basis of that ruling was not that the proration period was immutable, but rather that it was "entitled to respect ... and should not be enlarged without a significant reason." *Id.* at 817. In that case the extension of the proration period was found to have violated § 14(d)(6) of the Williams Act, 15 *U.S.C.* § 78n(d)(6), because no such "significant reason" had been shown.

The plaintiffs' also rely upon *Pryor v. United States Steel Corp.,* 794 F.2d 52 (2d Cir.1986), which also involved an extension of a proration period that resulted in an enlargement of the proration pool to include shares that were tendered after the proration deadline. The court found that the extension violated § 14(d)(6) of the Williams Act, on the ground that the tender offeror was not free to extend an already expired proration deadline, where the effect was to reduce the number of shares to be purchased from shareholders who had tendered before the deadline.

Apart from involving dissimilar facts, those cases do not support the proposition that directors have an absolute duty arising under state law, to maintain and preserve the proration position of tendering stockholders inviolate, regardless of the circumstances. Moreover, in those cases the challenged transactions were found to have violated § 14(d)(6) of the Williams Act. However, the transactions complained of here have been found *not* to have violated § 14(d)(6). *Brill v. Burlington Northern, Inc., supra.*

FN6. The parties dispute whether the proposal to terminate the December offer originated with the directors. For purposes of these motions, it will be assumed that the directors initiated that proposal.

FN7. As previously stated, Burlington was unwilling to commit to a "second step" transaction. However, it did commit that any future purchase of the remaining El Paso shares would be made subject to the approval of both a majority of the minority stockholders and the "continuing" directors of El Paso not designated by Burlington. Those procedural protections materially decreased (if they did not eliminate) Burlington's ability to acquire the remaining El Paso shares for an unfair price. Only 11 months later, Burlington acquired those shares in a second step merger at the same $24 per share tender offer price.

FN8. The uncontroverted record evidence

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d												Page 13
Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

is that El Paso insisted upon a direct sale of treasury shares to inject capital that would enable the corporation to reduce its high debt level. There is no evidence to support the plaintiffs' assertion that the parties agreed to a direct sale of treasury shares to camouflage the directors' selfish motives for substituting the January offer for the December offer.

FN9. Tendering shareholders would also benefit, since to the extend their shares were not part of the December proration pool, those shares would remain as minority shares in a Burlington-controlled company. Therefore, the January 10, 1983 agreement afforded "back-end" protection to tendering, as well as nontendering, shareholders.

Del.Ch.,1988.
Gilbert v. El Paso Co.
Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.