

Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429
**(Cite as: Not Reported in F.Supp.2d)**

▷
Sanderson v. BrugmanS.D.Ind.,2001.
United States District Court, S.D. Indiana,
Indianapolis Division.
SANDERSON, Charles H., Plaintiff,
v.
BRUGMAN, Helmut H., Surtech Corp., Indiana
Soft Water Services, Inc. d/b/a Culligan, Culligan
International Company, Defendants.
**No. IP00-459-C-H/G.**

May 29, 2001.

ENTRY ON DEFENDANTS' MOTIONS TO
DISMISS AND RELATED MATTERS
HAMILTON.
**\*1** Plaintiff Charles H. Sanderson has sued Helmut
H. Brugman, Surtech Corp., Indiana Soft Water
Services, Inc., and Culligan International Company
in this action. Sanderson's First Amended
Complaint attempts to allege violations of Section 1
of the Sherman Act, 15 U.S.C. § 1, and the Lanham
Act, 15 U.S.C. § 1125. Sanderson also alleges
claims under state law within this court's
supplemental jurisdiction. Defendants have moved
to dismiss the First Amended Complaint for failure
to state a claim upon which relief can be granted.
As explained below, defendants' motion is granted,
but Sanderson will have an opportunity to replead
his Lanham Act claim with greater specificity.

I. *Plaintiff's Complaint*

The operative complaint at this stage is the First
Amended Complaint.[FN1] Plaintiff Charles H.
Sanderson alleges that he provides "magnetic water
treatment and devices" in interstate commerce. He
contends that his treatment and devices provide a
means of treating hard water to control lime scale in
a way that does not require the use of toxic
chemicals. At the core of his complaint, Sanderson
alleges a widespread conspiracy in a worldwide

market beginning in the 1970's "to discredit and
malign magnetic water treatment." First Am. Cplt.
¶ 38. At the center of the alleged conspiracy is the
Water Quality Association (WQA), a trade
association.

FN1. Sanderson has moved for leave to
file a Second Amended Complaint that
differs from the First Amended Complaint
only by deleting references to certain
alleged "co-conspirators" who have settled
their differences with Sanderson. The
motion for leave to file the Second
Amended Complaint is hereby granted, but
the ruling on the defendants' motions to
dismiss shall also apply to the Second
Amended Complaint, which defendants
need not answer.

Sanderson alleges that the WQA and others have
conspired to restrain trade by means including:
Improper use of various studies and reports
derogatory to magnetic water treatment and devices,
including studies commissioned by the Water
Quality Association and conducted at Purdue
University, and the South Dakota School of Mines,
such use including interstate and international
publication and sale of these studies, while knowing
that the information contained therein was not
accurate, or acting with reckless disregard of the
truth or accuracy of the conclusions reached in
these studies.
Distribution of negative position papers and policy
statements regarding magnetic water treatment.
Banning the display of magnetic treatment devices
at the trade shows sponsored by the Water Quality
Association.
The instigation of investigations by various public
officials, including various state attorneys general,
the Federal Trade Commission, the Better Business
Bureau, such investigations prompted by an
improper motive, to-wit, the restraint of trade and
harassment of a competitor.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2

Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429
**(Cite as: Not Reported in F.Supp.2d)**

Placement of letters and other articles of misinformation in the trade press.
Direct contact with customers and potential customers of Plaintiff to discredit Plaintiff's products [and] processes.
Appearances at trade shows and other public forums to distribute information negative to magnetic water treatment.

First Am. Cplt. ¶ 40.

II. *Standard for Dismissal Under Rule 12(b)(6)*

Defendants' motions to dismiss challenge the sufficiency of the complaint for failure to state a claim upon which relief may be granted. See Fed.R.Civ.P. 12(b)(6). In reviewing a motion to dismiss, the court reviews all facts alleged in the complaint and any inferences reasonably drawn from the alleged facts in the light most favorable to the plaintiff. See *Caldwell v. City of Elwood,* 959 F.2d 670, 671 (7th Cir.1992). Dismissal is warranted only if the plaintiff can prove no set of facts consistent with his complaint that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). When a plaintiff provides the specifics of his claims in the complaint, however, it is possible for him to plead himself out of court where the specifics show he cannot be entitled to relief. See, *e.g., Khuans v. School Dist. 110,* 123 F.3d 1010, 1016 (7th Cir.1997) (affirming dismissal of First Amendment claim); *Lanigan v. Village of East Hazel Crest,* 110 F.3d 467, 474 (7th Cir.1997) (affirming dismissal of civil rights claim). Such specifics may serve the salutary purpose of avoiding prolonged litigation that is destined as a matter of law not to succeed. See *Zehner v. Trigg,* 952 F.Supp. 1318, 1322 n. 2 (S.D.Ind.1997) (plaintiffs' candor in complaint and briefing avoided waste of time), *aff'd,* 133 F.3d 459 (7th Cir.1997).

III. *Sherman Act Claims*

**\*2** Section 1 of the Sherman Act provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. A party injured by a violation of Section 1 may assert a civil claim pursuant to 15 U.S.C. § 15. To assert such a claim for a violation of Section 1, Sanderson must allege (1) a contract, combination, or conspiracy; (2) resulting in an unreasonable restraint of trade in the relevant market; (3) an accompanying antitrust injury; and (4) a direct link between the antitrust violation and the antitrust injury. See, *e.g., Greater Rockford Energy & Technology Corp. v. Shell Oil Co.,* 998 F.2d 391, 395-97 (7th Cir.1993) (identifying elements and affirming summary judgment for defendants). Sanderson has failed to allege a viable claim for relief under the Sherman Act.

A. *Competitors' Criticism of Plaintiff's Products*

Much of Sanderson's antitrust claim is built upon his allegations that defendants and other competitors criticized his products and their effectiveness. Sanderson alleges that those criticisms are deliberately or recklessly false and that scientific studies carried out to support those criticisms were not competent or honest. This branch of Sanderson's antitrust claim fails at the pleading stage for failure to identify any conduct that could be actionable as a restraint of trade.

In *Schachar v. American Academy of Ophthalmology, Inc.,* 870 F .2d 397 (7th Cir.1989), the Seventh Circuit explained the governing principles here. In *Schachar,* several ophthalmologists sued a professional association and some of its members alleging a conspiracy to restrain trade by labeling a surgical technique ( radial keratotomy) as "experimental," with the effect of depressing demand for plaintiffs' services in providing the surgery. The Seventh Circuit affirmed a jury verdict in favor of the defendants, but its opinion stated in no uncertain terms that the case should never have been allowed to go to trial because there was no evidence of any restraint of trade:
Mulling over the jury instructions would be pointless, however, for this case should not have gone to the jury; indeed it should not have gone to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3

Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429
**(Cite as: Not Reported in F.Supp.2d)**

trial. *All* the Academy did is state as its position that radial keratotomy was "experimental" and issue a press release with a call for research. It did not require its members to desist from performing the operation or associating with those who do. It did not expel or discipline or even scowl at members who performed radial keratotomies. It did not induce hospitals to withhold permission to perform the procedure, or insurers to withhold payment; it has no authority over hospitals, insurers, state medical societies or licensing boards, and other persons who might be able to govern the performance of surgery.

870 F.2d at 398 (emphasis in original).

**\*3** Similarly here, Sanderson has not alleged that defendants imposed any restraints of trade, such as boycotts or other coercive measures, that prevented customers or others from dealing with him or prevented him from selling his products to any willing buyer. Cf. *Wilk v. American Medical Ass'n,* 895 F.2d 352, 356 (7th Cir.1990) (distinguishing between AMA membership's earlier boycott on chiropractors and the AMA's later position that medical physicians could decide individually whether to associate professionally with chiropractors).

All Sanderson alleges is that defendants have joined together to criticize plaintiff and his products falsely. Writing for the Seventh Circuit in *Schachar,* Judge Easterbrook explained that such joint criticism is not enough to establish an antitrust violation even if it could be proven:
Warfare among suppliers and their different products *is* competition. Antitrust law does not compel your competitor to praise your product or sponsor your work. To require cooperation or friendliness among rivals is to undercut the intellectual foundations of antitrust law. [*Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1413-14 (7th Cir.1989); *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,* 784 F.2d 1325, 1338-39 (7th Cir.1986) ]. Unless one group of suppliers diminishes another's ability to peddle its wares (technically, reduces rivals' elasticity of supply), there is not even the beginning of an antitrust case, no reason to investigate further to

determine whether the restraint is "reasonable".

870 F.2d at 399 (emphasis in original). As for the claim that defendants were making deliberately false or misleading statements about plaintiff's products, the *Schachar* court made clear that antitrust law is not the source of relief: "If such statements should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech-the marketplace of ideas." *Id.* at 400.[FN2]

> FN2. Sanderson relies on *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556 (1982), which affirmed an antitrust verdict against a professional association for adopting standards that excluded plaintiff's product. On this issue, the critical fact in *Hydrolevel* was that the defendant-association's standards, while advisory, had "a powerful influence: federal regulations have incorporated many of them by reference, as have the laws of most States, the ordinances of major cities, and the laws of all the Provinces of Canada." 456 U.S. at 559. In this case, Sanderson has not alleged or argued that the WQA's standards have been incorporated into applicable law so as to impose legal barriers for his products. See also *Consolidated Metal Products, Inc. v. American Petroleum Institute,* 846 F.2d 284, 296 n. 43 (5th Cir.1988) (distinguishing *Hydrolevel* on precisely this basis).

Sanderson points out correctly that *Schachar* was not decided on a motion to dismiss and that his Sherman Act claim is not subject to any heightened pleading standard. *E.g., Hammes v. AAMCO Transmissions, Inc.,* 33 F.3d 774, 778 (7th Cir.1994) (reversing dismissal of antitrust claim). Nevertheless, Rule 8(a) of the Federal Rules of Civil Procedure requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Sanderson's lengthy complaint identifies the alleged conduct in restraint

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 4

Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429
**(Cite as: Not Reported in F.Supp.2d)**

of trade, and it is possible for a party to plead himself out of court. See, *e.g., Hammes,* 33 F.3d at 782.

The Seventh Circuit's opinion in *Schachar* shows as a matter of law that the types of conduct Sanderson has identified simply are not actionable as restraints of trade. His attachment of the conclusory label " restraint of trade" does not entitle him to subject the defendants to the burden and expense of discovery in the hope that he might find evidence to support some other claim.

**\*4** Where it is clear that the conduct alleged is not actionable, the action can and should be dismissed without any need to rely on any heightened pleading standard. See, *e.g., Generac Corp. v. Caterpillar Inc.,* 172 F.3d 971, 976-78 (7th Cir.1999) (affirming dismissal of antitrust claim); *Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994) (same); *BCB Anesthesia Care, Ltd. v. Passavant Memorial Area Hosp. Ass'n,* 36 F.3d 664, 668-69 (7th Cir.1994) (same); *Banks v. NCAA,* 977 F.2d 1081, 1093 (7th Cir.1992) (same); accord, *Foundation for Interior Design Education Research v. Savannah College of Art & Design,* 244 F.3d 521, 531-32 (6th Cir.2001) (affirming dismissal of antitrust claims based on refusal to accredit college's program); *Patel v. American Bd. of Psychiatry & Neurology, Inc.,* No. 89 C 1751, 1989 WL 152816, at \*3 (N.D.Ill. Nov. 21, 1989) (granting motion to dismiss in antitrust case based on refusal to accredit psychiatrist).

### B. *Denial of the "Gold Seal"*

Sanderson also alleges that defendants and others established something called the "Gold Seal Program," urging customers (and urging Better Business Bureaus to urge customers) to purchase water purification products only if the products have the WQA "Gold Seal" of approval. The WQA did not have any protocol for granting a "Gold Seal" to magnetic water treatment, so Sanderson could not obtain a "Gold Seal." There is no allegation that anyone was coerced to buy only "Gold Seal" products.

The allegations about the "Gold Seal Program" fail to state an antitrust claim for essentially the same reasons that Sanderson's allegations about competitor criticism failed. Again in *Schachar,* the Seventh Circuit addressed an essentially identical question:

*Consolidated Metal Products, Inc. v. American Petroleum Institute,* 846 F.2d 284 (5th Cir.1988), holds that when a trade association provides information (there, *gives a seal of approval* ) but does not constrain others to follow its recommendations, it does not violate the antitrust laws. See also *Clamp All Corp. v. Cast Iron Soil Pipe Institute,* 851 F.2d 478, 486-89 (1st Cir.1988). *We agree.* An organization's towering reputation does not reduce its freedom to speak out. Speech informed, hence affected, demand for radial keratotomy, but the plaintiffs had no entitlement to consumers' favor. The Academy's declaration affected only the demand side of the market, and then only by appealing to consumers' (and third-party payors') better judgment. If such statements should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech-the marketplace of ideas.

870 F.2d at 399-400 (emphasis added); accord, *Greater Rockford Energy,* 998 F.2d at 396-97 (affirming summary judgment for defendants: "the failure of a private, standard-setting body to certify a product is not, by itself, a violation of § 1").

**\*5** The Supreme Court's decision in *Hydrolevel* does not help Sanderson on this score because there is no allegation or indication that the standards of the Gold Seal program were incorporated into applicable law. See 456 U.S. at 559; *Consolidated Metal Products,* 846 F.2d at 296 n. 43 (distinguishing *Hydrolevel* on this basis). Sanderson was free to develop and use other means to reassure customers about the quality and efficacy of his products, such as publicizing the independent research he relies upon here. See *Consolidated Metal Products,* 846 F.2d at 296. The Sherman Act does not offer him relief on this theory.

### C. *Lack of Access to WQA Shows*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 5

Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429
**(Cite as: Not Reported in F.Supp.2d)**

Sanderson also alleges he was barred from displaying his products and processes at WQA trade shows. Unless Sanderson can meet the heavy burden of showing that such access is an "essential facility" in the industry, this allegation fails to establish an actionable restraint of trade.

The essential facility doctrine arose from a case involving a facility that was physically essential-access by railroads to limited facilities for crossing the Mississippi River at St. Louis, which new competitors could not duplicated. See *United States v. Terminal Railroad Ass'n of St. Louis,* 224 U.S. 383, 396-97 (1912). Although the concept has been broadened over the years, the courts have taken care to police a line between facilities (and channels of distribution and advertising) that are only helpful or advantageous on one side, and those that are truly essential for competition on the other side. See, *e.g., Paddock Publications, Inc. v. Chicago Tribune Co.,* 103 F.3d 42, 44-45 (7th Cir.1996) (affirming dismissal of "essential facility" claim based on exclusive terms in contracts for use of syndicated newspaper features); *Olympia Equipment Leasing Co. v. Western Union Telephone Co.,* 797 F.2d 370, 376-77 (7th Cir.1986) (defendant's sales force was not an essential facility; plaintiff not entitled to force defendant to allow plaintiff to use its sales force); accord, *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 543-45 (9th Cir.1991) (computerized reservation systems not an essential facility); *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568-69 (2d Cir.1990) (advertising channel not an essential facility).

The allegations in the complaint provide no indication that displays at WQA shows could possibly meet the standard of an essential facility.

### D. *Lobbying for Official Investigations*

Sanderson also alleges that defendants violated Section 1 of the Sherman Act by acting jointly to induce various governmental officials-state attorneys general and the FTC are mentioned-to investigate plaintiff and his products. Defendants invoke the *Noerr-Pennington* doctrine, which

recognizes that the Sherman Act does not make unlawful activity that is protected by the First Amendment right to petition the government for redress of grievances. This is true even if the petitions are motivated by a desire to harm a competitor or otherwise to gain an (unfair) competitive advantage. See *United Mine Workers v. Pennington,* 381 U.S. 657, 669-70 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136-40 (1961); see also *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 379 (1991) ("it is obviously peculiar in a democracy, and perhaps in derogation of the constitutional right 'to petition the Government for a redress of grievances,' U.S. Const., Amdt. 1, to establish a category of lawful state action that citizens are not permitted to urge").

**\*6** Asking government officials to investigate a competitor for possible violations of the law-*i.e.,* asking the executive branch to execute the laws-falls well within the scope of the *Noerr-Pennington* doctrine. Pursuant to *Noerr-Pennington,* "mere solicitation of governmental action with respect to the passage and enforcement of laws" is lawful conduct outside the scope of Sherman Act liability. *Noerr,* 365 U.S. at 138; see also *Pennington,* 381 U.S. at 670 ("*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.").

There is a "sham" exception to the *Noerr-Pennington* doctrine, and Sanderson attempts to rely on that exception to avoid dismissal of these portions of his antitrust claims. The sham exception, however, is narrow, especially outside the context of litigation in courts:
The "sham" exception to *Noerr* encompasses situations in which persons use the governmental *process*-as opposed to the *outcome* of that process-as an anticompetitive weapon. A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay. See *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508 (1972). A "sham" situation involves a defendant whose activities are "not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 6

Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429
**(Cite as: Not Reported in F.Supp.2d)**

genuinely aimed at procuring favorable government action" at all, *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. [492], 500, n. 4 (1988), not one "who 'genuinely seeks to achieve his governmental result, but does so *through improper means,*' " *id.,* at 508, n. 10 (quoting *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.,* 827 F.2d 458, 465, n. 5 (CA9-1987)).

*Omni Outdoor Advertising,* 499 U.S. at 380 (emphasis in original).

The sham exception does not depend on a defendant's alleged motive to harm one competitor in particular or all competition in general. See, *e.g., King v. Idaho Funeral Service Ass'n,* 862 F.2d 744, 745-46 (9th Cir.1988) (affirming summary judgment and award of sanctions in antitrust case; defendants' actions to start official investigation of plaintiffs were protected despite "underlying anticompetitive motives").

Sanderson argues that he is entitled to develop the facts to show that the repeated investigations of his products required him to devote "precious resources to the responses, regardless of the eventual outcome. " Pl. Br. at 11. If allegations or evidence of the plaintiff's own expenses and distractions were enough to establish the sham exception, then the exception would swallow the *Noerr-Pennington* doctrine nearly whole. Sanderson has not alleged facts that would support application of the "sham" exception to the *Noerr-Pennington* doctrine. He does not allege or contend that defendants did not want the investigations to go forward or to succeed.

**\*7** As the Seventh Circuit explained in the gasohol case: "Here, the plaintiffs do not allege that the lobbying efforts were not intended to get legislative results. In fact, the plaintiffs assert that the efforts achieved their desired legislative effect. Hence, these activities are protected and do not violate the Sherman Act." *Greater Rockford Energy,* 998 F.2d at 397 (affirming summary judgment for defendants). Similarly here, Sanderson cannot rely on the sham exception to avoid dismissal of his antitrust claims. See *A & M Records, Inc. v. A.L.W., Ltd.,* 855 F.2d 368, 370-71 (7th Cir.1988) (antitrust allegations based on testifying before and lobbying

Congress failed to state a claim); *Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220, 228-33 (7th Cir.1975) (affirming dismissal of antitrust claim based on *Noerr-Pennington* doctrine); accord, *Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital,* 185 F.3d 154, 158-60 (3d Cir.1999) (same, despite plaintiff's attempt to invoke "sham" exception); *Kottle v. Northwest Kidney Centers,* 146 F.3d 1056, 1063-64 (9th Cir.1998) (same, despite plaintiff's attempt to invoke "sham" exception, and applying heightened pleading standard in light of First Amendment concerns). [FN3]

> FN3. The court also agrees with defendants that Sanderson has failed to allege antitrust injury in this case. See generally *Banks v. NCAA,* 977 F.2d at 1087-89 & n. 9. The court has not relied on defendants' argument that the complaint should be dismissed for failure to allege defendants' market share.

Thus, Sanderson has failed to allege a viable Sherman Act claim under any of the theories he has embraced. The Sherman Act count is dismissed for failure to state a claim upon which relief can be granted.

### IV. *Lanham Act Claim*

Section 43(a) of the Lanham Act provides in relevant part:
(1) Any person who, on or in connection with any goods or services, ... uses in commerce ... any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

\* \* \*

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 7

Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429
**(Cite as: Not Reported in F.Supp.2d)**

by such act.

15 U.S.C. § 1125(a). The language regarding false or misleading statements about another person's goods, services, or commercial activities was enacted in 1988. Since that amendment took effect, this provision of the Lanham Act has become the principal legal vehicle for one competitor to challenge another's advertising as false, misleading, and/or deceptive.

For some reason, Sanderson's First Amended Complaint does not mention the Lanham Act by name but cites it only in the jurisdictional allegations. Nevertheless, defendants anticipated the argument, and Sanderson's brief makes clear that he contends the alleged activities of defendants are actionable under 15 U.S.C. § 1125(a). Because legal labels are not required in pleadings, the argument in the brief to the effect that the complaint's allegations support relief under the Lanham Act is sufficient to present the issue.

**\*8** Defendants argue that the Lanham Act claims should be dismissed for failure to state a claim because Sanderson has failed to identify any specific false or misleading statements in particular advertisements, essentially applying to the Lanham Act claim the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure that requires claims for fraud or mistake to be pled "with particularity." See *Max Daetwyler Corp. v. Input Graphics Inc.,* 608 F.Supp. 1549, 1556 (E.D.Pa.1985) (applying such standard to limit scope of Lanham Act complaint); accord, *In re Century 21-RE/MAX Real Estate Advertising Claims Litigation,* 882 F.Supp. 915, 927 (C.D.Cal.1994) (same); *Barr Laboratories, Inc. v. Quantum Pharmics, Inc.,* 827 F.Supp. 111, 117-18 (E.D.N.Y.1993) (requiring plaintiff to state the content of the alleged misrepresentations, but granting plaintiff leave to replead to specify alleged falsehoods or misrepresentations); *Sanderson v. Spectrum Labs, Inc .,* No. 1:99cv371, slip op. at 8-10 (N.D.Ind. Jan. 12, 2000) (dismissing Sanderson's similar Lanham Act claims against another competitor), *aff'd mem.,* 2000 WL 1909678 (7th Cir. Dec. 29, 2000).

Application of the Rule 9(b) particularity standard to claims of false or deceptive statements about a competitor's products is a reasonable interpretation of the term "fraud" in Rule 9(b), and specification of the allegedly false or misleading communications is important in such cases. Section 43(a) is not so broad as to include "all statements made by one competitor about its or another competitor's product. " *Gillette Co. v. Norelco Consumer Products Co.,* 946 F.Supp. 115, 134 (D.Mass.1996); accord, *Garland Co. v. Ecology Roof Systems Corp.,* 895 F.Supp. 274, 279 (D.Kan.1995) ("[T]his court has found no indication that Congress, through its use of the language 'commercial advertising or promotion,' intended to extend Lanham Act coverage to every isolated alleged misrepresentation made to a potential customer by a business competitor."); *American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.,* 820 F.Supp. 1072, 1078 (N.D.Ill.1993) (refusing to read § 43(a) so broadly so as to "sweep within the ambit of the Act any disparaging comment made in the context of a commercial transaction"). In other words, Section 43(a) did not wholly federalize the common law of commercial slander and libel. In addition, since this complaint's allegations cover more than twenty years, it is necessary to identify specific communications to determine whether the applicable statute of limitations has passed.

Accordingly, plaintiff Sanderson needs to identify in the complaint any specific false or deceptive communications in "commercial advertising or promotion" that he claims are actionable. The First Amended Complaint does not do so. Because Lanham Act claims do not fall squarely within the language of Rule 9(b), however, the court concludes that Sanderson is entitled to an opportunity to identify such communications if he is able to do so. The Lanham Act claims are dismissed without prejudice to repleading within 30 days.

## V. *State Law Claims*

**\*9** Whether the court will exercise supplemental jurisdiction over any state law claims will be decided once a final resolution is reached on the federal claims. Plaintiff suggests that the complaint

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 8

Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429
**(Cite as: Not Reported in F.Supp.2d)**

alleges sufficient damages to invoke the court's diversity jurisdiction. See Pl. Br. at 13. The suggestion misses the mark. The First Amended Complaint identifies plaintiff Sanderson as an Indiana resident (and presumably citizen) and at least two defendants as Indiana citizens. Diversity jurisdiction is not available.

### VI. *Conclusion*

Defendants' motions to dismiss are granted with respect to plaintiff's Sherman Act claims without leave to replead, and granted with respect to plaintiff's Lanham Act claims with leave to replead no later than June 28, 2001, consistent with this entry. The court takes no action at this time on the motions to dismiss as applied to plaintiff's state law claims. Plaintiff's motion for leave to file his second amended complaint is hereby granted. The Second Amended Complaint shall be deemed filed this date, and dismissed this date for the reasons set forth above. Discovery has been stayed pending resolution of the motion to dismiss and the related appeal before the Seventh Circuit in *Sanderson v. Spectrum Labs, Inc.,* 2000 WL 1909678 (7th Cir. Dec. 29, 2000). Plaintiff has moved to resume discovery and to establish a trial date and case management schedule. The motion is denied without prejudice to renewal in the event that plaintiff sufficiently repleads his Lanham Act claims so as to specify the advertising and promotional statements in question.

So ordered.

S.D.Ind.,2001.
Sanderson v. Brugman
Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.