IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GORDON ROY PARKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-229 SLR |
| | ) | |
| LEARN THE SKILLS CORP., *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**OPENING BRIEF OF DEFENDANTS LEARN THE SKILLS CORP., JAY VALENS, RAY LEVANS, PAUL J. ROSS AND STRAIGHTFORWARD, INC. IN SUPPORT OF THEIR AMENDED MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FAILURE TO STATE A CLAIM**

David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766
Attorney for defendants Learn the Skills
Corp., Jay Valens, Ray Levans, Paul J. Ross
and Straightforward, Inc.

Dated: March 16, 2007

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A.     THE PARTIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

B.     FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.     THE COURT SHOULD DISMISS DEFENDANTS JAY VALENS, RAY LEVANS,
       PAUL ROSS AND STRAIGHTFORWARD, INC. DUE TO LACK OF PERSONAL
       JURISDICTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       A.     PARKER HAS NOT ESTABLISHED A BASIS FOR PERSONAL
              JURISDICTION UNDER DELAWARE'S LONG-ARM STATUTE. . . . 9

              1.     Section 3104(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

              2.     Section 3104(c)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       B.     DEFENDANTS HAVE NOT WAIVED THEIR RIGHT TO SEEK
              DISMISSAL FOR LACK OF PERSONAL JURISDICTION.. . . . . . . . 11

       C.     THE COURT SHOULD NOT GRANT JURISDICTIONAL DISCOVERY
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II.    THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A
       CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       A.     ANTITRUST CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

              1.     Parker Has Failed to Allege a Combination or Conspiracy. . . . . . 12

              2.     Parker Has Failed to Allege Restraint of Trade in Violation of Section
                     1 of the Sherman Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                     a.     Tying Agreement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

|   |   | b. | Refusal to Deal/Blacklisting. . . . . . . . . . . . . . . . . . . . . . 16 |

|   |   | c. | Parker's Specific Issues. . . . . . . . . . . . . . . . . . . . . . . . . . 17 |

|   | 2. | Parker Has Failed to Allege Monopolization and Attempted Monopolization Under Section 2 of the Sherman Act. . . . . . . . . 20 |

|   |   | a. | Monopolization. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20 |

|   |   | b. | Attempted Monopolization. . . . . . . . . . . . . . . . . . . . . . . 21 |

| B. | RICO CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21 |

|   | 1. | Parker Lacks Standing to Assert a RICO Claim As He Has Not Suffered a Cognizable Injury Caused by Predicate Acts. . . . . . . . 22 |

|   | 2. | The Amended Complaint Does Not Adequately Allege Two Predicate Acts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 |

|   |   | a. | Hobbs Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24 |

|   |   | b. | Sarbanes-Oxley Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . 25 |

|   | 3. | Parker Has Failed to Allege a RICO Conspiracy. . . . . . . . . . . . . 27 |

| C. | LANHAM ACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28 |

| D. | UNFAIR COMPETITION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32 |

| E. | DEFAMATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32 |

| F. | TORTIOUS INTERFERENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33 |

| G. | CIVIL CONSPIRACY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34 |

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

ii

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories, Inc. v. Teva Pharmaceuticals USA, Inc.*, 432 F.Supp.2d 408 (D. Del. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174 (9th Cir. 2004). . . 8

*Adler v. Berg Harmon Assocs.*, 790 F.Supp. 1222 (S.D.N.Y. 1992). . . . . . . . . . . . . . . . 27

*ADP Investor Communications Services, Inc. v. In House Attorney Services, Inc.,* 390 F.Supp.2d 212 (E.D.N.Y. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Aeroglobal Capital Management, LLC*, 871 A.2d 428 (Del. 2005). . . . . . . . . . . . . . . . 33

*Boone v. Oy Partek Ab*, 724 A.2d 1150 (Del. Super.), *aff'd mem.*, 707 A.2d 765 (Del. 1997), *cert. denied*, 524 U.S. 939 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Borough of West Mifflin v. Lancaster,* 45 F.3d 780 (3d Cir.1995). . . . . . . . . . . . . . . . 32

*Brunson Communications, Inc. v. Arbitron, Inc.*, 238 F.Supp.2d 550 (E.D. Pa. 2002), *recons. denied*, 246 F.Supp.2d 446 (E.D. Pa. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*CCBN.com, Inc. v. Thomson Financial, Inc.*, 270 F.Supp.2d 146 (D. Mass. 2003). . . . . 16

*Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 276 F.Supp.2d 1276 (S.D. Ga. 2003), *aff'd*, 362 F.3d 775 (11th Cir.), *cert. denied*, 543 U.S. 1002 (2004). . . . . . . . . . . . . . . . 21

*Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129 (3rd Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Curtis-Universal, Inc. v. Sheboygan Medical Emergency Services, Inc.*, 43 F.3d 1119 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002), *cert. denied*, 539 U.S. 953 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869 (3rd Cir. 1992). . . . . 28

iii

*Donohue v. Teamsters Local 282, Welfare, Pension, Annuity, Job Training and Vacation and Sick Leave Trust Funds*, 12 F.Supp.2d 273 (E.D.N.Y. 1998). . . . . . . . . . . . . . . . . . . . . . . 23

*Dow Chemical Co. v. Exxon Corp.*, 30 F.Supp.2d 673 (D. Del. 1998). . . . . . . . . . . . . . 22

*Eastern Direct Marketing v. The Coolidge Co.*, No. 90-926, 1992 WL 884482, Winston, J. (Va. Cir. Ct. Feb. 4, 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Gilbert v. El Paso Co.*, C.A. No. 7075, 1988 WL 124325, Jacobs, V.C. (Del. Ch. Nov. 21, 1988), *aff'd*, Del. Supr., 575 A.2d 1131 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Gill v. Delaware Park, LLC*, 294 F.Supp.2d 638 (D. Del. 2003). . . . . . . . . . . . . . . . . . . 12

*Granader v. Public Bank*, 417 F.2d 75 (6th Cir. 1969), *cert. denied*, 397 U.S. 1065 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Green v. America Online (AOL)*, 318 F.3d 465 (3rd Cir), *cert. denied*, 540 U.S. 877 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Grillo v. John Alden Life Ins. Co.,* 939 F.Supp. 685 (D. Minn 1996). . . . . . . . . . . . . . . . 33

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2nd Cir. 1990). . . . . . . . . . . . 27

*HMG/Courtland Properties, Inc. v. Gray*, 729 A.2d 300 (Del. Ch. 1999). . . . . . . . . . . 10

*Hollander v. Flash Dancers Topless Club*, 340 F.Supp.2d 453 (S.D.N.Y. 2000), *aff'd mem.*, 173 Fed. Appx. 15 (2nd Cir.), *cert. denied*, 127 S.Ct. 49 (2006). . . . . . . . . . . . . . . . . . . 22

*ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.,* 147 F.Supp.2d 268 (D. Del. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Imagineering, Inc. v. Kiewit Pacific Co.,* 976 F.2d 1303, (9th Cir. 1992), *cert. denied*, 507 U.S. 1004 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Cascade Intern. Sec. Lit.*, 84 F.Supp. 1558 (S.D. Fla. 1993), *on recons.*, 894 F.Supp. 437 (S.D. Fla. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Intel Corp. v. Broadcom Corp.*, 167 F.Supp.2d 692 (D. Del. 2001). . . . . . . . . . . . . . . . 8

*Joint Stock Society v. Heublein*, 936 F.Supp. 177 (D. Del. 1996). . . . . . . . . . . . . . . . . . 8

*Kalmanovitz v. G. Heilman Brewing Co., Inc.*, 595 F.Supp. 1385 (D. Del. 1984). . . . . . 14

*Maio v. Aetna, Inc.*, 221 F.3d 472 (3rd Cir. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Mar Food Corp. v. Doane*, 405 F.Supp. 730 (N.D. Ill. 1975). . . . . . . . . . . . . . . . . . . . . 19

*Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n*, 107 F.3d 1026 (3d Cir.), *cert. denied*, 522 U.S. 907 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Masson v. New Yorker Magazine, Inc.*, 832 F.Supp. 1350 (N.D. Cal. 1993), *aff'd*, 83 F.3d 1394 (9th Cir. 1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Medtronic Minimed Inc. v. Smiths Medical MD, Inc.*, 371 F.Supp.2d 578 (D. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Moccio v. Cablevision Systems Corp.*, 208 F.Supp.2d 361 (E.D.N.Y.  2002).. . . . . . . . . 15

*Moore v. New York Cotton Exchange*, 270 U.S. 593 (1926). . . . . . . . . . . . . . . . . . . . . . . 16

*National Data Payment Systems, Inc. v. Meridian Bank*, 212 F.3d 849 (3rd Cir. 2000).. 34

*Northwest Wholesale Stationers, Inc. v. Pacific Stationary and Printing Co.*, 472 U.S. 284 (1985).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Oak Distributing Co. v. Miller Brewing Co.*, 370 F.Supp. 889 (E.D. Mich. 1973).. . . . . 19

*Parker v. Doe*, C.A. No. 02-CV-7215, 2003 WL 21294962, Kelly, J. (E.D. Pa. Jan. 21, 2003), *recons. denied*, 2003 WL 21294971, Kelly, J. (E.D. Pa. Feb. 10, 2003), *and action dismissed*, C.A. No. 02-CV-7215, Kelly, J. (Feb. 25, 2003) (ORDER). . . . . . . . . . . . . . . 5

*Parker v. Google, Inc.*, C.A. No. 04-CV-3918, 2006 WL 680916, Surrick, J. (E.D. Pa. March 10, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Parker v. Learn the Skills Corp., et al.*, C.A. No. 05-2752, 2006 WL 759693, Bartle, J. (E.D. Pa. March 23, 2006), *aff'd*, 2007 WL 625635 (3rd Cir. March 2, 2007).. . . . . . . . . . . . . . 5

*Parker v. University of Pennsylvania*, 128 Fed. Appx. 994 (3rd Cir.), *cert. denied,* 126 S.Ct. 755 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Peerless Heater Co. v. Mestek, Inc.*, C.A. No. 98-CV-6532, 2000 WL 637082, Padova, J. (E.D. Pa. May 11, 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Pizza Hut, Inc. v. Papa John's Intern., Inc.*, 227 F.3d 489 (5th Cir. 2000), *cert. denied*, 532 U.S. 920 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Price v. Pinnacle Brands, Inc.*, 138 F.3d 602 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . 23

*Ramunno v. Cawley*, 705 A.2d 1029 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Rose v. Bartle,* 871 F.2d 331 (3d Cir.1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Sable v. Southmark/Envicon Capital Corp.*, 819 F.Supp. 324 (S.D.N.Y. 1993). . . . . . . 25

*Sanderson v. Brugman*. No. IP00-459-C-H/G, 2001 WL 699876, Hamilton, J. (S.D. Ind. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Satellite Fin. Planning Corp. v. First National Bank of Wilmington*, 633 F.Supp. 386 (D. Del. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Schachar v. American Academy of Opthalmology, Inc.*, 870 F.2d 397 (7th Cir. 1989). . 18

*Scheidler v. Nat'l Organization for Women*, 537 U.S. 393 (2003). . . . . . . . . . . . . . . . . 24

*Scheidler v. Nat'l Organization for Women*, 547 U.S. 9 (2006). . . . . . . . . . . . . . . . . . . 24

*Sebago, Inc. v. Beazer East, Inc.*, 18 F.Supp.2d 70 (D. Mass 1998). . . . . . . . . . . . . . . . 25

*Stewart v. Associates Consumer Discount Co.*, 1 F.Supp.2d 469 (E.D. Pa. 1998). . . . . . 27

*Strong v. U.S.*, 361 U.S. 212 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043 (Del. Super. 2001). . . . . . . . . . 32

*Town Sound and Custom Tops, Inc. v. Chrysler Motor Corp.*, 743 F.Supp. 353 (E.D. Pa. 1990), *aff'd in part, rev'd in part on other grounds*, 959 F.2d 468 (3rd Cir.), *cert. denied*, 506 U.S. 868 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*TriStrata Technology , Inc. v. Neoteric Cosmetics, Inc.*, 961 F.Supp. 686 (D. Del. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566 (2nd Cir. 1990). . . . 18

*U.S. v. Dentsply Intern., Inc.*, 399 F.3d 181 (3rd Cir. 2005), *cert. denied*, 126 S.Ct. 1023 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*U.S. v. Du Bo*, 186 F.3d 1177 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. E. I. DuPont de Nemours & Co.*, 351 U.S. 377 (1956). . . . . . . . . . . . . 20

vi

## <u>Other authorities</u>

10 *Del. C.* §3104(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

10 *Del. C.* §3104(c)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

15 U.S.C. §1125(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

18 U.S.C §1962(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. §1513(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. §1951.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Civ. P. 12.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Civ. P. 8(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## NATURE AND STAGE OF THE PROCEEDINGS

On December 30, 2003, plaintiff Gordon Roy Parker ("Parker") filed suit against Learn The Skills Corp. ("LTSC"), formhandle@fastseduction.com, Thom E. Geiger, Osgaldor Storm and 100 "John Doe" defendants in the United States District Court for the Eastern District of Pennsylvania in Civil Action #2:03-cv-06936-JK, alleging claims of libel, trade libel, invasion of privacy, copyright infringement, state-law unfair competition, unjust enrichment, tortious interference and civil conspiracy and federal Lanham Act and RICO claims. Parker filed an amended complaint on February 27, 2004. The District Court dismissed that Complaint without prejudice on October 25, 2004, for failure to comply with Federal Rule of Civil Procedure 8(a).

Parker filed a Second Amended Complaint on November 26, 2004. On December 3, 2004, the District Court issued an Order dismissing the Second Amended Complaint, again for failing to satisfy Rule 8(a).

On June 9, 2005, Mr. Parker filed a new action, No. 2:05-02752-HB, in the U.S. District Court for the Eastern District of Pennsylvania against the University of Pennsylvania, Matthew S. Wolf, Esq., LTSC, formhandle@fastseduction.com, Thom E. Geiger and Paul J. Ross ("Ross") (the "Pennsylvania Action"). Parker filed an amended complaint in the Pennsylvania Action on October 24, 2006. On March 23, 2006, the District Court granted the motions to dismiss of LTSC and Mr. Ross for lack of personal jurisdiction, and the motions of the University of Pennsylvania and Mr. Wolf for failure to state a claim upon which relief may be granted. The District Court also denied Parker's motion to engage in jurisdictional discovery.

1

On April 3, 2006, Parker filed a motion for reconsideration.  On April 7, 2006, Parker filed an appeal to the United States Court of Appeal for the Third Circuit.  On that same day,  Parker filed a 48-page Complaint in this Court against LTSC, formhandle@fastseduction.com,  tokyoPUA@fastseduction.com,  Straightforward,  Inc. ("Straightforward") and Ross, asserting similar claims of violations of the Lanham Act, the Sherman Antitrust Act, the Clayton Act, RICO and state-law claims of defamation, tortious interference and civil conspiracy, all arising from the same nucleus of operative facts as the present action (the "Delaware Action").

On April 28, 2006, defendants LTSC, Straightforward and Ross filed a Motion to Stay or Dismiss in the Delaware Action, seeking to stay the Delaware Action pending a resolution of the appeal in the Pennsylvania Action, and to dismiss for lack of personal jurisdiction and for failure to state a claim. (D.I. 7)

On July 12, 2006, Parker filed a Motion to Vacate and to Supplement the Record in the Pennsylvania Action.

On July 31, 2006,  Parker filed a 72-page Amended Complaint in the Delaware Action, adding several more defendants, including identifying "Jay Valens" as defendant formhandle@fastseduction.com, and "Ray Devan" as tokyopua@fastseduction.com.[1] (D.I. 11). On August 8, 2006,  LTSC, Straightforward and Ross filed an Amended Motion to Stay and Dismiss to respond to the Amended Complaint

---

[1]

"Jay Valens" and "Ray Devans," however, are pseudonyms.  Parker refers to "Ray Devans" in the caption, but "Ray Levans" in the body of the Amended Complaint.  He shall be referred to as "Ray Levans" herein.

2

On August 2, 2006, the District Court in the Pennsylvania Action issued a Memorandum and Order denying Mr. Parker's Motion for Reconsideration and his Motion to Vacate Judgment. On August 11, 2006, Mr. Parker filed an Amended Notice of Appeal, appealing the denial of those motions.

On August 14, 2006, Mr. Parker filed a Motion for Reconsideration of the Order Denying the Motion to Vacate. That motion was denied on August 31, 2006. On September 20, 2006, Mr. Parker filed a Second Amended Notice of Appeal, adding to the appear the denial of the Motion for Reconsideration of the Denial of the Motion to Vacate Judgment.

On March 2, 2007, the Third Circuit affirmed the decisions of the U.S. District Court for the Eastern District of Pennsylvania. Defendants notified the Court of that fact by letter dated March 5, 2007, and indicated that they would file their opening brief in support of their motion to dismiss on the grounds of lack of personal jurisdiction and failure to state a claim on or by March 16, 2007. This is that opening brief.

## SUMMARY OF ARGUMENT

1.      There is no basis for personal jurisdiction over defendants Jay Valens, Ray Levans, Paul J. Ross and Straightforward under Delaware's Long Arm statute, as there are no allegations of any conduct in Delaware from which plaintiff's claims arise so as to justify specific jurisdiction, and there are no allegations of continuous and substantial activity in Delaware to justify general jurisdiction.

2.      The Amended Complaint fails to state an antitrust claim as there are no non-conclusory allegations of a combination or conspiracy, or of market power, and plaintiff does not allege the elements of a cause of action for illegal tying, refusal to deal, monopolization or attempted monopolization.  Additionally,  the alleged challenged activity does not suggest illegal anticompetitive conduct as it does not create any barriers to entry or in any way impede competition.

3.      The Amended Complaint fails to state a RICO claim as it fails to identify a cognizable RICO injury, fails to allege valid predicate acts, and fails to allege a RICO conspiracy.

4.      The Amended Complaint fails to state a claim for false advertising under the Lanham Act, as the allegations do not involve false statements of fact relating to goods or services which would be likely to deceive consumers in their purchasing decisions.

5.      Upon dismissal of the federal causes of action, the Court should dismiss the state law claims, which in any event fail to state a claim for the same reasons that the federal claims fail.

<u>STATEMENT OF FACTS</u>

A.    <u>THE PARTIES.</u>[2]

Parker, a resident of Pennsylvania (Am. Compl. ¶1), has been described as a "serial

litigant."[3] Parker also goes by the name "Ray Gordon," and does business under the name

"Snodgrass Publishing Group." (*Id.*).

LTSC is a Delaware corporation.  (Am. Compl. ¶2).

Jay Valens is alleged to be an owner, officer or director of LTSC. (Am. Compl. ¶¶3,

15).  The Complaint does not allege that Valens is a resident of Delaware.

Ray Levans is alleged to be an officer, director, or agent of LTSC.  (Am. Compl. ¶¶4,

15).   The Complaint does not allege that Levans is a resident of Delaware.

---

[2]

Mystery Method Corporation, Erik von Markovic, Allen Reyes and Miguel Anthony
Marcos are also named as defendants, but are not parties to the present motion to dismiss.

[3]

*Parker v. Learn the Skills Corp., et al.,* C.A. No. 05-2752, 2006 WL 759693, WL Op.
at *4, Bartle, J. (E.D. Pa. March 23, 2006), *aff'd*, 2007 WL 625635 (3rd Cir. March 2, 2007).
In addition to suing the present defendants, Parker has also filed unsuccessful *pro se* actions
against Google, Inc., *Parker v. Google, Inc.*, C.A. No. 04-CV-3918, 2006 WL 680916,
Surrick, J. (E.D. Pa. March 10, 2006) (dismissing copyright infringement claim), the
University of Pennsylvania, *Parker v. University of Pennsylvania*, 128 Fed. Appx. 994 (3rd
Cir.), *cert. denied,* 126 S.Ct. 755 (2005) (affirming entry of summary judgment against
Parker on Title VII and ADA claims), and assorted John Does, *Parker v. Doe*, C.A. No. 02-
CV-7215, 2003 WL 21294962, Kelly, J. (E.D. Pa. Jan. 21, 2003), *recons. denied*, 2003 WL
21294971, Kelly, J. (E.D. Pa. Feb. 10, 2003), *and action dismissed*, C.A. No. 02-CV-7215,
Kelly, J. (Feb. 25, 2003) (ORDER).  Additionally, a review of Philadelphia court records
reveals two actions filed by Parker in state court.  "Federal courts may take judicial notice
of proceedings in other courts of record." *Granader v. Public Bank*, 417 F.2d 75, 82-83 (6th
Cir. 1969) (citing cases), *cert. denied*, 397 U.S. 1065 (1970).

Straightforward is listed in the caption of the case as being located in Van Alstyne, Texas. The amended complaint does not identify Straightforward as being incorporated in Delaware.

Ross is listed in the caption of the case as residing in California.

LTSC. Straightforward and Messrs. Ross, Levans and Valens are referred to collectively herein as the "Defendants."

## B.    FACTUAL BACKGROUND.

Parker and the defendants are all in the "seduction" business, that is, they all market products designed to educate men in the art of seducing women. (Am. Compl. ¶21). According to Parker, there are now hundreds of seduction "gurus" marketing products and services to a customer base "well into the millions." (Am. Compl. ¶27). Parker further alleges there is a "never ending stream" of new "gurus" continuously entering the market. (Am. Comp. ¶25).

Much of the marketing of these products and services is done via the Internet. Specifically, the parties post messages on USENET, a sort of electronic bulletin board which distributes messages to subscribers. (Am. Compl. ¶22). Additionally, seduction "gurus" market their products and services via their individual websites and blogs. (Am. Compl. ¶27).

Parker complains of the following activities of the defendants:

1.    The defendants posted derisive, critical and hostile comments about Parker on USENET (Am. Compl. ¶33);

6

2.     The defendants instructed USENET readers how to use software called "killfile," which allows users to avoid messages according to certain selected criteria, in this case, messages from Parker (Am. Compl. ¶34);

3.     The defendants invited USENET readers interested in seduction to visit LTSC's own private online message boards (Am. Compl. ¶¶35, 67);

4.     Ross, allegedly on behalf of the defendants, set up a "hate website" disparaging Parker (Am. Compl. ¶36);

5.     LTSC restricts advertising on its privately-owned web site to only those advertisers approved by it and who agree to its terms (Am. Compl. ¶¶69, 122); and

6.     The defendants created city-based chapters which market their products and agree to refuse to deal with anyone not approved by the defendants, specifically Parker. (Am. Compl. ¶¶71-75).  Parker adds that these chapters have since disbanded, although Parker alleges that the defendants "maintain[] a strong level of influence and control over them to this day." (Am. Compl. ¶75).

7

<u>**ARGUMENT**</u>

**I.    THE COURT SHOULD DISMISS DEFENDANTS JAY VALENS, RAY
       LEVANS, PAUL ROSS AND STRAIGHTFORWARD, INC. DUE TO LACK
       OF PERSONAL JURISDICTION.[4]**

Parker relies exclusively on Delaware's Long-Arm statute as his basis for jurisdiction.
(Am. Compl. ¶¶12-15).  Parker has not alleged that any defendant (other than LTSC) is a
Delaware citizen or entity.  The burden is on Parker to allege facts sufficient to make a *prima
facie* showing that personal jurisdiction may be exercised over the non-resident defendants.
*ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.,* 147 F.Supp.2d 268, 270-71 (D.
Del. 2001).  To meet this burden, Parker  must allege facts which "'establish with reasonable
particularity'" that jurisdiction over the defendants exists.  *Id.* (quoting *Joint Stock Society
v. Heublein*, 936 F.Supp. 177, 193 (D. Del. 1996)).

As Parker has asserted several different causes of action, he is obligated to establish
an independent basis for jurisdiction as to each individual claim.  *Intel Corp. v. Broadcom
Corp*., 167 F.Supp.2d 692, 704 (D. Del. 2001); *Action Embroidery Corp. v. Atlantic
Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004); *ADP Investor Communications
Services, Inc. v. In House Attorney Services, Inc.,* 390 F.Supp.2d 212, 217 (E.D.N.Y. 2005).

As demonstrated below, he cannot.

---

[4]    As LTSC is a Delaware corporation, LTSC concedes that this Court has personal
jurisdiction over it, without regard to the Long Arm statute.

8

A.    **PARKER HAS NOT ESTABLISHED A BASIS FOR PERSONAL JURISDICTION UNDER DELAWARE'S LONG-ARM STATUTE.**

1.    **Section 3104(c)(2).**

First, as to defendants Straightforward and Ross, Parker relies on 10 *Del. C.* §3104(c)(2), which provides for personal jurisdiction where a non-resident "[c]ontracts to supply services or things in this state." This is a "specific jurisdiction" provision, meaning that the cause of action must arise from the alleged jurisdictional contact with Delaware. *Boone v. Oy Partek Ab*, 724 A.2d 1150, 1155 (Del. Super.), *aff'd mem.*, 707 A.2d 765 (Del. 1997), *cert. denied*, 524 U.S. 939 (1998).

Parker does not allege that Straightforward provides any services or things in Delaware. As to Ross, Parker alleges that Ross "provides a one-hour telephone consultation to purchasers of the Speed Seduction Advanced Home Study Course, including those in Delaware...." (Am. Compl. ¶14). Parker, however, carefully avoids stating affirmatively that Ross has ever actually provided a telephone consultation to anyone in Delaware.

Even assuming that Ross provided such a telephone consultation to someone in Delaware, and even if one were to assume, in the absence of any such assertion, that Straightforward contracted to supply services or things in Delaware, there is no nexus between such conduct and the causes of action. Parker's complaint goes toward the defendants' marketing techniques, none of which are alleged to have been created or enacted in or from Delaware. There is no allegation suggesting any wrongdoing in connection with the purported supplying of services or things in Delaware. As such, the Court may not use any imagined contract for supplying services or things in Delaware as the basis for antitrust,

9

RICO, Lanham Act or any other claim that does not arise from either the act of contracting or the supplying of services or things in Delaware pursuant to such contract.

### 2.   Section 3104(c)(4).

Under 10 *Del. C.* §3104(c)(4), the Court may exercise jurisdiction over a non-resident where the non-resident "[c]auses tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State." This section requires a showing that the defendants are engaged in substantial and continuous activity in Delaware. *HMG/Courtland Properties, Inc. v. Gray*, 729 A.2d 300, 310 (Del. Ch. 1999).

Parker simply lifts the language from the statute and places it in his Amended Complaint. (Am. Compl. ¶¶13-15). He does not affirmatively assert any facts which would support his conclusory allegation, and so does not provide a basis for the exercise of personal jurisdiction pursuant to 10 *Del. C.* §3104(c)(4). *Eastern Direct Marketing v. The Coolidge Co.*, No. 90-926, 1992 WL 884482, WL Op. at *1, Winston, J. (Va. Cir. Ct. Feb. 4, 1992).[5]

---

[5]

Parker appears to seek to assert personal jurisdiction over Messs. Valens and Levans on the theory that, as directors or officers of LTSC, they allegedly derive "substantial revenue from the use of products and services that are sold to residents of Delaware, for use and consumption in the state." (Am. Compl. ¶15). Apart from the fact that Parker does not allege that any products or services were sold or used in Delaware, to the extent that he is seeking to assert jurisdiction over Valens and Levans as a result of products allegedly sold by LTSC, that is not a proper jurisdictional connection. Personal jurisdiction over Valens and Levans must be determined by their individual conduct, and not by conduct of LTSC. *See TriStrata Technology , Inc. v. Neoteric Cosmetics, Inc.*, 961 F.Supp. 686, 691 (D. Del. 1997).

10

**B.     DEFENDANTS HAVE NOT WAIVED THEIR RIGHT TO SEEK DISMISSAL FOR LACK OF PERSONAL JURISDICTION.**

Parker suggests that Defendants have waived their defense and submitted to the personal jurisdiction of the Court by filing a motion to stay.  (Am. Compl. ¶¶13-15). Defendants, however, coupled their motion to stay with a motion to dismiss for lack of personal jurisdiction (and failure to state a claim). (D.I. 6, 12, 23).  In so doing, Defendants preserved their right to assert the defense of lack of personal jurisdiction.  Fed. R. Civ. P. 12(g, h).

**C.     THE COURT SHOULD NOT GRANT JURISDICTIONAL DISCOVERY.**

In the Pennsylvania Action, Parker requested jurisdictional discovery, and defendants expect that he will make the same request here.  In the Pennsylvania Action, the District Court denied the request, and that denial was specifically affirmed by the Third Circuit.  This Court should also deny any such request.

Parker has not alleged any specific facts which justify the expense and inconvenience of jurisdictional discovery.  Indeed, mere conclusory and speculative assertions and quotation of language from the Long Arm statute are inadequate to warrant such discovery. *Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n,* 107 F.3d 1026, 1042 (3d Cir.), *cert. denied*, 522 U.S. 907 (1997); *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 402-03 (4th Cir. 2003).

11

## II.     THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

### A.     ANTITRUST CLAIMS.

A party claiming an antitrust violation must allege sufficient facts to state each element of an antitrust offense.  Conclusory allegations that the Defendants violated the antitrust laws and that Parker was injured thereby will not survive a motion to dismiss if not supported by facts constituting a legitimate claim for relief.  *Satellite Fin. Planning Corp. v. First National Bank of Wilmington*, 633 F.Supp. 386, 394 (D. Del. 1986).

As demonstrated below, Parker's Amended Complaint, verbose as it is, nonetheless fails to allege crucial facts necessary to state a valid antitrust claim, and so Counts I and II of the Amended Complaint should be dismissed.

### 1.     Parker Has Failed to Allege a Combination or Conspiracy.

In order to state a valid antitrust claim, Parker must allege a combination or conspiracy.  *Gill v. Delaware Park, LLC*, 294 F.Supp.2d 638, 643 (D. Del. 2003).

Throughout his Amended Complaint, Parker makes repeated conclusory assertions of conspiracy, in attempt to manufacture a combination or conspiracy amongst and between

12

the Defendants themselves, and with others..[6]  However, to sustain a claim of conspiracy,

more than these conclusory assertions of conspiracy is required.  As this Court has stated:

> It is a longstanding rule in the Third Circuit that a mere
> general allegation of conspiracy is insufficient.  A general
> averment of conspiracy or collusion without alleging the facts
> which constituted such conspiracy or collusion is a conclusion
> of law and is insufficient. As has been noted: Generally,
> fraud, conspiracy and collusion must be charged by
> allegations of fact; and general allegations of fraud, fraudulent
> intent, and conspiracy or collusion, without a statement of
> supporting facts, are conclusions of law and are insufficient.
> The plaintiffs must plead with particularity the
> "circumstances" of the alleged wrongdoing in order to place
> the defendants on notice of the precise misconduct with which
> they are charged.  Only allegations of conspiracy which are
> particularized, such as those addressing the period of the
> conspiracy, the object of the conspiracy, and certain actions

---

[6]
    Am. Compl. ¶¶ 17 (defendant Marcos acted "in conspiracy with all Defendants..."),
32 (Ross acted "in agreement and conspiracy with defendants Straightforward, von
Markovic, Mystery Method, Valens, LTSC, and [D]evans"), 36 (Ross "on behalf of the entire
Seduction Mafia or Cartel...acted in conspiracy with Thom E. Geiger...and potentially other
operatives..."), 40 (identifying individuals who "were acting at the direction of and/or in
conspiracy with Defendant Ross, and by extension, the entire Seduction Mafia"), 43 "[t]he
postings by all the operatives listed above were made in conspiracy with Defendant Ross and
the entire Seduction Mafia and Cartel, with their full knowledge and approval..."), 67
(LTSC/Valens/Levans acted "in conspiracy and agreement with Defendant Ross (and by
extension, Defendant Straightforward)..."), 78 (von Markovoc acted "in conspiracy with
Defendants Valens, LTSC, Levans, Ross, and Straightforward..."), 103 (referring to a
"general conspiracy"), 110 (Reyes acted "in full conspiracy with the Seduction Mafia and
Cartel"), 110 ("in full conspiracy with the Seduction Mafia and Cartel..."), 136 (the RayFAQ
"was created in full conspiracy by Defendants Ross, Straightforward, LTSC, Valens, von
Markovic, Mystery Method, and Levans"), 142 (Thrasher acted "in conspiracy with the
Seduction Cartel and Mafia principals"), 154 ("[a]ll Seduction Cartel members named in this
count are either principals or operatives of the Seduction Mafia, or have acted in conspiracy
with same"), 158(a, c) (postings by "Editorial Staff" were "in conspiracy with the Seduction
Mafia and Cartel..."), 185 (Valens acted "in conspiracy with the Seduction Cartel..."), 187
(von Markovic acted "in conspiracy with the Seduction Cartel..."), 193 (action was taken "in
conspiracy among all Defendants...").

> of the alleged conspirators taken to achieve that purpose, will
> be deemed sufficient.

*Kalmanovitz v. G. Heilman Brewing Co., Inc.*, 595 F.Supp. 1385, 1400-01 (D. Del. 1984) (citations omitted).

In the antitrust context, general allegations of conspiracy without a statement of the facts is an allegation of a legal conclusion and insufficient of itself to establish a cause of action. Accordingly, only allegations of conspiracy which are particularized will be deemed sufficient. *Brunson Communications, Inc. v. Arbitron, Inc.*, 238 F.Supp.2d 550, 559 (E.D. Pa. 2002), *recons. denied*, 246 F.Supp.2d 446 (E.D. Pa. 2003).

Parker's allegations do not satisfy the requirements for alleging conspiracy, and so should be deemed inadequate for establishing an antitrust claim.

**2.    Parker Has Failed to Allege Restraint of Trade in Violation of Section 1 of the Sherman Act.**

**a.    Tying Agreement.**[7]

Parker claims that the defendants are engaged in an illegal "tying" arrangement because LTSC, on its privately-owned website, has a policy to avoid "spam"[8], but allows advertising from among their own group of approved advertisers, at LTSC's discretion.

---

[7]
    Parker claims that the alleged tying agreement violates Section 3 of the Clayton Act as well as Section 1 of the Sherman Act. (Am. Compl. ¶143). The elements of the cause of action remain the same under either statute. *Town Sound and Custom Tops, Inc. v. Chrysler Motor Corp.*, 743 F.Supp. 353, 361 (E.D. Pa. 1990), *aff'd in part, rev'd in part on other grounds*, 959 F.2d 468 (3rd Cir.), *cert. denied*, 506 U.S. 868 (1992).

[8]
    "Spam" generally refers to unsolicited bulk commercial messages sent electronically. *See Green v. America Online (AOL)*, 318 F.3d 465, 470 (3rd Cir.), *cert. denied*, 540 U.S. 877 (2005)..

(Am. Compl ¶¶97, 99, 120). Apart from the fact that it makes no sense, this arrangement is not "tying" under the antitrust laws.

To state a *prima facie* tying claim, Parker must allege: (1) two separate and distinct products (meaning that there is sufficient demand for each product individually that manufacturers can efficiently provide both independently) ; (2) actual coercion by the seller that forces the buyer to take the tied product; (3) seller's market power in the tying product or the ability to force the buyer to take the tied product; (4) anti-competitive effects in the tied product market; and (5) more than an insubstantial amount of interstate commerce affected by the tying arrangement in the tied product market. *Moccio v. Cablevision Systems Corp.*, 208 F.Supp.2d 361, 374 & n. 10 (E.D.N.Y. 2002). *Accord Medtronic Minimed Inc. v. Smiths Medical MD, Inc.*, 371 F.Supp.2d 578, 585 (D. Del. 2005) ("[a] 'tying arrangement' is unlawful where (1) the scheme in question involves two distinct items and provides that one (the tying product) may not be obtained unless the other (the tied product) is also purchased ...; (2) the tying product possesses sufficient economic power to appreciably restrain competition in the tied product market ...; and (3) a 'not insubstantial' amount of commerce, must be affected by the arrangement," *quoting Mitel Corp. v. A & A Connections*, 1998 WL 136529, WL Op. at *5 (E.D.Pa. Mar. 20, 1998)).

Parker utterly fails to allege the elements of an unlawful tying arrangement. First, he fails to allege that any of the defendants have conditioned the sale of one product or service upon the sale of another product or service. *Id.* Second, he has not alleged any coercive conduct that forced any consumer to purchase any "tied" product (whatever it may be).

15

Parker makes no effort to identify LTSC's market power or share in the Amended Complaint. Absent specific facts setting forth the percentage of the market the defendants control, or showing that the defendants have the ability to control prices or exclude competition, Parker's conclusory statement is inadequate to withstand a motion to dismiss. "More must be alleged to satisfy the market power element of a § 1 claim than the mere assertion that such power exists." *CCBN.com, Inc. v. Thomson Financial, Inc.*, 270 F.Supp.2d 146, 155-56 (D. Mass. 2003).

Fourth, Parker has not alleged any facts demonstrating that the alleged wrongful conduct has had any anti-competitive effects in the market, beyond inadequate conclusory assertions. *Id.* Fifth and finally, Parker has not alleged facts demonstrating a more than insubstantial effect on interstate commerce.

In short, Parker has not come close to alleging a viable claim of illegal tying, and so this claim must be dismissed.

### b.    Refusal to Deal/Blacklisting.

In the absence of any purpose to create or maintain a monopoly, the Sherman Act does not restrict the right of the owner of a business to exercise freely his or her own independent discretion as to the parties with whom he or she will deal. *Moore v. New York Cotton Exchange*, 270 U.S. 593, 606 (1926). "The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive." *Northwest Wholesale Stationers, Inc. v. Pacific Stationary and Printing Co.*, 472 U.S. 284, 298 (1985).

16

In order for a refusal to deal to violate the Sherman Act, there must be monopoly power (*i.e.*, the power to control prices or exclude competition), and the exclusionary conduct must have an anti-competitive effect. *U.S. v. Dentsply Intern., Inc.*, 339 F.3d 181, 187 (3rd Cir. 2005), *cert. denied*, 126 S.Ct. 1023 (2006)..

As noted previously, Parker has not alleged any facts supporting the inference that the defendants have market or monopoly power.

Moreover, dismissal is warranted as there is no assertion of fact justifying the conclusion that the refusal to deal with Parker will result in any anti-competitive effect in the market. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 212-13 (4th Cir. 2002), *cert. denied*, 539 U.S. 953 (2003).

### c.    Parker's Specific Issues.

Parker has alleged several actions which he claims run afoul of the antitrust laws. A review of those actions demonstrate that Parker is simply upset because he is disliked and disparaged, and seeks to wreak vengeance through the legal system. Even putting aside the failure to allege any monopoly power, it is evident on the face of things that the challenged actions do not restrict competition and do not create barriers to competition. Indeed, Parker concedes that there are "hundreds" of individuals marketing similar products and services. (Am. Compl. ¶27). There is no allegation that any of these hundreds of others is in any way affected by the defendants' conduct. Thus, it appears that competition in this market is robust and unrestricted.

First, Parker complains of LTSC maintaining its own website, and choosing those who may advertise on that site (and excluding Parker therefrom). But Parker does not allege

17

that he or anyone else is restricted from maintaining a competing website, or identify any facts showing that access to LTSC's website constitutes a competitive necessity.[9]  *See Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568-69 (2nd Cir. 1990) (not an antitrust violation to deny a competitor the right to advertise in the defendant's magazine, in the absence of any evidence that such denial would inflict a sever handicap on potential or current market entrants or that there is no feasible alternative, even though defendant had monopoly power).

There is no allegation that LTSC's website is an essential facility for the advertising to reach the seduction market, or that Parker's own website is not a feasible alternative for marketing his goods and services.  As such, this activity does not provide the basis for an antitrust claim.

Parker also complains that the defendants have disparaged him on USENET and on websites.  The defendants' promotion of their own products and criticism of Parker and his products does not constitute illegitimate business conduct.  "Warfare among suppliers and their different products *is* competition. Antitrust law does not compel your competitor to praise your product or sponsor your work. To require cooperation or friendliness among rivals is to undercut the intellectual foundations of antitrust law."  *Schachar v. American Academy of Opthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989) (italics in original).  Accordingly, criticism, even joint criticism, does not constitute unlawful antitrust conduct.

---

[9]

Indeed, Parker does maintain his own website, where he sells his "seduction" books (along with other products), has his own sponsors, and provides his own electronic message boards. http://www.cybersheet.com/hotties.html. (Am. Compl. ¶1).

*Sanderson v. Brugman*. No. IP00-459-C-H/G, 2001 WL 699876, WL Op. at *3, Hamilton, J. (S.D. Ind. 2001); *Mar Food Corp. v. Doane*, 405 F.Supp. 730 (N.D. Ill. 1975) (business disparagement is not a basis for an antitrust claim); *Oak Distributing Co. v. Miller Brewing Co.*, 370 F.Supp. 889, 898 (E.D. Mich. 1973) (same). This is particularly so in the absence of any factual allegations indicating market power or that the disparagement had any effect on competition.

Parker's next complaint is that the defendants posted information on USENET advising readers of how to utilize certain software called KillFile to preclude Parker's postings from reaching them. However, use of such software is entirely voluntary by the readers (and could equally be used to filter our the defendants' postings). There is no allegation that the defendants coerced any USENET reader to use the KillFile program, and Parker certainly has no right to force readers to read his postings. As such, educating, and even encouraging, USENET readers to avoid Parker's postings is not exclusionary (as it does not preclude Parker from marketing).

Finally, Parker complains of the creation of marketing chapters in various cities, which Parker alleges no longer exist. There is no allegation that these chapters created any barriers to entry or marketing of competing products, and in any even the point is moot as Parker concedes that the chapters no longer exist.

19

2.    **Parker Has Failed to Allege Monopolization and Attempted Monopolization Under Section 2 of the Sherman Act.**

a.    **Monopolization.**

To state a claim for monopolization, Parker must allege that (1) the defendants have monopoly power, and (2) the defendants have willfully engaged in impermissible exclusionary practices with the design or effect of protecting or enhancing their monopoly position, as opposed to growth or development as a consequence of a superior product, business acumen or historical accident. *Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129, 141 (3rd Cir. 1998)*; CCBN.com, Inc.*, 270 F.Supp.2d at 156 .

Parker does not allege any facts establishing that the defendants, individually or collectively, have monopoly power, beyond a conclusory assertion, which is insufficient to avoid dismissal.  *Id.* at 157.[10]

Nor has Parker alleged any facts showing impermissible exclusionary practices, or that such practices either create, protect or enhance any alleged monopoly position.

As demonstrated in Section II(A)(2)© above, the conduct Parker challenges does not logically permit a conclusion that they create any restrictions on competition or barriers to entry.

Moreover, to state a monopolization claim, the monopolist's conduct must harm the competitive process (and thereby harm consumers), and not merely affect one or two

---

[10]

    "Monopoly power is the power to control prices or exclude competition." *United States v. E. I. DuPont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  It is noteworthy that Parker alleges that his prices are significantly lower than those of Ross.  (Am. Compl. ¶28).

competitors. *Abbott Laboratories, Inc. v. Teva Pharmaceuticals USA, Inc.*, 432 F.Supp.2d 408, 420 (D. Del. 2006). To harm the competitive process, it must be shown that the alleged conduct bars a substantial number of competitors or severely restricts the market's ambit. *Id.* at 421. Parker does not allege any facts establishing harm to the competitive process or logically linking such harm to the defendants' conduct.

Parker has not alleged that the defendants have market power, or explained how any of the complained-of activity can maintain or enhance any imagined market power. As such, this claim fails and should be dismissed.

### b. Attempted Monopolization.

To state a claim for attempted monopolization, a plaintiff must allege (1) that the defendant has engaged in predatory or anti-competitive conduct with (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power. *Crossroads Cogeneration Utilities, Inc.*, 159 F.3d at 141. Additionally, it is insufficient simply to allege market share (which Parker has not even done). There must be something more, such as the strength of the competition, probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand. *Id.*

Parker's Amended Complaint falls way short of meeting this standard. These deficiencies mandate the dismissal of his antitrust claims.

### B. RICO CLAIMS.

"Because of the specificity of the RICO statute and the stigma associated with charges of racketeering, courts have held RICO claims to enhanced specificity of pleading requirements." *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 276 F.Supp.2d 1276, 1283

(S.D. Ga. 2003), *aff'd*, 362 F.3d 775 (11th Cir.), *cert. denied*, 543 U.S. 1002 (2004). As

demonstrated below, Parker has not pleaded a proper RICO claim.

> **1.    Parker Lacks Standing to Assert a RICO Claim As He Has Not
> Suffered a Cognizable Injury Caused by Predicate Acts.**

In order to have standing to assert a RICO claim, Parker must allege (i) an injury

cognizable in antitrust law, and (ii) a causal link between the injury and the alleged

racketeering activity.  *Dow Chemical Co. v. Exxon Corp.*, 30 F.Supp.2d 673, 695 (D. Del.

1998).  Parker has done neither.

Parker has alleged, in a conclusory manner, that as a result of Defendants' conduct,

he has suffered "lost revenue, lost goodwill, lost investment value an[d] lost media

exposure."  (Am. Compl. ¶165).

In reverse order, "lost media exposure" is not a compensable RICO injury, as a RICO

injury requires actual monetary loss. *Maio v. Aetna, Inc.*, 221 F.3d 472, 483-84 (3rd Cir.

2000).

"Lost investment value," with no explanation of what the investment was, its amount

and purpose, is so conclusory as to be insufficient.  It is important to know the factual nature

of the investment, so that the Court can determine whether loss of value is a legitimate

economic injury.  *See id*. at 489-80.

"Goodwill" is too amorphous to qualify as a cognizable RICO injury. *Hollander v.

Flash Dancers Topless Club*, 340 F.Supp.2d 453, 439 (S.D.N.Y. 2000), *aff'd mem.*, 173 Fed.

Appx. 15 (2nd Cir.), *cert. denied*, 127 S.Ct. 49 (2006).

As for "lost revenue," Parker does not identify any orders for his products or services that were cancelled, of which were filled but not paid for, because of the Defendants' alleged conduct.  As for Parker's hopes of future sales, mere expectancy of a future benefit is not sufficient to confer RICO standing.  *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998); *Donohue v. Teamsters Local 282, Welfare, Pension, Annuity, Job Training and Vacation and Sick Leave Trust Funds*, 12 F.Supp.2d 273, 277-78 (E.D.N.Y. 1998). *See also Imagineering, Inc. v. Kiewit Pacific Co.,* 976 F.2d 1303, 1310-11 (9th Cir. 1992), *cert. denied*, 507 U.S. 1004 (1993) (where there was no guarantee that plaintiff would have received contracts, alleged injury was too speculative to state a RICO claim).[11]

Even assuming that Parker has identified a valid injury (which he has not), he has not explained how any conduct by the Defendants caused such injury, beyond conclusory allegations.  Considerably more is required.

2.    **The Amended Complaint Does Not Adequately Allege Two Predicate Acts.**

The Amended Complaint alleges as its predicate acts violations of the Hobbs Act, 18 U.S.C. §1951, and the Sarbanes-Oxley Act, 18 U.S.C. §1513(b)(2). (Am. Compl. ¶158).  To maintain a RICO action, at minimum, Parker must allege sufficient facts with enough

---

[11]

As part of his "kitchen sink" approach, Parker throws in a conclusory allegation that the Defendants "have received financial consideration in return for aiding and abetting the RICO enterprise, and have invested those proceeds in commerce, and in further and similar racketeering activity, in violation of 18 USC §1962(a)." (Am. Compl. ¶163).  To have standing to assert a claim under Section 1962(a), Parker must allege an injury that was "caused by the use or investment of income in the enterprise, rather than by the predicate racketeering acts or pattern." *Rose v. Bartle,* 871 F.2d 331, 357 (3d Cir.1989).  He has not done so.

specificity to show probable cause that predicate acts were committed. In other words, the Amended Complaint must allege sufficient facts to support an indictment against the defendants as to the claimed predicate acts. *In re Cascade Intern. Sec. Lit.*, 84 F.Supp. 1558, 1582 (S.D. Fla. 1993), *on recons.*, 894 F.Supp. 437 (S.D. Fla. 1995).

### a.    Hobbs Act.

The elements of a Hobbs Act offense are (i) robbery or extortion, and (ii) interference in commerce. *Strong v. U.S.*, 361 U.S. 212, 218 (1960). Extortion requires compelling another to part with property. *Scheidler v. Nat'l Organization for Women*, 537 U.S. 393, 402-04 (2003). Threats of violence unrelated to robbery or extortion fall outside the Hobbs Act. *Scheidler v. Nat'l Organization for Women*, 547 U.S. 9 (2006).

The Hobbs Act claim fails for several reasons. First, the alleged threats do not indicate any connection to robbery or extortion, *i.e.,* any attempt to obtain property. (Am. Compl. ¶39). Parker alleges that the statements "were designed to use fear and coercion to intimidate Plaintiff into vacating ASF and the seduction-advice industry..." (Am. Compl. ¶43), and were "an attempt to obtain property in the form of revenue and market share, from Plaintiff." (Am. Compl. ¶158(a)). However, none of the alleged threats are explicitly or implicitly conditioned on the payment of any money or other property. Therefore, in the absence of any allegations rationally tying the alleged statements to a plot to obtain property, Parkers claims are mere conclusions which are not entitled to credit on a motion to dismiss.

Second, the claimed method does not fall within the Hobbs Act. Parker's theory appears to be not that threats were made to force Parker to deliver money or other property to the defendants, but that threats were made to Parker to compel third parties not to purchase

Parker's goods and services. But the threats were not directed to anyone other than Parker, and there is no explanation how threats to Parker would coerce third parties not to deal with Parker or purchase his products or services. As Parker has not alleged facts explaining how the alleged threats caused third parties not to purchase his products or services, the Amended Complaint fails. *See Sebago, Inc. v. Beazer East, Inc.*, 18 F.Supp.2d 70, 79 (D. Mass 1998) (RICO plaintiff must allege facts sufficient to demonstrate that the alleged racketeering activity was the "but for" and proximate cause of the plaintiff's damages); *Sable v. Southmark/Envicon Capital Corp.*, 819 F.Supp. 324, 342 (S.D.N.Y. 1993) (conclusory allegation that the plaintiff suffered injury as a result of racketeering activity is not sufficient).

Third, Parker does not allege *mens rea* as to the defendants, as is required. *U.S. v. Du Bo*, 186 F.3d 1177, 1179-80 (9th Cir. 1999) (failure to adequately allege *mens rea* in Hobbs Act indictment is a fatal defect).

For all these reasons, Parker's claim of a Hobbs Act violation as a predicate act under RICO fails.

### b.    Sarbanes-Oxley Act.

Parker's other purported predicate act under RICO is an alleged violation of the Sarbanes-Oxley Act, which provides in pertinent part that:

> Whoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for -
>
> > (2) any information relating to the commission or possible commission of a Federal offense

25

> or a violation of conditions of probation,
> parole, or release pending judicial proceedings
> given by a person to a law enforcement
> officer; or attempts to do so, shall be fined
> under this title or imprisoned not more than
> ten years, or both.

18 U.S.C. §1513(b)(2).

Parker makes three allegations pertaining to the Sarbanes-Oxley Act.  The first is::

> Each publication of the RayFAQ, and linking to the RayFAQ
> from operatives, constitutes a separate violation of ... the
> Sarbanes-Oxley Act (18 USC 1513), because it was done in
> retaliation for Plaintiff reporting federal crimes by the
> Seduction Mafia and Cartel to law enforcement, and for the
> purpose of interfering with Plaintiff's employment and
> livelihood.

(Am. Compl. ¶158(b)).

The failing of this allegation is that Parker does not identify any threats to him contained on the RayFAQ, but merely states that it contains "malicious lies."  The Sarbanes-Oxley Act, however, does not criminalize malicious lies.  In the absence of any  allegation of threats of bodily injury to Parker or harm to any tangible property owned by him in the RayFAQ, this allegation does not satisfy the terms of the Sarbanes-Oxley Act.

The second and third allegations are that statements from James L. King and someone identified as "Thrasher," neither of whom are named as defendants in this action, violated the Sarbanes-Oxley Act. (Am. Compl. ¶158©, d)).  However, as noted in Section II(A)(1), the allegations of conspiracy are inadequate to tie these individuals to the Defendants. Moreover, there are no threats contained in the alleged postings of "Thrasher." (Am. Compl. ¶41).

The final alleged violation of the Sarbanes-Oxley Act relied upon by Parker is the alleged postings made by Ross. (Am. Compl. ¶157(g), referring to Am. Compl. ¶76). However, none of these alleged postings threaten any physical harm to Parker or any of his tangible property.

Finally, as with the Hobbs Act, Parker has not alleged a *mens rea,* rendering the allegations inadequate. *See Du Bo*, 186 F.3d at 1179-80.

As such, Parker has failed to establish the predicate acts necessary to maintain a RICO action, and so Count IV of the Amended Complaint should be dismissed.

### 3.   Parker Has Failed to Allege a RICO Conspiracy.

As noted in Section II(A)(1), Parker has repeatedly stated in a conclusory fashion that the Defendants and others acted in a conspiracy.  As with the antitrust claim, the conclusory allegations of conspiracy are insufficient to establish a RICO conspiracy.

To assert a RICO conspiracy claim, Parker was obligated to allege facts showing that each of the Defendants agreed to commit at least two predicate acts.  *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 24 (2nd Cir. 1990).  Additionally, Parker had to allege facts showing that the Defendants knew that the predicate acts were part of a pattern of racketeering activity. *Stewart v. Associates Consumer Discount Co.*, 1 F.Supp.2d 469, 475 (E.D. Pa. 1998),  Conclusory allegations that the defendants conspired amongst themselves to further an unlawful scheme or knowingly and willingly participated in a conspiracy are insufficient.  *Adler v. Berg Harmon Assocs.*, 790 F.Supp. 1222, 1234 (S.D.N.Y. 1992).

As such, Parker may not establish a RICO conspiracy claim, and may not use the alleged actions of any one party or Defendant as a basis for stating a RICO claim as to any other party or Defendant.

### C.     LANHAM ACT.

Parker next alleges a violation of 15 U.S.C. §1125(a), which states that:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

To state a claim under Section 1125, Parker must allege (1) that the defendants have made false and misleading statements as to their products or as to those of Parker, (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience, (3) that the deception is material in that it is likely to influence purchasing decisions, (4) that the advertised goods traveled in interstate commerce, and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc. *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 872 (3rd Cir. 1992).

28

As demonstrated below, none of the alleged Lanham Act violations involve comments about Parker's goods and/or services, there is no allegation of actual or potential deception, that any deception is like to influence purchasing decisions, or that there is a likelihood of injury to Parker resulting from the alleged misrepresentations.

The challenged statements (counsel apologizes for the language) are as follow:

1.    "Ray, Ross' products rival yours the way chocolate mousse in a crystal serving bowl rivals a shit stain on the heel of a shoe.  And THAT is my OPINION."

(Am. Compl. ¶¶92, 168(a)).

This statement is clearly a statement of personal opinion, which is not subject to Section 1125(a).  "Bald assertions of superiority or general statements of opinion cannot form the basis of Lanham Act liability." *Pizza Hut, Inc. v. Papa John's Intern., Inc.*, 227 F.3d 489, 496 (5th Cir. 2000), *cert. denied*, 532 U.S. 920 (2001).

2.    "You are not a [business] competitor. You are, however, an annoying fuckwit and a poo-poo head."

(Am. Compl. ¶¶96, 168(b)).

Apart from the fact that no one could take this seriously as a factual assertion, the reference is to Parker personally, and not to his goods, services or commercial activities, and is not likely to deceive consumers in their purchasing decisions.  As such, it is beyond the scope of the Lanham Act

3.    "If he does quote or provide some sort of reference, and it's a forum for which he's been told he's not allowed any form of access, and confirmed receipt of such statement, ***he will be admitting to electronic trespass over state lines.***"

(Am. Compl. ¶¶93, 168©), emphasis in original).

29

This is a statement about Parker, and not about his goods, services or commercial activities, and is not reasonably likely to deceive consumers in their purchasing decisions, and so this statement is beyond the scope of the Lanham Act.

      4.      "Each separate publication of the 'ASF FAQ' document that claims that the LTSC website is somehow 'associated with ASF' in a formal capacity, or that the LTSC message board is a 'replacement for ASF.'"

(Am. Compl. 168(d)).

The ASF FAQ refers to a document providing information regarding "Frequently Asked Questions on ASF." (*See* Am. Compl. ¶¶32-33). Unfortunately, Parker does not provide the ASF FAQ and the excerpt he provides fails to explain the claim. In any event, the language is irrelevant as it does not refer to a commercial product or service, and so is outside the scope of the Lanham Act. Moreover, there is no explanation of how this language deceives consumers in making their purchasing decisions

      5.      "The republication of Plaintiff's 'returning fox' posting to ASF, and its intentionally false and misleading designation of the author as 'Ray Parker' rather than 'Ray Gordon.'"

(Am. Compl. ¶168(e)).

This refers to a posting by Parker that LTSC reproduced on its website (and has since removed), in which Parker was identified as "Ray Parker" instead of "Ray Gordon." (Am. Compl. ¶¶104-05). The irony of this is that "Ray Parker" is closer to plaintiff's true real name than "Ray Gordon," which is a pseudonym of Parker. (Am. Compl. ¶1). As such, it is highly questionable whether the reference to "Ray Parker" is false or misleading, and in any event it does not refer to Parker's goods, services or commercial activities, and so is beyond the scope of the Lanham Act.

6.    "The repeated references to Plaintiff as a 'newsloon' posted in Defendant Valens's 'posting signature' to ASF, for each of hundreds of thousands of postings and in the 'ASF FAQ.'"

(Am. Compl ¶168(f)).

Of course, the Lanham Act does not extend to name-calling that cannot be demonstrably proven true or false. *Peerless Heater Co. v. Mestek, Inc.*, C.A. No. 98-CV-6532, 2000 WL 637082, WL Op. at *10, Padova, J. (E.D. Pa. May 11, 2000) ("only statements of fact capable of being proven false are actionable under the Lanham Act because when personal opinions on nonverifiable matters are given, the recipient is likely to assume only that the communicator believes the statement, not that the statement is true"). Moreover, the statement relates to Parker personally, and not to goods, services or commercial activities, and there is no explanation how this statement would influence purchasing decisions.  As such, this statement is beyond the scope of the Lanham Act.

7.    "Defendant Ross's claim that Plaintiff sent a 'hateful e-mail' to 'Jeri Ryan' and threatened her (paragraph 43(e)) was an intentionally false and misleading attempt to disparage Plaintiff for the purpose of gaining a competitive business advantage."

(Am. Compl. ¶178, referring to Am. Compl. ¶76(d)).

Again, the alleged reference to a "hateful" e-mail is a matter of opinion unrelated to any business, services or commercial activities of Parker, and is not likely to deceive consumers as to their purchasing decisions, and so is beyond the scope of the Lanham Act.

For these reasons, the Court should dismiss Counts V & VI, the Lanham Act claims.

31

## D.     UNFAIR COMPETITION.

Count III asserts a claim for unfair competition under Delaware law.  Of course, if the Court dismisses the federal law claims,  it should dismiss the state law counts.  *Borough of West Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir.1995) ("if federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well").

In any event, Parker has failed to allege the elements of a cause of action for unfair competition: (1) the plaintiff has a reasonable expectation of entering into a valid business relationship, (2) with which the defendants wrongfully interfere, (3) thereby defeating the plaintiff's legitimate expectancy, and (4) causing harm.  *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1057 (Del. Super. 2001).

As set forth above, the defendants' actions do not violate the Sherman Act, RICO or the Lanham Act.  For the same reasons, there is no basis to conclude that there was any wrongful interference with any claimed business relationship under state law.  As such, Count III should be dismissed.

## E.     DEFAMATION.

Parker states this his Count V (Lanham Act violations) is alternatively a claim for defamation under Delaware law. (Am. Compl. ¶173).[12]  However, for the same reasons that

---

[12]     It is highly questionable that Delaware law would apply to the claim, as there is no allegation that the alleged statements were drafted or uploaded in Delaware, or that a Delaware server was used to upload the statements to the Internet.  Moreover, Parker, the alleged victim, is based in Pennsylvania.  For the purpose of the present motion, however, the choice of law issue is moot.

32

the challenged statements do not violate the Lanham Act, the statements are not actionable as defamation. Words such as "newsloon," obscenities and abusive rhetoric are not capable of being proven objectively true or false, and so are not actionable as defamation. *E.g., Grillo v. John Alden Life Ins. Co.,* 939 F.Supp. 685, 688 (D. Minn 1996).

Moreover, falsity alone does not render words actionable as defamation. *Curtis-Universal, Inc. v. Sheboygan Medical Emergency Services, Inc.*, 43 F.3d 1119, 1126 (7th Cir. 1994) ("not all false information about a product or its services is defamatory"); *Masson v. New Yorker Magazine, Inc.*, 832 F.Supp. 1350, 1367 (N.D. Cal. 1993), *aff'd*, 83 F.3d 1394 (9th Cir. 1996) ("[n]ot all false statements are defamatory, and not all defamatory statements are false"). The challenged words simply do not rise to the level justifying judicial relief.

For these reasons (along with the fact that supplemental jurisdiction over the state law claims should be denied when the federal claims have been dismissed), Parker's defamation claim should be dismissed.

## F.    TORTIOUS INTERFERENCE.

Count VII purports to allege tortious interference under state law. (Am. Compl. ¶¶185-191). The elements of a claim for tortious interference with contract under Delaware common law are (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury. *Aeroglobal Capital Management, LLC*, 871 A.2d 428, 437 n.7 (Del. 2005). In addition, the intentional act must itself be wrongful. *Gilbert v. El Paso Co.*, Del. Ch., C.A. No. 7075, 1988 WL 124325, WL Op. at *13, Jacobs, V.C. (Nov. 21, 1988), *aff'd*, Del. Supr., 575 A.2d 1131 (1990). For the act to be "wrongful," it must be independently

33

actionable under a recognized tort theory, apart from its effect on the contractual relationship.
*National Data Payment Systems, Inc. v. Meridian Bank*, 212 F.3d 849, 857 (3rd Cir. 2000).

As demonstrated above, none of the claimed actions was "wrongful" in the legal sense, as they do not give rise to any cause of action. For this reason, and the fact that the Court should not retain supplemental jurisdiction once the federal claims are dismissed, the Court should dismiss Count VII, the tortious interference count.

### G.    CIVIL CONSPIRACY.

Count VIII purports to assert a claim for civil conspiracy under Delaware law. (Am. Compl. ¶193). However, Delaware law does not recognize civil conspiracy as an independent cause of action. *Ramunno v. Cawley*, 705 A.2d 1029, 1039 (1998). As such, this claim should be dismissed.

34

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, defendants Learn The Skills Corporation, Ray Levans, Jay Valens, Paul Ross and Straightforward, Inc., respectfully request that the Court dismiss the Amended Complaint in its entirety.

Dated: March 16, 2006

Respectfully submitted,

 /s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766
Attorney for defendants Learn The Skills Corporation, Ray Levans, Jay Valens, Paul Ross and Straightforward, Inc.

35

## <u>CERTIFICATE OF SERVICE</u>

I, David L. Finger, hereby certify that on this 16th day of March, 2007, I caused two

copies of the foregoing document to be served via first class mail, postage prepaid, on the

below-listed party:

                    Gordon Roy Parker, *pro se*
                    4247 Locust Street, #806
                    Philadelphia, PA 19104

                    Allen Reyes, *pro se*
                    123 S. Laguna St.
                    Klamath Falls, OR 97601

                    /s/ David L. Finger
                    David L. Finger (DE Bar ID #2556)
                    Finger & Slanina, LLC
                    One Commerce Center
                    1201 Orange Street, Suite 725
                    Wilmington, DE 19801-1155
                    (302) 884-6766



Not Reported in S.E.2d                                                              Page 1

Not Reported in S.E.2d, 26 Va. Cir. 282, 1992 WL 884482 (Va. Cir. Ct.)
**(Cite as: Not Reported in S.E.2d)**

C
Eastern Direct Marketing v. The Coolidge
Co.Va.Cir.Ct. 1992.
Circuit Court of Virginia, Arlington County.
Eastern Direct Marketing
v.
The Coolidge Co.
**LAW #90-926.**

February 4, 1992.

**\*1** This matter comes before the Court on
defendant's Motion to Quash the Amended Motion
for Judgment. The Court has heard oral argument
on the matter and has received submissions from
counsel.
William L. Winston, Judge.
The plaintiff, Eastern Direct Marketing Inc., is a
Virginia corporation whose principal place of
business is Falls Church, Virginia. The plaintiff is
engaged in the business of mailing list management.
The defendant, the Coolidge Co., is a New York
corporation and is not authorized to transact
business within the Commonwealth. In its Amended
Motion for Judgment, the plaintiff alleges that on
May 25, 1990, the defendant faxed a libelous
memorandum from New York to various list
vendors with whom the plaintiff had been dealing.
Several of the vendors were located in Virginia.
The plaintiff is seeking compensatory damages for
business defamation and tortious interference with
contractual relationships resulting from the
publication of the memo.

As the defendant is a nonresident, the plaintiff is
attempting to invoke the jurisdiction of this Court
through the Virginia long-arm statute. The plaintiff
served the defendant through the Secretary of the
Commonwealth pursuant to Va. Code '8.01-329
which provides for service of process on a
nonresident defendant when the exercise of personal
jurisdiction is authorized by statute.

The defendant is moving to quash the Amended
Motion for Judgment on the ground that the Court
has no long-arm jurisdiction over the defendant.
Without long-arm jurisdiction, service of process
cannot be accomplished under '8.01-329.

When jurisdiction is sought under the long arm
statute, the Court first examines whether jurisdiction
is authorized under state law and then determines if
the exercise of personal jurisdiction is consonant
with due process. Peanut Corp. v. Hollywood
Brands, 696 F. 2d 311 (4th Cir. 1982). If the
provisions of the long arm statute are not met, the
inquiry is at an end -- there is no personal
jurisdiction. Processing Research v. Larson, 686
F.Supp. 119 (E.D.Va. 1988).

The statutory basis for personal jurisdiction in the
present case is Va. Code '8.01-328.1(A) (4). The
exercise of jurisdiction under this subsection
requires a tortious injury in Virginia caused by an
act or omission outside of Virginia and a
relationship between the defendant and the
Commonwealth which exists in any one of three
ways as provided for by the code. Blue Ridge Bank
v. Veribanc, 755 F.2d 371 (4th Cir. 1985).

The plaintiff has alleged tortious injury in Virginia
caused by an act outside of Virginia, i.e. the fax of
the memo from New York to various list vendors in
Virginia. However, the plaintiff fails to specifically
allege a relationship between the defendant and the
Commonwealth.

In paragraph #2 of the Amended Motion for
Judgment, the plaintiff alleges that the defendant, "
regularly does or solicits business, or engages in
any other persistent course of conduct, or derives
substantial revenue from services rendered in the
Commonwealth of Virginia." The plaintiff simply
lifts this language from the code. The plaintiff never
affirmatively asserts any facts which would support
these allegations. The plaintiff's conclusory
pleading does not satisfy the requirements for the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                    Page 2

Not Reported in S.E.2d, 26 Va. Cir. 282, 1992 WL 884482 (Va. Cir. Ct.)
**(Cite as: Not Reported in S.E.2d)**

exercise of personal jurisdiction under the long-arm
statute.

**\*2** The Court does not need to reach the due
process aspect of the analysis. Because the
requirements of the long arm statute '8.01-328.1(A)
(4) are not met, there is no jurisdiction.

In the absence of facts supporting the exercise of
jurisdiction under the long arm statute, service of
process pursuant to '8.01-269 cannot be obtained.
Therefore, the Court grants the defendant's Motion
to Quash and allows the plaintiff leave to amend the
Amended Motion for Judgment to include those
facts which would establish a relationship between
the defendant and the Commonwealth sufficient to
sustain jurisdiction under ' 8.01-328.1 (A) (4).
Counsel for the plaintiff will have 21 days from the
date of the order to file a Second Amended Motion
for Judgment.

Counsel for the defendant should prepare the order,
obtain the appropriate signatures, and send it to me
in chambers for entry.

Va.Cir.Ct. 1992.
Eastern Direct Marketing v. The Coolidge Co.
Not Reported in S.E.2d, 26 Va. Cir. 282, 1992 WL
884482 (Va. Cir. Ct.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                      Page 1

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

Gilbert v. El Paso Co.Del.Ch.,1988.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
 Court of Chancery of Delaware, New Castle County.
    Peter **GILBERT** and William Steiner, Plaintiffs,
                          v.
      The EL PASO COMPANY and Burlington
            Northern, Inc., et al., Defendants.
     Herbert BREITMAN, as sole Trustee of Ed
 Rosenthal Neckwear, Inc. Profit Sharing Plan, and
      all other parties similarly situated and
          circumstanced, Plaintiff,
                          v.
     BURLINGTON NORTHERN, INC., et al.,
                   Defendants.
        **CIV. A. Nos. 7075, 7079, and 7078.**


                  Nov. 21, 1988.


**731** William Prickett, and Vernon R. Proctor, of
Prickett, Jones, Elliott, Kristol & Schnee,
Wilmington, Abraham G. Levin, Martin A.
Coleman, Stephen A. Marshall, and Serene K.
Nakano, of Rubin Baum Levin Constant &
Friedman, and Mordecai Rosenfeld, Esquire, New
York City, for plaintiffs.
Robert K. Payson, and James F. Burnett, of Potter
Anderson & Corroon, Wilmington, and Howard W.
Goldstein, and Robert J. Gunther, Jr., of MUDGE
ROSE Guthrie Alexander & Ferdon, New York
City, for defendant, the El Paso Company and the
individual defendants.
A. Gilchrist Sparks, III, and Lawrence A.
Hamermesh, of Morris, Nichols, Arsht & Tunnell,
Wilmington, and Marc P. Cherno, Stephen D.
Alexander, Lisa Klein Wager, and Deborah L.
Stein, of Fried, Frank, Harris, Shriver & Jacobson,
New York City, for defendant, Burlington Northern,
Inc.

                   OPINION
JACOBS, Vice Chancellor.

*1 Presently pending are the defendants' motions to
dismiss or for summary judgment, and also the
plaintiffs' cross motion for summary judgment.
These consolidated class actions were brought in
1983 on behalf of a class of stockholders of the El
Paso Company ("El Paso") who tendered their
shares into a tender offer that Burlington Northern,
Inc. ("Burlington") initiated on December 21, 1982.
Named as defendants are (i) El Paso, a Delaware
corporation; (ii) the directors of El Paso at the time
of the transactions complained of (referred to as "
the directors" or the "individual defendants") and
(iii) **732** Burlington and its wholly owned
subsidiary, R-H Holdings Corporation, also
Delaware corporations (collectively, "Burlington").

The complaint, as initially filed, had seven counts.
On September 14, 1983, Burlington filed a motion
to dismiss or for summary judgment as to all counts.
Neither El Paso nor the individual defendants
joined in that motion. Then Vice Chancellor (now
Justice) Walsh dismissed the complaint as to
Burlington, except for Count V (the conspiracy
claim). *Gilbert v. El Paso Co.,* Del.Ch., 490 A.2d
1050 (1984). Three years of discovery then
ensued. Thereafter, El Paso and the individual
defendants moved to dismiss or, alternatively, for
summary judgment as to all counts; Burlington
moved for summary judgment as to Count V; and
the plaintiffs filed a cross motion for summary
judgment. All motions were briefed and argued on
April 26, 1988.

At issue on those motions is the validity of the
plaintiffs' claims: (1) against the El Paso directors
for self-dealing and breaching their fiduciary duties
of fairness and loyalty to the class; (2) against all
defendants, *i.e.,* El Paso, its directors, and
Burlington, for conspiracy; and (3) against El Paso
and its directors for tortious interference with
business relationships. [FN1] The plaintiffs' cross
motion for summary judgment also concerns the
measure and amount of damages sustained by the
class. This is the Opinion of the Court on all

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

dismissal and summary judgment motions. For the reasons now discussed, the defendants' motions will be granted and the plaintiffs' motion will be denied.

I.

On a motion to dismiss, or for summary judgment, the moving party must demonstrate that the nonmoving party cannot prevail under any state of facts that could be proved in support of its claim, or that no material question of fact exists and that the moving party is entitled to relief as a matter of law. In deciding a motion for summary judgment, all permissible factual inferences must be resolved in favor of the nonmoving party. *Gilbert v. El Paso Co., supra,* at 1053. As thus viewed, the undisputed pertinent facts are now set forth.

In 1982, El Paso was a diversified energy company engaged in the exploration, production, and marketing of natural gas and oil **733 products. As of December 20, 1982, El Paso had ten directors, three of whom were "inside" directors: Travis R. Petty, El Paso's President and Chief Executive Officer; Richard S. Morris, El Paso's Executive Vice President; and William V. Holik, Jr., President of the El Paso Natural Gas Company, an El Paso subsidiary. The seven remaining directors were independent, none being an officer or employee of El Paso or any of its subsidiaries.

*2 On December 21, 1982, Burlington commenced a partial tender offer (the "December offer") for up to 25,100,000 shares of El Paso's common stock at $24 per share. If that offer was oversubscribed, the tendered shares were to be purchased on a prorated basis. The proration period would terminate on December 30, 1982, the period in which tendering shareholders could withdraw their tenders would conclude on January 12, 1983, and the offer itself would expire on January 19, 1983.

The stated purpose for Burlington's December offer was to acquire the majority of El Paso's outstanding shares. If the offer were totally successful, Burlington would own 51.8% of El Paso's outstanding shares and control El Paso. In its offering materials, Burlington disclosed no plans to

purchase the remaining, nontendered shares. Nor did those materials disclose any price or other protections in the event of a "second step" acquisition of nontendered shares, *i.e.,* shares owned by those persons who would remain as minority shareholders in a Burlington controlled enterprise. To the contrary, Burlington specifically cautioned that "[a]ny possible transactions [with the minority shareholders] might be on terms (including the consideration offered per share) the same as, or more or less favorable than, those of the offer." [FN2]

In response, El Paso immediately took steps to evaluate the Burlington offer. The directors engaged Merrill Lynch, which for many years had served as El Paso's investment banker, to advise the Board and render an opinion on the adequacy of the December offer. El Paso's regular outside counsel, Mudge Rose Guthrie Alexander & Ferdon, was engaged to render legal advice concerning Burlington's offer, and the law firm of Wachtell, Lipton, Rosen & Katz was also specially retained for that purpose.

**734 On December 23, 1982, the El Paso Board held a special meeting. Merrill Lynch advised the directors that the Burlington offer was subject to certain complex, restrictive financing arrangements that could inhibit Burlington's ability to acquire the balance (49%) of El Paso's shares. Those arrangements included the requirement of bank consents if Burlington spent more than $750 million to acquire El Paso. Merrill Lynch also explained the nature of partial tender offers, and pointed out that after the completion of the December offer, El Paso's shareholders would remain vulnerable as minority shareholders in a Burlington-controlled enterprise.

Merrill Lynch concluded that the Burlington's $24 per share offering price was inadequate, and advised that the Board explore the possible alternative transactions that might achieve greater value for shareholders. El Paso's management then reviewed the company's financial condition and its prospects in the natural gas business, and reported that El Paso's financial prospects were attractive and that the company was well positioned to take

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

advantage of anticipated favorable developments in the natural gas market.

**\*3** The above information prompted the Board unanimously to conclude that Burlington's offer was not in El Paso's or its shareholders' best interests, and that the offer should be rejected. The directors' principal concerns were the inadequacy of the $24 offering price, the "partial" nature of the offer, and its potential adverse impact upon the minority shareholders remaining after the completion of the offer.

By a letter dated December 23, 1982, the shareholders were informed of the Board's conclusions and its recommendation that the shareholders not tender to Burlington. Specifically, the stockholders were advised that the Board had reached its decision, because: (i) the $24 per share offering price was too low; (ii) the Board was committed to maximizing the value of the company for all shareholders, and management had been authorized to pursue financial alternatives; (iii) Burlington might have difficulty acquiring the remaining El Paso common stock on terms that would be fair to the remaining El Paso stockholders; (iv) because such stockholders would remain as minority stockholders in a Burlington-controlled enterprise, the value of their shares might be adversely affected; and (v) the financing restrictions applicable to Burlington's offer might induce Burlington to engage in transactions that would not be in the minority stockholders' best interests, in order to enable Burlington to service its debt or increase its investment in El Paso.

**\*\*735** The Board subsequently authorized various defensive measures. Various litigations were commenced; employment agreements involving key personnel were executed or authorized; amendments to El Paso's by-laws, Employees Savings Plan, and Employees Stock Ownership Plan were adopted; and the Board also authorized a new series of Preferred stock to be issued as a stock dividend. The Preferred dividend would preclude a merger or other business combination between El Paso and a 25% or more shareholder for less than the highest price paid by the 25% shareholder,

unless 90% of the outstanding Preferred shares approved the transaction.

After the December 23, 1982 Board meeting, El Paso's management and advisors intensively searched for superior alternatives to the Burlington offer. Specifically, management explored: a possible sale of the assets of El Paso natural Gas Company with Houston Natural Gas Corporation, a possible sale of the assets of El Paso Hydrocarbons Company with another firm; and a possible sale of the assets of El Paso Exploration Company with Sohio Petroleum Company, Shell, American Petrofina and Texaco. Management also explored a possible sale of the entire company with Houston Natural Gas, Mid-Con, InterNorth, and Texas Eastern. All told, representatives of management and Merrill Lynch spoke or met with dozens of companies, including almost all major pipeline firms, in an effort to develop a better offer.

This activity, for all its intensity, produced disappointing results. Despite Merrill Lynch's opinion that El Paso stock was worth more than $24 per share, the lamentable reality was that $24 was all that the market would bear. As Mr. Petty testified:

**\*4** On January 7th, I believed that $24 [per share] did not reflect the full value of El Paso shares, but I also believed that within the severe time constraints that we were operating under, we had tested the market and within those time constraints the $24 [per share] was probably all we could expect.

The El Paso Board held another special meeting on January 7, 1983. By that point, over 25 million El Paso shares had been tendered to Burlington. The directors did not (and never did) tender their own shares into the December offer. In these circumstances, everyone recognized that it was inevitable that Burlington would acquire control of El Paso unless an alternative could quickly be found. As to price, it was apparent that the Burlington offer was the highest price likely attainable. The Board still believed, nonetheless, that the Burlington **\*\*736** offer was inadequate because of its partial nature and its lack of "back-end" protection. The critical issue was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727**
**(Cite as: Not Reported in A.2d)**

whether in the remaining few days, El Paso could achieve greater protection for its shareholders, either by developing an alternative transaction or by negotiating with Burlington.

At the January 7 meeting, the Board reaffirmed that El Paso's management should continue pursuing all avenues that promised to produce superior value and protection for potential minority shareholders. That meant continuing ongoing negotiations with other potential bidders. In addition, however, the Board directed El Paso's management to initiate discussions with Burlington to explore whether its offer could be improved.

Accordingly, over the next two days (January 8 and 9, 1983) Messrs. Petty and Morris met with members of Burlington senior management. Mr. Petty advised Burlington's representatives that El Paso was pursuing other alternatives designed to produce maximum benefit to its shareholders, but that El Paso was willing to discuss a possible acquisition by Burlington on terms superior to its current offer. Mr. Petty then informed Burlington of El Paso's main concerns with Burlington's offer, *i.e.,* the inadequacy of the $24 per share price, the fact that the offer was partial, and risks that the remaining minority shareholders would be treated unfairly in any "second step" transaction. Petty also shared the Board's concerns over El Paso's substantial debt and its critical need for an infusion of additional capital.

Burlington's representatives responded that the $24 per share offering price was fair and would not be increased. But Burlington was more sympathetic to El Paso's concerns about the adverse impact of its partial offer on the remaining minority shareholders, as well as El Paso's capital needs. Arms length negotiations then followed. As a result, Burlington ultimately agreed that any merger it subsequently proposed would be made subject to the approval of the five El Paso directors who would continue to serve after Burlington acquired control (the "continuing directors"). Moreover, any subsequent merger proposal would be approved by a majority of the minority (*i.e.,* non-Burlington) shareholders. Finally, Burlington ultimately agreed, as part of its acquisition of the majority

stock interest, to purchase, directly from El Paso, 4,166,667 shares of newly issued treasury stock for $100 million.

**\*5** In these negotiations, Messrs. Petty and Morris took a position that became the basis for this litigation, namely, that all of El Paso's shareholders should be given the opportunity to participate in the **\*\*737** improved transaction that the parties had negotiated. That objective was accomplished by an agreement whereby Burlington would withdraw its December offer and would substitute a new tender offer, at the same $24 price but for fewer shares, in its place.[FN3]

On January 10, 1983, the El Paso Board again met, this time to consider the accord reached between El Paso and Burlington. As finally negotiated, that agreement had the following principal terms: (a) Burlington's December tender offer would be terminated, and Burlington would initiate a new tender offer for 21 million El Paso shares at $24 per share; (b) Burlington covenanted to elect five El Paso "continuing directors"; (c) Burlington agreed that any future proposal to acquire the minority El Paso shares must be approved by a majority of the continuing directors, as well as by a majority of the minority (non-Burlington) shares; (d) Burlington agreed to purchase 4,166,667 shares of El Paso's newly authorized treasury stock for $100 million; and (e) Burlington would have an option to acquire an additional 4,950,000 of El Paso's authorized but unissued common stock.

The El Paso Board approved the El Paso/Burlington agreement at that meeting. Both corporations then executed it on that same day, January 10, 1983.

In accordance with the agreement, Burlington terminated its December offer on January 10, 1983. The next day, January 11, 1983, Burlington instituted a new offer (the "January offer") for 21 million shares at $24 per share. In response to the January offer, 40,246,853 shares, including most of the shares owned by the directors, were tendered. [FN4] Burlington ultimately purchased, on a prorated basis, 21 million of the over 40 million shares tendered.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 5

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

Eight months later, in August, 1983, Burlington proposed a merger to acquire the balance of El Paso's outstanding shares for the $24 per share price. El Paso's continuing directors unanimously approved that proposal on September 14, 1983, and the merger was **738 approved by both the Burlington and El Paso Boards on September 19, 1983. A special meeting of El Paso shareholders was held on December 13, 1983, at which the merger was formally approved by a majority of the non-Burlington shares. Burlington completed its acquisition of the remaining El Paso shares that same day.

## II.

Plaintiffs challenge two aspects of the January 10, 1983 Burlington/El Paso agreement in this litigation: the substitution of the January offer for the December offer, and the direct purchase by Burlington of 4,166,667 treasury shares from El Paso. It is undisputed that the effect of those transactions was (i) to reduce by 4,100,000 shares the number of shares that Burlington would purchase directly from El Paso stockholders, and (ii) to dilute the "proration pool" established in the December offer, by allowing all shareholders, including those who were not members of the class, to tender into the January Burlington offer. It is claimed that those acts constituted a breach of two fiduciary duties owed by El Paso's directors to the class, *i.e.,* the duty to preserve the class' proration percentage achieved in the December offer, and the duty not to prefer their own personal interests over the interests of the class. Plaintiffs contend that Burlington knowingly conspired in those breaches of fiduciary duty, and that the directors' actions also tortiously interfered with a business opportunity of the class to have their shares purchased in the Burlington December offer.

**\*6** These claims are all bottomed upon the plaintiffs' contention that the class had a legally recognized right and expectancy to have their tendered shares purchased in Burlington's December offer. Consequently, plaintiffs argue, El Paso's directors had a fiduciary duty not to interfere with the proration arrangements applicable to those

tendered shares. Plaintiffs contend that by negotiating the January 10, 1983 agreement, the El Paso defendants interfered with those arrangements, defeated that right and expectancy, and thereby breached their fiduciary duty. It is argued that it was unnecessary to eliminate the proration pool by substituting a new tender offer for the December offer. It is further argued that the directors insisted upon such actions solely to further their selfish interests, by enabling them to tender their shares, which otherwise could not be sold since the directors had not tendered their shares into the December offer.

The defendants vigorously insist that they breached no duty of any kind. They contend, first, that the class had no vested right to **739 have their tendered shares acquired in the Burlington tender offer, and that, therefore, the directors had no duty to preserve the proration arrangements applicable to that offer.

Second, the defendants argue that even if the class did have a legally protectible interest in preserving the December proration arrangements, the directors were permitted, in the valid exercise of their business judgment, to alter those arrangements in order to achieve a transaction that would benefit the corporation and all of its shareholders. Defendants argue that the January 10, 1983 agreement was such a transaction, because it was reasonable and approved in good faith by disinterested directors for the benefit of all shareholders. Defendants emphasize that although the directors were benefited by being afforded an opportunity to tender their El Paso shares to Burlington, that benefit was made equally available to all El Paso shareholders, and the directors' shares were acquired on the same prorated basis as all other tendered shares. Hence, the defendants conclude: (i) no fiduciary duty existed or was violated; (ii) the claim that Burlington knowingly participated in the directors' breach of duty therefore rests upon an invalid premise; and (iii) because the directors acts were not wrongful, those acts could not constitute a tortious interference with any business opportunity, right or expectancy of the class.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

### III.

To address properly the contentions being advanced here, the applicable standards for evaluating the El Paso defendants' conduct must first be determined. That determination involves two separate but related inquiries: (a) the standard of judicial review under which the directors' actions must be scrutinized and (b) the nature of the duties owed by the directors to the class.

### A.

The applicable standard of judicial review is first addressed, because the parties invoke, at various points in their briefs, no less than three differing review standards: under *Unocal Corp. v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946 (1985), (" *Unocal* "); under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173 (1986), ("*Revlon* "); and the entire fairness standard under cases such as *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701 (1983), and *Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717 (1971) .

**\*7 \*\*740** First, I reject the suggestion that the *Unocal* standard forms the appropriate analytical framework here. In highly general terms, *Unocal* prescribes the standard for evaluating the conduct of directors adopting antitakeover measures to defend against a threat to the corporate enterprise resulting from a potential change of control. The transactions complained of here are not of that character. They were agreed to as part of an overall rapprochement between Burlington and El Paso. The underlying premise of that agreement was that Burlington would be permitted to acquire control of El Paso with the express approval of El Paso's Board. Hence, the transactions under attack cannot properly be regarded as antitakeover defense measures that would trigger the enhanced judicial scrutiny mandated by *Unocal.*

Nor is the *Revlon* standard responsive to the contentions being advanced here. Under *Revlon,* El Paso's directors were obliged, as auctioneers, to obtain the best possible price or transaction for the

stockholders in a sale of the company. *Revlon, supra; In Re J.P. Stevens & Co., Inc. Shareholders Litigation,* Del.Ch., 542 A.2d 770 (1988). Clearly those duties were satisfied in this instance, and plaintiffs do not seriously contend otherwise. Here the Board "shopped" the company in an effort to develop a bid superior to the Burlington offer. Only after those efforts proved unsuccessful did the Board feel itself compelled to negotiate an improved transaction with Burlington.

Plaintiffs do not challenge the ultimate transaction price of $24 per share. Nor do they claim that the directors wrongfully failed to obtain a higher available price. What they assail is the manner chosen for allocating the $24 per share consideration among El Paso's shareholders. That is, the plaintiffs contend that the directors structured the transaction so as improperly to allocate to themselves a portion of the consideration that rightfully belonged to the class. While that claim charges a breach of fiduciary duty, the duty that plaintiffs invoke does not arise under *Revlon.*

Lastly, the plaintiffs contend that the challenged transaction must be evaluated in accordance with the entire fairness standard. That standard, firmly embedded in our corporate jurisprudence, requires that directors who engage in self-dealing-that is, who stand on both sides of the transaction, dictate its terms, and obtain a benefit not received by all stockholders generally-must prove the transaction's entire fairness to the satisfaction of a reviewing court. *Weinberger v. UOP, Inc., supra,* at 710; **\*\*741***Sinclair Oil Corp. v. Levien, supra,* at 720; *David J. Greene & Co. v. Dunhill International, Inc.,* Del.Ch., 249 A.2d 427, 430 (1968).

For this exacting standard to govern, the El Paso directors, in carrying out the acts complained of, must have engaged in self-dealing. The plaintiffs argue that self-dealing occurred, because (i) the January offer afforded the directors the opportunity-not otherwise available to them-to tender their El Paso shares into that offer, (ii) as a result, the proration pool was diluted to the complete detriment of the class; (iii) the total number of shares Burlington would acquire from the class was decreased by 4,166,667 shares, which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 7

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

also operated to the detriment of the class, and (iv) it was unnecessary to structure the transaction in that fashion.

**\*8** It cannot be doubted that the January offer benefited El Paso's directors insofar as it afforded them the opportunity to tender into a new offer. It must also be acknowledged that the transactions complained of adversely affected the interests of the class (*i.e.,* the tendering shareholders) since the total number of shares being purchased from shareholders was reduced, and the December proration pool was diluted insofar as all El Paso shareholders were allowed to tender into the January offer.

To engage in self-dealing, however, the directors must have stood on both sides of the transaction, dictated its terms, and derived a benefit to the exclusion of the shareholders. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984); *Sinclair Oil Corp. v. Levien, supra,* at 720. The plaintiffs have failed to show that that occurred here. The directors did not stand on both sides of the transaction; indeed, at all times their relationship to Burlington was adverse and the parties negotiated at arms length. Nor did the directors receive a benefit to the exclusion of the class. The opportunity to tender into the new offer was afforded equally to all shareholders, including the directors and the class, and the directors' stock was purchased on the same prorated basis as the stock tendered by all other stockholders. Accordingly, the transactions under attack cannot fairly be considered as "self-dealing" transactions of the kind that would implicate the rigorous entire fairness standard of review.

It must therefore be concluded that the challenged conduct will be evaluated from the standpoint of the business judgment rule, unless (as the plaintiffs contend) other circumstances, such as a breach of the duty of loyalty or of due care, would make that standard not applicable. That brings us to the second inquiry: the precise nature of the duty, if any, owed by the El Paso directors to the plaintiff class in these circumstances.

**\*\*742** B.

The defendants' primary position is that the El Paso directors owed no duty of any kind to the class. They argue that the class had no vested property or contract right, or any legally protected expectancy, to have their shares in the December proration pool acquired in Burlington's December offer. For the reasons now discussed, I agree that the class had no vested (*i.e.,* inviolate) right, arising under Delaware law, to have their proration position frozen in place. However, the class did have interests that El Paso's directors, as fiduciaries, were not free to interfere with absent some overriding or paramount corporate purpose.

This Court has previously found, in earlier proceedings, that the class had no vested right to have their shares purchased in the December offer. In *Gilbert v. El Paso Co., supra,* at 1054-1055, Justice Walsh held that because the December offer was made subject to certain conditions, Burlington was free to terminate that offer, and was therefore free to terminate its obligation to purchase any tendered shares, if one or more of those conditions occurred. The United States District Court for the District of Delaware has determined also, that the class had no vested rights arising under federal law. In *Brill v. Burlington Northern Inc.,* 590 F.Supp. 893 (D.Del.1984), that court held that Burlington did not violate the Williams Act by terminating the December offer and instituting the January offer. The court observed: "... Burlington and R-H, as the masters of the offer, had the right to terminate and withdraw the December offer as long as the offer did not specifically prohibit that action ..." It further held that the December offer "... could have been terminated and withdrawn any time after December 17, 1982, and prior to acceptance by Burlington ... for payment." *Id.* at 898.

**\*9** Nor do the plaintiffs' cited cases support their position that the class had a vested right to have their shares in the December proration pool acquired in the December offer.[FN5]

**\*\*743** Although the shareholder class did not have a vested contract or other property right, it does not follow that the class had no legally protectable interest. As now discussed, the members of the shareholder class did have a protectible interest in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 8

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

the maintenance of their proration position. That interest, while not absolute, was one that the El Paso directors, under Delaware fiduciary principles, were not completely free to disregard. As Justice Walsh previously found, the El Paso directors owed

... a fiduciary duty to the plaintiff class not to prejudice their interests in the December tender offer. This does not mean that El Paso's management was not free to attempt to persuade its shareholders not to tender their shares or to engage in other defensive tactics, but El Paso could not interfere with the alienability of the tendered shares by pursuing its own interests ...

490 A.2d at 1057.

The defendants correctly argue that the directors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups. *See Phillips v. Insituform of North America, Inc.,* Del.Ch., C.A. No. 9173, Allen, C. (August 27, 1987); *Kors v. Carey,* Del.Ch., 158 A.2d 136, 143 (1960). However, from that general principle it cannot be concluded (as defendants seem to suggest) that the directors can never owe a duty to a particular shareholder subclass or group. **744 Manifestly that cannot be so. *See, e.g., Eisenberg v. Chicago Milwaukee Corp.,* Del.Ch., 537 A.2d 1051, 1062 (1987) (recognizing the fiduciary duty owed by corporate directors to preferred stockholders).

Corporate directors owe a fundamental, bedrock duty of loyalty not to put their personal interests ahead of the interests of their shareholders. *See Weinberger v. UOP, Inc., supra,* at 710; *Revlon, supra,* at 179; *Guth v. Loft, Inc.,* Del.Supr., 5 A.2d 503, 510 (1939). Thus (and to use an extreme example) suppose El Paso's directors had purposefully chosen to interfere with the proration position of the class solely to enable themselves to tender their shares. In such a case, can it be supposed that the directors could be heard to argue that they had no duty to the class, because its members consisted of less than the entire body of stockholders? Clearly not. At the very least, those directors had an absolute duty not to interfere with

the proration interests of the class for an improper or selfish purpose. That duty, the plaintiffs contend, was violated here.

The defendants assiduously deny that they were actuated by any selfish or improper motive. They insist that in negotiating and later approving the January 10, 1983 agreement with Burlington, El Paso's directors intended to-and did-protect the interests of all El Paso shareholders. If that is correct, then the directors' fiduciary duty would not be absolute, but qualified. That is, the directors' duty not to prejudice the interests of the class would be subject to the qualification that they, in a proper exercise of their business judgment, could act to serve an overriding or paramount interest of the corporation or its shareholders as a group, even if, as an incidental result, the interests of a subgroup, such as the class, were adversely affected.

*10 That statement of the directors' fiduciary duty reveals little that is new or remarkable. It is, by-now, a commonplace phenomenon of corporate governance that corporate directors will confront situations involving conflicting interests of different shareholder groups. In such cases the directors are not enjoined to lie inert. Our case law recognizes that the directors may take whatever action that, in their proper exercise of business judgment, will best serve the interests of the corporation or the entire body of shareholders. That such action may adversely affect the interests of a particular shareholder subgroup, will, in certain instances, be unavoidable. Nonetheless, no wrongdoing will have occurred if the directors are able to justify the result as furthering a paramount or overriding corporate or shareholder interest. *See, e.g., Unocal, supra; Phillips v. Insituform of **745 North America, Inc., supra,* at 18-19; and *Eisenberg v. Chicago Milwaukee Corp., supra,* at 1062.

The foregoing analysis makes it possible to define the critical issues remaining to be decided. They are: (1) did the directors, in negotiating and approving the January 10, 1983 agreement with Burlington, act out of selfish motives or did they act to serve a paramount interest of the corporation and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                        Page 9

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

of all shareholders? (2) If the directors were motivated by the latter (*i.e.,* proper) set of considerations, are their actions protected under the business judgment rule? Those issues are now addressed.

IV.

A.

The essence of plaintiffs' position is that El Paso's directors intentionally breached their duty of loyalty by negotiating the termination of the December offer, the substitution of the January offer, and the direct sale of treasury shares to Burlington, all to benefit themselves at the expense of the class. In its earlier opinion, this Court indicated that as a pleading matter, that theory stated a cognizable claim for relief against the directors. *Gilbert v. El Paso Co., supra,* at 1057. Now that this matter has progressed beyond the pleading stage and the record has been amplified through discovery, the question is whether the record evidence is sufficient to create a triable issue of fact as to the directors' culpable intent. I conclude that it is not. There is no direct evidence that the directors were motivated by selfish concerns, or that they insisted on the substituted January tender offer to enable themselves to tender their El Paso shares to Burlington.[FN6]

Plaintiffs argue, nonetheless, that the undisputed facts compel an inference of improper intent. They emphasize that in opposing the December offer, the directors took the position that $24 per share price was inadequate and exhorted their shareholders not to tender. Yet only weeks later, in an about face, the directors took the opposite position, and tendered their shares into the January offer at the same "inadequate" $24 per share price. Moreover, plaintiffs emphasize, **746 it was unnecessary to replace the December offer with an entirely new offer that required undoing the December proration arrangements. All that was needed, plaintiffs say, was for Burlington to amend its December offer to reduce the number of shares to be purchased to 21,000,000 shares.

**\*11** The difficulty with these arguments is that they ignore other undisputed facts of record that, when also considered, dispel the adverse inferences that are said to be compelled. It is undisputed that the El Paso directors had significant reasons to be concerned about the December offer: it was partial, the offeror (Burlington) had made no commitment to acquire the remaining shares at all or for a fair price, and Burlington's financing arrangements created the risk that any "second step" acquisition of the minority shares would not be on fair terms. Finally, El Paso's investment banker had opined that the $24 per share offering price was too low in relation to the company's underlying values, and that nontendering shareholders would face significant risks as minority stockholders in an ongoing Burlington-controlled, highly leveraged company. The inherently coercive nature of partial offers of this kind, *i.e.,* offers that promise no guaranteed "second step" transaction at an adequate price, cannot be (and is not) seriously disputed. *See, e.g., Unocal, supra; CTS Corp. v. Dynamics Corp. of America,* 107 S.Ct., 1637, 1646 (1987).

By the time El Paso had reached its January 10, 1983 agreement with Burlington, most of the relevant circumstances had materially changed. By that point the market had been tested to determine if a superior bid or transaction was obtainable, and none was. For that reason, Merrill Lynch advised El Paso's Board that, although $24 per share was possibly less than El Paso's intrinsic worth, realistically it was all that the market would currently bear. On that basis the Board decided that in addition to exploring other alternatives, it must negotiate with Burlington.

It is true that, as a result of those negotiations, the Board approved a transaction at a price that it had previously rejected as being too low. It is also true that the directors ultimately tendered their shares to Burlington at that same $24 price. The parties do not dispute those facts, only their significance. In my view, the record, considered as a whole, permits only the inference that the directors' acceptance of the $24 price represented a pragmatic acknowledgement of, and accommodation to, the realities of the marketplace. No higher price was available. Unless a superior transaction could be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                      Page 10

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

negotiated with Burlington-and promptly-the coercive December offer, which already was over subscribed, would close **747** within a matter of days. The directors' consequent negotiating strategy was to seek concessions that hopefully would eliminate the risks inherent in the December offer. Although El Paso's representatives were unsuccessful in increasing the price, they did succeed in eliminating the offer's other coercive elements.[FN7]

That leads to the plaintiff's second argument, *viz.*, that improper director motivation must be inferred from the fact that it was unnecessary to dismantle the December offer, and (as a consequence) its proration pool, to accomplish the El Paso directors' objectives. Plaintiffs argue that if, in fact, it was necessary and proper to reduce the number of shares Burlington would acquire from the stockholders by having El Paso sell the same number of treasury shares directly,[FN8] Burlington could simply have amended its December offer to reduce the number of shares it would purchase. Since none of Burlington's "back-end" procedural concessions required undoing the December offer, with predictable adverse consequences to the shareholder class, and since the only beneficiaries of such actions would be the directors, plaintiffs conclude that the directors could only have intended to benefit themselves at the expense of the class.

*12 Concededly, from a purely mechanical standpoint these transactions could have been structured differently. The defendants argue, however, that that fact, by itself, does not establish that the defendants acted wrongfully. *Robinson v. T.I.M.E.-DC, Inc.,* 566 F.Supp. 1077, 1084 (N.D.Tex.1983) (applying Delaware law); *Abelow v. Symonds,* Del.Ch., 184 A.2d 173, 176 (1962). They further contend that if the December offer had not been replaced with the January offer, the result would have been unfair to El Paso's nontendering shareholders.

I concur. At the time that El Paso's directors were actively opposing Burlington, they had a valid reasons for believing that the **748** December offer was for an inadequate price and lacked "back-end" protections. As previously stated, El Paso's

representatives were able to obtain concessions that effectively eliminated the December offer's offensive aspects, other than price. Those concessions materially changed the environment in which the parties had been operating. The coercive elements of the December offer are what had motivated the directors to recommended against tendering. In reliance upon the directors' recommendation, many shareholders chose not to tender. Nothing of record shows otherwise, and the directors clearly so believed.

The negotiated elimination of those coercive aspects obviated the basis for recommending that shareholders ought not to tender. Accordingly, the directors concluded that it would be unfair to the nontendering shareholders if they were not afforded the opportunity to tender their shares into the improved offer. Consequently, the directors decided to structure the transaction as a new, substituted tender offer into which all El Paso shareholders could tender their shares, if they so chose. By that choice of transaction structure, the directors also stood to benefit personally in their capacity as shareholders, but only to the same extent as all other stockholders. The record establishes that any personal benefit to the directors was an incidental, secondary consideration, and not the primary motivation for their actions.

For these reasons the plaintiffs have failed to establish *prima facie* their claim for breach of fiduciary duty, based on their theory that the directors deliberately sought to serve their selfish interests at the expense of the tendering shareholder class.

B.

The second fiduciary duty issue is whether the directors' actions are protected under the business judgment rule. That rule, where applicable, creates a presumption that corporate directors, in making a business decision not involving self interest, acted on an informed basis, in good faith, and in the honest belief that their actions were in the best interests of the corporation. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 (1988); *Aronson v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 11

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

*Lewis, supra,* at 812. Where that presumption is applicable, the directors' judgment will be respected, unless the plaintiff demonstrates that the challenged transaction cannot be attributed to any rational business purpose. *Aronson v. Lewis, supra,* at 812.

**\*13** The evidence previously discussed establishes that the directors' actions in negotiating and approving the January 10, 1983 agreement **\*\*749** were the product of a valid business judgment that that agreement would serve a paramount, overriding corporate interest, as well as the interests of the stockholders as a group. The record demonstrates that in deciding upon the challenged transaction structure, the directors, a majority of whom were independent, acted in the honest, good faith belief that the corporation would benefit by receiving needed capital and that all shareholders, including those who had not tendered into the December offer, would benefit by having the opportunity to tender into a new offer with "back-end" procedural protections. [FN9] The actions of the El Paso directors must therefore be upheld as a valid exercise of business judgment.

Because the plaintiffs have failed to demonstrate that the El Paso directors violated any fiduciary duty owed to the class, summary judgment must be granted in favor of the defendants, and against the plaintiffs, on the breach of fiduciary duty claims.

### V.

The plaintiffs next contend that all defendants conspired jointly to achieve their improper goals. Specifically, plaintiffs argue that Burlington, chargeable with knowledge that the El Paso directors were preferring their own interests over those of the shareholders who tendered into the December offer, knowingly participated in the El Paso directors' breach of fiduciary duties. That conspiracy claim necessarily depends upon the directors having committed a breach of fiduciary duty. Since no such breach of fiduciary duty has been established, summary judgment must be granted dismissing the conspiracy claim.

The plaintiffs' tortious interference claim must also be dismissed, because an essential element of that tort has not been established. To constitute tortious interference, the act that is claimed to have interfered with the contract relationship or business opportunity must itself have been wrongful. *DeBonaventura v. Nationwide Mut. Ins. Co.,* Del.Supr., 428 A.2d 1151 (1981). Because the El Paso directors committed no wrongful acts, the interference claim cannot stand.

**\*\*750** Finally, the plaintiffs contend that the amount of damages may be determined from the record as a matter of law. Because the plaintiffs have failed to establish that any of the defendants are liable as a result of the acts complained of, it becomes unnecessary to address the damages question.

For the foregoing reasons, the defendants' motions for summary judgment are granted, and the plaintiffs' cross motion for summary judgment is denied. IT IS SO ORDERED.

> FN1. Plaintiffs have elected not to pursue their claims for entrenchment and breach of fiduciary duty of candor against the El Paso defendants.
>
> FN2. The December offering materials also stated that Burlington did not intend to change El Paso's management. In a letter accompanying the offer, Burlington's chairman advised that Burlington expected that El Paso's "management would continue its service uninterrupted" and that El Paso's chairman, Mr. Petty, would be offered a position on Burlington's Board of Directors.
>
> FN3. Because Burlington agreed to purchase the treasury shares directly from El Paso, there would be a corresponding reduction of the number of shares Burlington would purchase from the shareholders in its January offer. Under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 12

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

the December offer, Burlington would have purchased up to 25,100,000 shares. In the January offer, that amount was reduced to 21,000,000 shares, for a net reduction of 4,100,000 shares. That amount was only 66,667 shares less than the number of treasury shares being sold directly by El Paso to Burlington.

FN4. Of the 40,246,854 El Paso shares tendered, nine of El Paso's ten directors tendered a total of 50,322 shares. Only one director, Mr. Noel, tendered a significant number of shares, *i.e.,* 534,285 shares.

FN5. Plaintiffs rely upon *San Francisco Real Estate Investors v. Real Estate Investment Trust of America,* 692 F.2d 814 (1st Cir.1982), wherein the First Circuit reversed an injunction that extended the proration period applicable to a partial tender offer. The Court of Appeals found the injunction unnecessary, because the offer had been conditioned upon the invalidation of a target company by-law. The offer could not be completed unless the challenged by-law was preliminarily enjoined. That court also held that the extension of the proration period was improper, because it took "... money from those who tendered within the original time limit and [gave] it to those who tendered later." 692 F.2d at 818. However, the basis of that ruling was not that the proration period was immutable, but rather that it was "entitled to respect ... and should not be enlarged without a significant reason." *Id.* at 817. In that case the extension of the proration period was found to have violated § 14(d)(6) of the Williams Act, 15 *U.S.C.* § 78n(d)(6), because no such "significant reason" had been shown. The plaintiffs' also rely upon *Pryor v. United States Steel Corp.,* 794 F.2d 52 (2d Cir.1986), which also involved an extension of a proration period that resulted in an enlargement of the proration

pool to include shares that were tendered after the proration deadline. The court found that the extension violated § 14(d)(6) of the Williams Act, on the ground that the tender offeror was not free to extend an already expired proration deadline, where the effect was to reduce the number of shares to be purchased from shareholders who had tendered before the deadline.

Apart from involving dissimilar facts, those cases do not support the proposition that directors have an absolute duty arising under state law, to maintain and preserve the proration position of tendering stockholders inviolate, regardless of the circumstances. Moreover, in those cases the challenged transactions were found to have violated § 14(d)(6) of the Williams Act. However, the transactions complained of here have been found *not* to have violated § 14(d)(6). *Brill v. Burlington Northern, Inc., supra.*

FN6. The parties dispute whether the proposal to terminate the December offer originated with the directors. For purposes of these motions, it will be assumed that the directors initiated that proposal.

FN7. As previously stated, Burlington was unwilling to commit to a "second step" transaction. However, it did commit that any future purchase of the remaining El Paso shares would be made subject to the approval of both a majority of the minority stockholders and the "continuing" directors of El Paso not designated by Burlington. Those procedural protections materially decreased (if they did not eliminate) Burlington's ability to acquire the remaining El Paso shares for an unfair price. Only 11 months later, Burlington acquired those shares in a second step merger at the same $24 per share tender offer price.

FN8. The uncontroverted record evidence

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 13

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727
**(Cite as: Not Reported in A.2d)**

> is that El Paso insisted upon a direct sale of treasury shares to inject capital that would enable the corporation to reduce its high debt level. There is no evidence to support the plaintiffs' assertion that the parties agreed to a direct sale of treasury shares to camouflage the directors' selfish motives for substituting the January offer for the December offer.

> FN9. Tendering shareholders would also benefit, since to the extend their shares were not part of the December proration pool, those shares would remain as minority shares in a Burlington-controlled company. Therefore, the January 10, 1983 agreement afforded "back-end" protection to tendering, as well as nontendering, shareholders.

Del.Ch.,1988.

Gilbert v. El Paso Co.

Not Reported in A.2d, 1988 WL 124325 (Del.Ch.), 14 Del. J. Corp. L. 727

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                    Page 1

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents

Peerless Heater Co. v. Mestek, Inc.E.D.Pa.,2000.
United States District Court, E.D. Pennsylvania.
PEERLESS HEATER COMPANY, et al.,
v.
MESTEK, INC., et al.
**No. CIV. A. 98-CV-6532.**

May 11, 2000.

*MEMORANDUM*

PADOVA.
**\*1** Plaintiffs filed the instant suit against Mestek, Incorporated, John E. Reed, and R. Bruce Dewey alleging violations of various federal antitrust laws and the Massachusetts Unfair Sales Act, Mass.Gen.Laws.Ann. ch. 93 §§ 14E-14K, for attempting to restrict Plaintiffs' nationwide sales of mid-priced, cast iron residential and commercial boilers. The Complaint further asserts claims under Pennsylvania law for defamation, tortious interference with existing and prospective business advantage, and trade libel.

Before the Court is Defendants' Motion for Summary Judgment, Plaintiffs' Motion Pursuant to Rule 56(f), and Plaintiffs' Motion to Strike the Affidavits of Shea and Schwaber. All of the pending Motions are fully briefed and ripe for decision. The Court held oral argument on April 20, 2000. For the reasons that follow, the Court grants in part and denies in part Defendants' Motion, dismisses Plaintiffs' Motion Pursuant to Rule 56(f) as moot, and grants in part and denies in part Plaintiffs' Motion to Strike.

I. Background

Plaintiffs Peerless Heater Company and Peerless Industries, Inc. (collectively "Peerless"), and Defendant Mestek, Incorporated ("Mestek") manufacture and sell cast-iron residential and commercial boilers. Prior to 1992, Peerless owned over 90% of Eafco, Incorporated ("Eafco"), a corporation that operated a foundry ("Eafco Foundry"). Although Peerless and Mestek are competitors in the nationwide boiler market, in 1992, the two companies entered into an agreement by which Mestek and Peerless would become joint owners of Eafco. Under the agreement, both Peerless and Mestek would then obtain their iron boiler castings from the Eafco Foundry. Over the next several years, however, the relationship between Peerless and Mestek deteriorated.

Peerless claims that during the period between 1994 and 1998, Mestek embarked on a campaign to either drive Peerless from the market or takeover Peerless outright. Peerless alleges that Mestek, through its sales representatives, sought to take business away from Peerless by spreading false rumors about Peerless' precarious financial condition and stability. Mestek's representatives further allegedly told customers that Mestek would likely purchase either Peerless itself or Peerless' interest in the Eafco Foundry. In the case of the latter, Peerless claims that Mestek warned customers that Peerless would have to raise its prices to reflect the true costs of production. According to Plaintiffs, Mestek registered the Internet domain name of "Peerlessco.com" to further enhance confusion over Mestek's affiliation with Peerless.

In addition to creating confusion over the affiliation of the two companies, Mestek also allegedly attempted to increase its sales volume by selling boilers at prices below its cost of production to select distributors in New Jersey and Maine. Peerless claims that despite having knowledge of this allegedly predatory conduct, Mestek management deliberately failed to remedy the situation. As a result, the parties ceased their joint ownership of Eafco in 1998.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                 Page 2

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: Not Reported in F.Supp.2d)**

**\*2** Plaintiffs filed the instant suit on December 15, 1998, against Mestek, John Reed ("Reed"), Mestek's Chairman and Chief Executive Officer, and R. Bruce Dewey ("Dewey"), Mestek's Senior Vice President and General Counsel. The Amended Complaint alleges seven causes of action. Count I states a claim pursuant to Section One of the Sherman Antitrust Act, 15 U.S.C. § 1, for Defendants' alleged dissemination of false and misleading information about Peerless' financial status and future, and affiliation with Mestek. Count II alleges that Defendants engaged in illegal price discrimination and predatory pricing in violation of Section 2(a) of the Clayton Act, as amended by the Robinson Patman Act, 15 U.S.C. § 13(a). Count III asserts that Mestek made misrepresentations to Plaintiffs' potential and existing distributors in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1). Counts IV, V, and VI state claims under Pennsylvania state law for defamation, tortious interference with existing and prospective business advantage, and trade label respectively. Finally, Count VII alleges that Mestek violated the Massachusetts Unfair Sales Act, Mass.Gen.Laws.Ann. ch. 93 §§ 14E-14K, by selling boilers at prices below its cost of production. Counts III and VII are against Mestek only; Counts I, II, IV, V, and VI are against all Defendants.

## II. Plaintiffs' Motion to Strike the Affidavits of Stephen Shea and Steven Schwaber Pursuant to Rule 56(e)

Plaintiffs challenge two affidavits submitted by Defendants in support of their Motion for Summary Judgment as improper under Rule 56(e) of the Federal Rules of Civil Procedure: the affidavits of Stephen Schwaber ("Schwaber"), Vice President of Mestek's Boiler Division, and Stephen Shea ("Shea"), Mestek's Chief Financial Officer. *See* Def.Ex. 42; Def.Reply Mem.Ex.A. Both affidavits relate to the issue of whether Mestek sold boilers below cost to certain distributors. For the reasons that follow, the Court grants in part and denies in part Plaintiffs' Motion.

### A. *Legal Standard*

Rule 56(e) of the Federal Rules of Civil Procedure states in pertinent part:
Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

When considering motions for summary judgment, courts interpret Rule 56(e) to preclude consideration of hearsay statements that are not " capable of being admissible at trial." *Philbin v. Trans Union Corp.,* 101 F.3d 957, 961 n. 1 (3d Cir.1996). Furthermore, courts may disregard affidavits submitted in connection to a summary judgment motion when, without a satisfactory explanation, the affidavit contradicts the affiant's earlier deposition testimony. *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991).

### B. *Discussion*

**\*3** Plaintiffs argue that Schwaber's affidavit should be struck because Defendants failed to attach or serve certified copies of the papers referred to in the affidavit. The Court agrees that Defendants failed to comply with that technical portion of the rule and accordingly strikes Schwaber's affidavit, attached as Exhibit A to Defendants' Reply Memorandum in Support of Motion for Summary Judgment.

Plaintiffs next assert that Shea's affidavit fails to comply with Rule 56(e) because he lacks personal knowledge and is incompetent to testify regarding the subject matter of the affidavit, and because the affidavit presents only conclusions and interpretations of documents that constitute impermissible lay opinion rather than facts. Plaintiffs further argue that Shea's affidavit contradicts his earlier deposition testimony. The Court disagrees with all of Plaintiffs' contentions. As Chief Financial Officer, Shea bears ultimate responsibility for Mestek's financial documents and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: Not Reported in F.Supp.2d)**

is therefore competent to explain the contents of those documents. Furthermore, the affidavit affirms his personal knowledge of the matters about which he testifies. Shea's affidavit also contains facts and does not constitute improper lay opinion, nor did Shea contradict his earlier deposition testimony. Accordingly, the Court denies Plaintiffs' Motion with respect to Shea's affidavit.[FN1]

> FN1. The Court notes that Shea's affidavit is not a significant factor in the Court's determination that a genuine issue of material fact exists as to below-cost pricing.

### III. Defendants' Motion for Summary Judgment

The Court will address Defendants' summary judgment motion prior to discussing Plaintiffs' Motion Pursuant to Rule 56(f).

#### A. *Legal Standard*

It is clear that courts apply the same standard on summary judgment used in all other types of actions to antitrust actions. *See Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.,* 953 F.Supp. 617, 638 (E.D.Pa.1997). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the

movant's initial *Celotex* burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing " sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

**\*4** Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson,* 477 U.S. at 255. "[I]f the opponent [of summary judgment] has exceeded the 'mere scintilla' [of evidence] threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992).

#### B. *Discussion*

Defendants request summary judgment on all counts. For the following reasons, the Court grants in part and denies in part Defendants' Motion.

##### 1. *Causation of Injury In Fact*

Defendants first globally argue that Counts I, III, IV, V, and VI fail because Plaintiffs lack evidence demonstrating that Defendants' alleged behavior caused any harm to Peerless. Proof of causation, i.e. that the defendant's conduct caused the injury to the plaintiff, is required in cases arising under Section One of the Sherman Act, the Lanham Act, and Pennsylvania state law claims of tortious interference with business relations, defamation, and trade libel. *See Callahan v. A.E.V., Inc.,* 182 F.3d 237, 250 (3d Cir.1999)(Sherman Act Section

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: Not Reported in F.Supp.2d)**

One); *AT & T Co. v. Winback and Conserve Program, Inc.,* 42 F.3d 1421, 1428 (3d Cir.1994) (Lanham Act); *Guardian Life Ins. Co. of Am. v. Am. Guardian Life Assurance Co.,* 943 F.Supp. 509, 526 (E.D.Pa.1996)(trade libel); *Centennial School District v. Independence Blue Cross,* 885 F.Supp. 683, 686-88 (E.D.Pa.1994)(defamation and interference with current and prospective business relations). To satisfy this causation requirement, the plaintiff must prove that the defendant's activities were a material cause of the injury, but need not eliminate all possible alternative sources of injury as the cause of its injury. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9. (1969). The plaintiff also need not prove that the defendant's conduct was the sole proximate cause of the injury. *Id.* It is sufficient that the plaintiff " adduce evidence of specific lost transactions showing causation or fact of injury, which is bolstered by an expert damage report that is not overly speculative as a matter of law." *Callahan,* 182 F.3d at 260 (*quoting Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 487 (3d Cir.1998)).

Upon a review of the parties' submissions, the Court concludes that Plaintiffs have submitted sufficient evidence from which a jury could reasonably infer causation as to these claims. Plaintiffs present testimony regarding the effects such misstatements have on distributors and customers within the specialized context of the boiler industry, and evidence of decreased sales growth rates involving the distributors who were allegedly exposed to the misstatements. *See* Pl.Ex. 8 at 95-122; Pl.Ex. 14 at 17-18. The Court, therefore, denies Defendants' request for summary judgment on this ground.

### 2. *Count I: Sherman Antitrust Act Section 1*

**\*5** Count I asserts that Defendants disseminated false or misleading information about Peerless' financial condition and stability, the fairness of Peerless' pricing, and the relationship between Mestek and Peerless in violation of Section One of the Sherman Antitrust Act, 15 U.S.C. § 1 (1994). Plaintiffs allege that Defendants conspired with Mestek's sales representatives to spread these false statements about Peerless among boiler distributors

and other customers. Defendants argue that Count I fails because Mestek's sales representatives are not third parties with whom Defendants are capable of conspiring as a matter of law, and nor can Plaintiffs prove that a conspiracy actually existed. Defendants further claim that Plaintiffs have no evidence showing any injury to competition, or to Peerless itself, as a result of the alleged conspiracy.

Section 1 of the Sherman Act provides:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1 (1994). Courts construe Section One to proscribe only those combinations or conspiracy that "unduly" restrain trade. *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164, 166 (3d Cir.1979). In cases such as this where the particular restraint alleged does not fall within a category that has been judicially determined to be illegal per se,[FN2] the court must apply the "rule of reason" test to determine whether the restraint imposed "merely regulates competition or whether it ... may suppress or even destroy competition." *Yeager's Fuel,* 953 F.Supp. at 656 & n. 9 (quoting *Board of Trade v. United States,* 246 U.S. 231, 238 (1918) and citing *National Society of Professional Engineers v. United States,* 435 U.S. 679, 691 (1978)). To present a valid claim under the rule of reason test, a plaintiff must prove that: (1) the defendants contracted, combined, or conspired among each other; (2) the combination or conspiracy produced anticompetitive effects within the relevant product and geographic markets; (3) the objects of and the conduct pursuant to that conspiracy were illegal; and (4) the plaintiff was injured as a result of that conspiracy. *Angelico v. Lehigh Valley Hosp., Inc.,* 184 F.3d 268, 275 (3d Cir.1999).

> FN2. Courts have held that group boycotts, price fixing, resale price maintenance, tying arrangements and reciprocal dealing constitute per se violations of the Sherman Act. *MHB Distrib. Inc. v. Parker Hannifin Corp.,* 800 F.Supp. 1265, 1268 (E.D.Pa.1992) (citing *Malley-Duff &*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: Not Reported in F.Supp.2d)**

*Assoc. v. Crown Life Ins. Co.,* 734 F.2d 133, 140 (3d Cir.), *cert. denied,* 469 U.S. 1072 (1984)). This case does not involve those types of conduct.

To establish the first element, the plaintiff must prove that two or more distinct entities agreed to take action against the plaintiff. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768 (1984)(holding that Section One does not reach conduct that is wholly unilateral); *Siegel Transfer Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1131 (3d Cir.1995). Although the express language of the Sherman Act's concerted action requirement could include coordinated conduct among officers or employees of the same company, courts do not interpret the statute in that manner. *See Siegel Transfer,* 54 F.3d at 1132-34. Rather, courts routinely hold that internal agreements or coordinated conduct among employees, officers, corporate divisions, or subsidiaries to implement the policies of the corporation do not violate the Sherman Act. *See Copperweld,* 467 U.S. at 769 (holding that a parent corporation and its wholly-owned subsidiary are incapable of conspiring as a matter of law for the purposes of Section One of the Sherman Act); *Siegel Transfer,* 54 F.3d at 1134 ("A corporation can act only through its agents, thus the acts of corporate directors, officers, and employees on behalf of the corporation are the acts of the corporation and a corporation cannot conspire with itself.")(quoting *Tunis Bros. Co. v. Ford Motor Co.,* 763 F.2d 1482, 1496 n. 21 (3d Cir.), *vacated and remanded,* 475 U.S. 1105, *reinstated,* 823 F.2d 49 (3d Cir.), *cert. denied,* 484 U.S. 1060 (1988)). Under this principle, corporate agents are incapable of engaging in an antitrust conspiracy when they demonstrate a unity of economic interest and purpose with the corporate principal. *Siegel Transfer,* 54 F.3d at 1134-35. For this reason, courts have held that sales representatives for corporate entities are not third parties with whom the corporation is capable of conspiring where the representatives receive commissions based on the amount of sales they achieve. *Id.* at 1135 (concluding that the receipt of commissions aligns the economic interests of the corporation and its representatives such that the parties constitute a single economic unit); *see also Pink Supply Corp. v. Hiebert,* 788 F.2d 1313, 1316-7 (8th Cir.1986).

**\*6** Conversely, intra-corporate persons or entities are legally capable of conspiring with the corporation for the purposes of Section One when they act for their own separate and personal interests outside the interests of the corporation. *Siegel Transfer,* 54 F.3d at 1134-35; *Weiss v. York Hosp.,* 745 F.2d 786, 813 n. 43, 817 (3d Cir.), *cert. denied,* 470 U.S. 1060 (1985). To determine when agents act for personal interests, courts should examine the substance, and not just the form, of the economic relations between the alleged conspirators. *Copperweld,* 467 U.S. at 772-73; *Siegel Transfer,* 54 F.3d at 1132-33. The substance of the arrangements at issue depends on the economic incentives of the parties involved. *Siegel Transfer,* 54 F.3d at 1135. In cases in which the plaintiff alleges that a defendant corporation conspired with its sales agents or representatives in restraint of trade, courts require that the agent "act to further his own economic interest in a marketplace actor which benefits from the alleged restraint [of trade], and causes his principal to take the anticompetitive actions about which the plaintiff complains." *Id* . at 1136-37. The alleged conspiracy must have brought together the economic power of the corporation and its agents so as to merge their previously divergent interests and goals. *Id.* at 1137.

The Court has examined the parties' submissions and found no evidence that Mestek's sales representatives had personal or economic interests and goals divergent from Mestek.[FN3] Rather, the evidence only confirms that the economic interests of the sales representatives were completely aligned with that of Mestek. Accordingly, the Court concludes that, as a matter of law, Mestek was incapable of engaging in an antitrust conspiracy with its sales representatives and grants summary judgment in favor of Defendants on Count I. [FN4] . [FN5]

FN3. It is undisputed that Mestek's sales representatives receive commissions in exchange for their sales of Mestek's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: Not Reported in F.Supp.2d)**

products. *See* Pl.Br. at 113-114; Pl.Ex. 57 at 3.

FN4. Plaintiffs neither argue nor present evidence that Defendants Reed and Dewey, both officers of Mestek, acted for their own personal interests in this case. There is no genuine issue of material fact, therefore, that Reed and Dewey are not third parties with whom Mestek is capable of conspiring for the purposes of Section One.

FN5. Having disposed of Count I on this ground, the Court declines to address Defendants' other arguments.

### 3. *Counts II and VII: Robinson Patman Act and Massachusetts Unfair Sales Act*

Counts II and VII of the Amended Complaint allege that Defendants violated Section 2(a) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a) ("Clayton Act"), and the Massachusetts Unfair Sales Act ("Sales Act"), Mass.Gen.Laws Ann.ch. 93 § 14E-14K (West 2000), by selling commercial and residential boilers in various states at prices below the cost of production and only to certain select distributors. Defendants argue that both Counts fail because Plaintiffs lack evidence of below-cost pricing, and are unable to prove Mestek's ability to recoup its investment in below-cost prices.

The Massachusetts Unfair Sales Act is a penal statute applicable to:
[a]ny retailer who, with intent to injure competitors or destroy competition, advertises, offers to sell or sells at retail any item of merchandise at less than cost to the retailer ... or any wholesaler who, with intent as aforesaid, advertises, offers to sell or sells at wholesale any item of merchandise at less than cost to the wholesaler ...

**\*7** Mass.Gen.Laws.Ann. ch. 93 § 14F (West 2000). Section14G lists exceptions under which retailers and wholesalers may legally sell items below cost. Mass.Gen.Laws.Ann. ch. 93 § 14G (West 2000). Section 14H provides a private right of action under

the Sales Act for injunctive relief, but not for damages. *Massachusetts Candy & Tobacco Distrib., Inc. v. Golden Distrib., Ltd.,* 852 F.Supp. 63, 67-70 (D.Mass.1994); *see* Mass.Gen.Laws.Ann. ch. 93 § 14H (West 2000).

Section 2(a) of the Clayton Act prohibits price discrimination "where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly.[FN6]" 15 U.S.C. § 13(a) (1994); *Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.,* 159 F.3d 129, 141 (3d Cir.1998). The essence of a claim under the Clayton Act is that "[a] business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 222 (1993).

FN6. The statute provides:
It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption or resale within the United States ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.
15 U.S.C. § 13(a) (1994).

To state a claim under Section 2(a) of the Clayton Act for price discrimination, a plaintiff must prove that the defendant made at least two contemporary sales of the same commodity at different prices to different purchasers, and the effect of such discrimination was to injure competition.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: Not Reported in F.Supp.2d)**

*Crossroads Cogeneration,* 159 F.3d at 141. Because the Clayton Act is only a prophylactic statute, it does not require proof that the alleged price discrimination in fact harmed competition. *Stelwagon Manu. Co. v. Tarmac Roofing Sys., Inc.,* 63 F.3d 1267, 1721 (3d Cir.1995). Rather, the Clayton Act requires only a "reasonable possibility" of substantial injury to competition to trigger its protections. *Brooke Group,* 509 U.S. at 222.

To prove a reasonable possibility of injury to competition in the absence of direct evidence, the plaintiff must prove both that "the prices complained of are below an appropriate measure of [the defendant's] costs," and that the defendant had a reasonable prospect of recouping its investment in below-cost prices. *Id.* at 222-24; *Advo, Inc. v. Philadelphia Newspapers, Inc.,* 51 F.3d 1191, 1195 n. 3 (3d Cir.1995). While a necessary element under Section 2(a), evidence of below-cost pricing alone is nonetheless insufficient to allow an inference of recoupment and injury to competition. *Brooke Group,* 509 U.S. at 226.

The United States Supreme Court has outlined two prerequisites for recoupment. *Id.* at 225-26; *see also Stearns Airport Equip. Co., Inc. v. FMC Corp.,* 170 F.3d 518, 528 (5th Cir.1999). First, the defendant's alleged below-cost pricing must have been capable of producing the intended effects on the plaintiff. *Brooke Group,* 509 U.S. at 225; *Stearns,* 170 F.3d at 528. The threshold inquiry of recoupment, therefore, is whether "given the aggregate losses caused by the below-cost pricing, the intended target would likely succumb." *Brooke Group,* 509 U.S. at 225. "This [analysis] requires an understanding of the extent and duration of the alleged predation, the relative financial strength of the predator and its intended victim, and their respective incentives and will." *Id.; see also Stearns,* 170 F.3d at 529-30 (requiring plaintiffs to show that the defendants' below-cost pricing is "of a sufficient duration and extent to independently force [the plaintiff] out of the market.")

**\*8** If the record indicates that the defendant's below-cost pricing could likely produce the intended effect on the target, the second prerequisite is proof that the pricing would likely injure competition in the relevant market. *Brooke Group,* 509 U.S. at 225. To establish this second element of recoupment, the plaintiff must show that "there is a likelihood that the predatory scheme alleged would cause a rise in prices above a competitive level that would be sufficient to compensate for the amounts expended on the predation, including the time value of the money invested in it." *Id.* Determining whether recoupment is likely to injure competition requires an estimate of the cost of the alleged predation, and a close analysis of both the scheme alleged by the plaintiff and the structure and conditions of the relevant market. *Id.* at 226. The plaintiff's case may be terminated on summary judgment in circumstances where market circumstances or deficiencies in proof would preclude a reasonable jury from finding that the alleged scheme would likely result in sustained supracompetitive pricing. *Id.; see also Stearns,* 170 F.3d at 529.

Defendants challenge Counts II and VII on several grounds. Defendants first assert that Plaintiffs lack any significant evidence of below-cost pricing. [FN7] The Court determines that Plaintiffs' expert reports, submitted by Dr. Richard Gering, contain sufficient data to raise a genuine issue of material fact regarding the occurrence of below-cost sales.[FN8] [FN9] *See* Pl.Ex. 14 at 14-15; Pl.Ex. 62 at Ex. A, Ex. B.

> FN7. Defendants do not challenge Plaintiffs' ability to produce evidence regarding price discrimination.

> FN8. Even had Schwaber's affidavit been considered, the Court would nonetheless conclude that a genuine issue of material fact exists as to the existence of below-cost pricing.

> FN9. Courts have not articulated a clear standard that the jury or the district court should properly apply to determine the measure of the defendant's cost. *See Brooke Group,* 509 U.S. at 223 n. 1 (accepting parties' agreement to use average variable cost); *Advo,* 51 F.3d at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 8

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: Not Reported in F.Supp.2d)**

1198 (identifying marginal cost as the proper measure under standard microeconomic theory and average variable cost as a potentially viable proxy for marginal cost). The Court's determination, however, stands under either standard.

Defendants next argue that Plaintiffs lack evidence demonstrating that Mestek had a reasonable prospect of recouping its investment in below-cost prices. Given the *Brooke Group* standard, the Court agrees. Plaintiffs submit no evidence from which a jury could reasonably conclude that Mestek's below-cost pricing could have achieved its intended effect, namely to drive Peerless from the market or eliminate Peerless as a viable competitor.[FN10] To the contrary, the parties' submissions indicate that Peerless' market share, sales, and profits have steadily increased during the relevant period. *See* Def.Ex. 10 at 225; Def.Ex. 13 at 63-64; Def .Ex. 1 at 158-64, 186-190; Pl.Ex. 54. By all accounts, Peerless has become a stronger competitor showing no signs of succumbing to Mestek's allegedly predatory behavior. *Id.* Furthermore, Plaintiffs' expert identifies only approximately $150,000.00 in damages attributable to Mestek's below-cost pricing. Pl.Ex. 14 at 17. Outside of several conclusory statements in their legal briefs and expert report, Plaintiffs present no contrary evidence showing a reasonable possibility that Peerless could have been driven from the market by Mestek's conduct.[FN11] *See* Pl.Br. at 141; Pl.Ex. 14 at 12, 16. Such unsupported statements alone are insufficient to create a genuine issue of material fact. *See Siegel Transfer,* 54 F.3d at 1138; *Advo,* 51 F.3d at 1198-99.

FN10. Plaintiffs' position is that Mestek engaged in the below-cost sales scheme and spread malicious rumors about Peerless "to take over or destroy Peerless as a competitor." Pl.Br. at 5; *see also* Pl.Br. at 141.

FN11. The Court further notes that Plaintiffs' evidence of below-cost pricing involves transactions totaling less than

$100,000 .00, and with an aggregate negative margin of only $15,000.00 over a three year period between 1995 and 1998. *See* Pl.Ex. 62 at Exs. A, B. In comparison, Peerless' gross sales in 1999 reached approximately $36 million. Def.Ex. 1 at 159.

**\*9** In conclusion, the Court determines that the proffered evidence is insufficient to establish a reasonable possibility of success in driving Peerless from the market. *See Stearns,* 170 F.3d at 529-530 (affirming grant of summary judgment in favor of defendant where plaintiff demonstrated underpricing in only five bids out of 240-400 available over a four year period and plaintiff presented no evidence that "its survival was threatened by the sales lost to the rare, sporadic predation that it alleges, and does not claim that the continuation of below-cost bids at [that] level will drive it out of business"); *Taylor Publ'g Co. v. Jostens, Inc.,* 36 F.Supp.2d 360, 369 (E.D.Tex.1999)(finding no reasonable possibility of success where below-cost pricing caused the loss of less than 1% of the plaintiff's sales). Since Plaintiffs are unable to establish an essential prerequisite of recoupment, the Court grants summary judgment in favor of Defendants on Counts II and VII.[FN12]

FN12. Having resolved Counts II and VII on this ground, the Court declines to consider Defendants' other arguments.

### 4. *Count III: Lanham Act*

Count III states a claim against Mestek under the Lanham Act, 15 U.S.C. § 1125(a)(1), for Mestek's alleged oral statements to distributors and dealers that it would imminently own or currently owns Peerless; that Plaintiffs were financially unstable; and that Peerless price-gouged their customers. Mestek argues that Count III fails as a matter of law because any false statements that were made were not disseminated so as to constitute advertising or promotion within the boiler industry, and were only general comments about Plaintiffs' business and not designed to capitalize on the goodwill associated with Plaintiffs' products.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: Not Reported in F.Supp.2d)**

Section 43(a) of the Lanham Act both proscribes trademark infringement, and generally creates a federal cause of action for unfair competition. *AT & T v. Winback and Conserve Prog., Inc.,* 42 F.3d 1421, 1428 (3d Cir.1994). The statute provides:
Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of his or her or another person's goods, services, or commercial activities,
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1) (1994). Plaintiffs proceed under both sections 1125(a)(1)(A) and (B). Pl.Br. at 155.

Under section 1125(a)(1)(A), the plaintiffs must prove that (1) the defendant made misrepresentations relating to a false designation of affiliation in interstate commerce in connection with goods and services; (2) the misrepresentations are likely to cause confusion, mistake, or deception as to the affiliation of the parties; and (3) the plaintiffs have been or are likely to be damaged. *Winback,* 42 F.3d at 1428. To state a claim under section 1125(a)(1)(B) for false advertising, the plaintiff must prove that (1) the defendant has made false or misleading statements as to his or another's product; (2) there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff in terms of declining sales and loss of good will.

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 922-23 (3d Cir.1990); *Synygy, Inc. v. Scott-Levin, Inc.,* 51 F.Supp.2d 570, 575 (E.D.Pa.1999).

**\*10** Section 1125(a)(1)(B)'s language regarding " commercial advertising or promotion" describes (1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) designed to influence customers to buy the defendant's products; and (4) that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry. *Synygy,* 51 F.Supp.2d at 576. Some courts have held that section 1125(a)(1)(B) is not designed to apply to oral statements by salespeople to individual customers "concerning matters which an ordinary listener would recognize as personal opinion as opposed to representations of hard definable facts, such as product descriptions." *Licata & Co., Inc. v. Goldberg,* 812 F.Supp. 403, 408 (S.D.N.Y.1993); *see also Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,* 173 F.3d 725, 731 (9th Cir.1999)('puffery' is not actionable under Lanham Act). Under this principle, only statements of fact capable of being proven false are actionable under the Lanham Act because when personal opinions on nonverifiable matters are given, the recipient is likely to assume only that the communicator believes the statement, not that the statement is true. *Coastal Abstract Serv.,* 173 F.3d at 731; *Licata,* 812 F.Supp. at 408.

Mestek argues that Plaintiffs' claim under section 1125(a)(1)(A) fails because any misrepresentations that Mestek's sales representatives made were not " in connection with any goods or services or any container for goods." Similarly, Defendant asserts that the section 1125(a)(1)(B) claim fails because the alleged misrepresentations do not constitute " commercial advertising or promotion," but rather are mere puffery and sales talk. *See* 15 U.S.C. §§ 1125(a)(1) (1994). Based upon the parties' submissions, the Court determines that Plaintiffs have presented sufficient evidence from which a jury could reasonably conclude that the alleged misstatements made by Mestek's sales representatives were connected with goods or services, and constituted commercial advertising or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 10

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: Not Reported in F.Supp.2d)**

promotion. *See e.g.* Pl.Ex. 16 at 96; Pl.Ex. 20 at 128-29; Pl.Ex. 18; Pl.Ex. 23 at 73-77; Pl.Ex. 24 at 23-26; Pl.Ex. 25 at 23-29; Pl.Ex. 43; Pl.Ex. 30 at 17-19; Pl.Ex. 34 at 79-80. The Court, therefore, denies Mestek's request for summary judgment on Count III.

### 5. *Counts IV-VI: Pennsylvania State Law Claims*

As noted above, Counts IV through VI are for defamation, interference with current and prospective business relations, and trade libel under Pennsylvania law.[FN13] Defendants first request that the Court grant summary judgment in their favor because Plaintiffs cannot adduce evidence of causation. The Court has already rejected this argument. *See supra* at 7-8. Since one federal claim remains in this case, the Court also will not decline to exercise supplemental jurisdiction over Plaintiffs' state law claims.

> FN13. Despite hinting that Pennsylvania law may not apply to this action, Defendants offer no alternative choice of law analysis and cite only Pennsylvania law in support of their Motion with respect to Counts IV through VI. *See* Def.Br. at 48-50. Plaintiffs also cite only Pennsylvania law. The Court, therefore, will apply Pennsylvania law to Counts IV through VI.

Defendants Reed and Dewey next argue that Plaintiffs lack a legal basis for imposing individual and personal liability on them for any misrepresentations that were made by Mestek's sales representatives. Reed and Dewey point out that Plaintiffs lack evidence that either personally made any misrepresentations. Reed and Dewey further argue that they had no legal duty to stop anyone else from making any misstatements.

**\*11** Under Pennsylvania law, corporate officers are only individually liable for tortious activities in which they personally participate. *Wicks v. Milzoco Builders, Inc.,* 470 A.2d 86, 90 (Pa.1983). The general, if not universal, rule is that an officer

of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done or participated, or cooperated therein.

*Id.* The touchstone for personal liability under Pennsylvania caselaw, therefore, is knowing participation in the tortious conduct. *Chester-Cambridge Bank & Trust Co. v. Rhodes,* 31 A.2d 128, 131 (Pa.1943).

The *Wicks* court interpreted this rule to allow personal liability only for misfeasance, but not for nonfeasance. *Id.; Chester-Cambridge Bank,* 31 A.2d at 131; *Brindley v. Woodland Village Restaurant, Inc.,* 652 A.2d 865, 868 (Pa.Super.Ct.1995). Nonfeasance is "omitting to do, or not doing, something which ought to be done, which a reasonable and prudent man would do." *Brindley,* 652 A.2d at 868 (*quoting Nelson v. Duquesne Light Co.,* 12 A.2d 299, 303 (Pa.1940)). Misfeasance "is the doing of something which ought not to be done, something which a reasonable man would not do, or doing it in such a manner as a man of reasonable and ordinary prudence would not do it, in either case leading to mischief and injury." *Id.* Misfeasance requires that the defendant officer have actively or knowingly engaged in, or directed overt acts during commission of the tort. *Brindley,* 652 A.2d at 869-70. Courts will not premise liability on allegations or argument that the corporate officer merely "should have known the consequences of the liability-creating corporate act," *Wicks,* 470 A.2d at 90, or upon proof of the defendant officer's general supervisory responsibility. *Rhodes,* 31 A.2d at 131. *Kaites v. Commonwealth of Pennsylvania, Dep't of Environmental Resources,* 529 A.2d 1148, 1151 (Pa.Commw.Ct.1987). A defendant, however, may be personally liable for intentional neglect, or failure to act when subject to a duty requiring action. *Bernhardt v. Needleman,* 705 A.2d 875, 878 (Pa.Super.Ct.1998); *Kaites,* 529 A.2d at 1151.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 11

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: Not Reported in F.Supp.2d)**

The Court determines that Plaintiffs have submitted sufficient evidence raising a genuine issue of material fact as to whether Defendants Reed and Dewey personally participated in the alleged tortious conduct in that they knew about the allegedly defamatory statements being made by Mestek representatives about Peerless, and deliberately failed to take effective remedial steps. *See e.g.* Pl.Ex. 3 at 20-24; Pl.Ex. 6 at 79-80; Pl.Ex. 7 at 27-29; Pl.Ex. 8 at 18; Pl.Ex. 9 at 14-18. Summary judgment, therefore, is inappropriate with respect to Counts IV through VI.

### IV. Plaintiffs' Rule 56(f) Motion for Additional Discovery

**\*12** Plaintiffs move for additional discovery pursuant to Rule 56(f). For the following reasons, the Court dismisses Plaintiffs' Motion as moot.

#### A. *Legal Standard*

Federal Rule of Civil Procedure 56(f) provides:
Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). In considering motions under Rule 56(f), the court should consider "what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not been previously obtained." *Contractors Assoc. v. City of Philadelphia,* 945 F.2d 1260, 1266 (3d Cir.1991) (citation omitted). Rule 56(f) motions must be properly supported by affidavits that specifically identify the sought information and how such information would preclude summary judgment. *Gambrell v. Hess,* 777 F.Supp. 375, 378 (D.N.J.), *aff'd,* 970 F.2d 898 (3d Cir.1992).

Where the relevant information sought is in the hands of the moving party, the court should grant a Rule 56(f) motion "almost as a matter of course unless the information is otherwise available to the non-movant." *Contractors Assoc.,* 945 F.2d at 1267 . Where, however, the motion is based on speculation or raises merely colorable claims, when the party has already had an adequate opportunity to discover the information, or when the discovery request is irrelevant, the court may deny a Rule 56(f) motion. *City of Rome v. Glanton,* 958 F.Supp. 1026, 1039 (E.D.Pa.), *aff'd without op.,* 133 F.3d 909 (3d Cir.1997).

#### B. *Discussion*

Plaintiffs request several items of additional discovery. The Court will deal with each in turn. [FN14] First, Plaintiffs ask to re-depose Defendants Reed and Dewey on the contents of two memoranda that discuss alternative scenarios for Mestek's ownership of the Eafco Foundry. Pl.Ex. I. The issues raised in the memoranda are allegedly relevant to Reed and Dewey's knowledge and dissemination of false and misleading statements about the affiliation between Peerless and Mestek on which their liability under Counts IV through VI rests. Since the Court has denied Defendants' Motion as to those Counts, Plaintiffs' request is moot.

> FN14. The Court will evaluate Plaintiffs' requests only within the context of the Rule 56 issues presented in Defendants' Motion, and not as general requests for discovery. Since discovery is closed, Plaintiffs are entitled to additional documents or depositions only to the extent they are necessary to oppose Defendants' arguments on summary judgment.

Second, Plaintiffs seek to re-depose Shea about his affidavit submitted in support of Defendants' Motion. The affidavit asserts that Mestek did not sell boilers at below-cost prices to a select distributor in 1998. Plaintiffs also seek production of documents showing the account detail for several categories of expenses referenced in Shea's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: Not Reported in F.Supp.2d)**

affidavit. Plaintiffs claim that the documents are necessary to determine whether the enumerated costs are fixed or variable and are relevant to the below cost pricing issue. Peerless further seeks production of bills of materials and cost summary sheets for the months in which Mestek sold boilers to Nutley Heating and Cooling Supply ("Nutley") and Sondik Supply Company ("Sondik") to establish below-cost sales. These requests are moot since the Court has determined that Plaintiffs succeeded in establishing a genuine issue of material fact as to the existence of below-cost sales.

**\*13** Third, Plaintiffs request the monthly reports of two of Mestek's sales representatives. These reports reveal to whom the representatives spoke and may indicate what, if any, misstatements about Peerless the representatives made. This issue is relevant primarily to Counts I, and III through VI. The Court did not grant summary judgment in favor of Defendants on Counts III through VI. Although the Court granted summary judgment in favor of Defendants on Count I, it did so without considering whether Plaintiffs presented sufficient evidence that misstatements were actually made. Rather the Court's decision rests on the principle that Mestek's sales representatives, under the circumstances presented in this case, could not as a matter of law conspire with Mestek. The reports are irrelevant to that determination. For these reasons, Plaintiffs' request is moot.

Fourth, Plaintiffs seek production of documents related to a meeting held among Mestek executives in which Peerless and the relevant market for boilers were discussed. The documents are not relevant to the Court's resolution of Defendants' Motion. Plaintiffs' request is, therefore, moot.

Lastly, Plaintiffs seek production of missing invoices for three customers on the ground that they relate to the issue of discriminatory pricing. Defendants' Motion does not challenge Plaintiffs' ability to demonstrate discriminatory pricing and the Court assumed for the purpose of resolving the Motion that such pricing took place. Therefore, Plaintiffs' request is moot.

### V. Conclusion

In summary, the Court grants summary judgment in favor of Defendants on Counts I, II, and VII. Counts III, IV, V, and VI shall proceed to trial. Plaintiffs' Motion to Strike Affidavits is granted with respect to Schwaber's affidavit and denied with respect to Shea's affidavit. Plaintiffs' Motion Pursuant to Rule 56(f) is dismissed as moot. An appropriate Order follows.

### *ORDER*

AND NOW, this __ day of May, 2000, upon consideration of Defendants' Motion for Summary Judgment (Doc. No. 51), Plaintiffs' Motion to Strike Affidavits of Stephen Shea and Steven Schwaber (Doc. No. 64), and Plaintiffs' Alternative Motion for Order Pursuant to FRCP 56(f) (Doc. No. 54), and all the briefing submitted thereon, IT IS HEREBY ORDERED that:
VI. Defendant's Motion for Summary Judgment (Doc. No. 51) is GRANTED in part and DENIED in part;
I. Judgment in favor of Defendant is ENTERED on Counts I, II, and VII;
II. Counts III, IV, V, and VI will proceed to trial;
VII. Plaintiffs' Motion to Strike Affidavits of Stephen Shea and Steven Schwaber (Doc. No. 64) is GRANTED in part and DENIED in part;
A. The affidavit of Steven Schwaber (Ex. A Doc. No. 63) is STRIKEN;
3. Plaintiffs' Alternative Motion for Order Pursuant to FRCP 56(f) (Doc. No. 54) is DISMISSED as moot.

E.D.Pa.,2000.
Peerless Heater Co. v. Mestek, Inc.
Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917

Briefs and Other Related Documents (Back to top)

• 2:98cv06532 (Docket) (Dec. 15, 1998)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                          Page 1

Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429
**(Cite as: Not Reported in F.Supp.2d)**

▷
Sanderson v. BrugmanS.D.Ind.,2001.
United States District Court, S.D. Indiana,
Indianapolis Division.
SANDERSON, Charles H., Plaintiff,
v.
BRUGMAN, Helmut H., Surtech Corp., Indiana
Soft Water Services, Inc. d/b/a Culligan, Culligan
International Company, Defendants.
**No. IP00-459-C-H/G.**

May 29, 2001.

ENTRY ON DEFENDANTS' MOTIONS TO
DISMISS AND RELATED MATTERS
HAMILTON.
**\*1** Plaintiff Charles H. Sanderson has sued Helmut
H. Brugman, Surtech Corp., Indiana Soft Water
Services, Inc., and Culligan International Company
in this action. Sanderson's First Amended
Complaint attempts to allege violations of Section 1
of the Sherman Act, 15 U.S.C. § 1, and the Lanham
Act, 15 U.S.C. § 1125. Sanderson also alleges
claims under state law within this court's
supplemental jurisdiction. Defendants have moved
to dismiss the First Amended Complaint for failure
to state a claim upon which relief can be granted.
As explained below, defendants' motion is granted,
but Sanderson will have an opportunity to replead
his Lanham Act claim with greater specificity.

I. *Plaintiff's Complaint*

The operative complaint at this stage is the First
Amended Complaint.[FN1] Plaintiff Charles H.
Sanderson alleges that he provides "magnetic water
treatment and devices" in interstate commerce. He
contends that his treatment and devices provide a
means of treating hard water to control lime scale in
a way that does not require the use of toxic
chemicals. At the core of his complaint, Sanderson
alleges a widespread conspiracy in a worldwide
market beginning in the 1970's "to discredit and
malign magnetic water treatment." First Am. Cplt.
¶ 38. At the center of the alleged conspiracy is the
Water Quality Association (WQA), a trade
association.

> FN1. Sanderson has moved for leave to
> file a Second Amended Complaint that
> differs from the First Amended Complaint
> only by deleting references to certain
> alleged "co-conspirators" who have settled
> their differences with Sanderson. The
> motion for leave to file the Second
> Amended Complaint is hereby granted, but
> the ruling on the defendants' motions to
> dismiss shall also apply to the Second
> Amended Complaint, which defendants
> need not answer.

Sanderson alleges that the WQA and others have
conspired to restrain trade by means including:
Improper use of various studies and reports
derogatory to magnetic water treatment and devices,
including studies commissioned by the Water
Quality Association and conducted at Purdue
University, and the South Dakota School of Mines,
such use including interstate and international
publication and sale of these studies, while knowing
that the information contained therein was not
accurate, or acting with reckless disregard of the
truth or accuracy of the conclusions reached in
these studies.
Distribution of negative position papers and policy
statements regarding magnetic water treatment.
Banning the display of magnetic treatment devices
at the trade shows sponsored by the Water Quality
Association.
The instigation of investigations by various public
officials, including various state attorneys general,
the Federal Trade Commission, the Better Business
Bureau, such investigations prompted by an
improper motive, to-wit, the restraint of trade and
harassment of a competitor.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 2

Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429
**(Cite as: Not Reported in F.Supp.2d)**

Placement of letters and other articles of misinformation in the trade press.
Direct contact with customers and potential customers of Plaintiff to discredit Plaintiff's products [and] processes.
Appearances at trade shows and other public forums to distribute information negative to magnetic water treatment.

First Am. Cplt. ¶ 40.

### II. *Standard for Dismissal Under Rule 12(b)(6)*

Defendants' motions to dismiss challenge the sufficiency of the complaint for failure to state a claim upon which relief may be granted. See Fed.R.Civ.P. 12(b)(6). In reviewing a motion to dismiss, the court reviews all facts alleged in the complaint and any inferences reasonably drawn from the alleged facts in the light most favorable to the plaintiff. See *Caldwell v. City of Elwood,* 959 F.2d 670, 671 (7th Cir.1992). Dismissal is warranted only if the plaintiff can prove no set of facts consistent with his complaint that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). When a plaintiff provides the specifics of his claims in the complaint, however, it is possible for him to plead himself out of court where the specifics show he cannot be entitled to relief. See, *e.g., Khuans v. School Dist. 110,* 123 F.3d 1010, 1016 (7th Cir.1997) (affirming dismissal of First Amendment claim); *Lanigan v. Village of East Hazel Crest,* 110 F.3d 467, 474 (7th Cir.1997) (affirming dismissal of civil rights claim). Such specifics may serve the salutary purpose of avoiding prolonged litigation that is destined as a matter of law not to succeed. See *Zehner v. Trigg,* 952 F.Supp. 1318, 1322 n. 2 (S.D.Ind.1997) (plaintiffs' candor in complaint and briefing avoided waste of time), *aff'd,* 133 F.3d 459 (7th Cir.1997).

### III. *Sherman Act Claims*

**\*2** Section 1 of the Sherman Act provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. A party injured by a violation of Section 1 may assert a civil claim pursuant to 15 U.S.C. § 15. To assert such a claim for a violation of Section 1, Sanderson must allege (1) a contract, combination, or conspiracy; (2) resulting in an unreasonable restraint of trade in the relevant market; (3) an accompanying antitrust injury; and (4) a direct link between the antitrust violation and the antitrust injury. See, *e.g., Greater Rockford Energy & Technology Corp. v. Shell Oil Co.,* 998 F.2d 391, 395-97 (7th Cir.1993) (identifying elements and affirming summary judgment for defendants). Sanderson has failed to allege a viable claim for relief under the Sherman Act.

### A. *Competitors' Criticism of Plaintiff's Products*

Much of Sanderson's antitrust claim is built upon his allegations that defendants and other competitors criticized his products and their effectiveness. Sanderson alleges that those criticisms are deliberately or recklessly false and that scientific studies carried out to support those criticisms were not competent or honest. This branch of Sanderson's antitrust claim fails at the pleading stage for failure to identify any conduct that could be actionable as a restraint of trade.

In *Schachar v. American Academy of Ophthalmology, Inc.,* 870 F .2d 397 (7th Cir.1989), the Seventh Circuit explained the governing principles here. In *Schachar,* several ophthalmologists sued a professional association and some of its members alleging a conspiracy to restrain trade by labeling a surgical technique ( radial keratotomy) as "experimental," with the effect of depressing demand for plaintiffs' services in providing the surgery. The Seventh Circuit affirmed a jury verdict in favor of the defendants, but its opinion stated in no uncertain terms that the case should never have been allowed to go to trial because there was no evidence of any restraint of trade:
Mulling over the jury instructions would be pointless, however, for this case should not have gone to the jury; indeed it should not have gone to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 3

Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429
**(Cite as: Not Reported in F.Supp.2d)**

trial. *All* the Academy did is state as its position that radial keratotomy was "experimental" and issue a press release with a call for research. It did not require its members to desist from performing the operation or associating with those who do. It did not expel or discipline or even scowl at members who performed radial keratotomies. It did not induce hospitals to withhold permission to perform the procedure, or insurers to withhold payment; it has no authority over hospitals, insurers, state medical societies or licensing boards, and other persons who might be able to govern the performance of surgery.

870 F.2d at 398 (emphasis in original).

**\*3** Similarly here, Sanderson has not alleged that defendants imposed any restraints of trade, such as boycotts or other coercive measures, that prevented customers or others from dealing with him or prevented him from selling his products to any willing buyer. Cf. *Wilk v. American Medical Ass'n*, 895 F.2d 352, 356 (7th Cir.1990) (distinguishing between AMA membership's earlier boycott on chiropractors and the AMA's later position that medical physicians could decide individually whether to associate professionally with chiropractors).

All Sanderson alleges is that defendants have joined together to criticize plaintiff and his products falsely. Writing for the Seventh Circuit in *Schachar,* Judge Easterbrook explained that such joint criticism is not enough to establish an antitrust violation even if it could be proven:
Warfare among suppliers and their different products *is* competition. Antitrust law does not compel your competitor to praise your product or sponsor your work. To require cooperation or friendliness among rivals is to undercut the intellectual foundations of antitrust law. [*Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1413-14 (7th Cir.1989); *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,* 784 F.2d 1325, 1338-39 (7th Cir.1986) ]. Unless one group of suppliers diminishes another's ability to peddle its wares (technically, reduces rivals' elasticity of supply), there is not even the beginning of an antitrust case, no reason to investigate further to

determine whether the restraint is "reasonable".

870 F.2d at 399 (emphasis in original). As for the claim that defendants were making deliberately false or misleading statements about plaintiff's products, the *Schachar* court made clear that antitrust law is not the source of relief: "If such statements should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech-the marketplace of ideas." *Id.* at 400.[FN2]

> FN2. Sanderson relies on *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556 (1982), which affirmed an antitrust verdict against a professional association for adopting standards that excluded plaintiff's product. On this issue, the critical fact in *Hydrolevel* was that the defendant-association's standards, while advisory, had "a powerful influence: federal regulations have incorporated many of them by reference, as have the laws of most States, the ordinances of major cities, and the laws of all the Provinces of Canada." 456 U.S. at 559. In this case, Sanderson has not alleged or argued that the WQA's standards have been incorporated into applicable law so as to impose legal barriers for his products. See also *Consolidated Metal Products, Inc. v. American Petroleum Institute,* 846 F.2d 284, 296 n. 43 (5th Cir.1988) (distinguishing *Hydrolevel* on precisely this basis).

Sanderson points out correctly that *Schachar* was not decided on a motion to dismiss and that his Sherman Act claim is not subject to any heightened pleading standard. *E.g., Hammes v. AAMCO Transmissions, Inc.,* 33 F.3d 774, 778 (7th Cir.1994) (reversing dismissal of antitrust claim). Nevertheless, Rule 8(a) of the Federal Rules of Civil Procedure requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Sanderson's lengthy complaint identifies the alleged conduct in restraint

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4

Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429
**(Cite as: Not Reported in F.Supp.2d)**

of trade, and it is possible for a party to plead himself out of court. See, *e.g., Hammes,* 33 F.3d at 782.

The Seventh Circuit's opinion in *Schachar* shows as a matter of law that the types of conduct Sanderson has identified simply are not actionable as restraints of trade. His attachment of the conclusory label " restraint of trade" does not entitle him to subject the defendants to the burden and expense of discovery in the hope that he might find evidence to support some other claim.

**\*4** Where it is clear that the conduct alleged is not actionable, the action can and should be dismissed without any need to rely on any heightened pleading standard. See, *e.g., Generac Corp. v. Caterpillar Inc.,* 172 F.3d 971, 976-78 (7th Cir.1999) (affirming dismissal of antitrust claim); *Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994) (same); *BCB Anesthesia Care, Ltd. v. Passavant Memorial Area Hosp. Ass'n,* 36 F.3d 664, 668-69 (7th Cir.1994) (same); *Banks v. NCAA,* 977 F.2d 1081, 1093 (7th Cir.1992) (same); accord, *Foundation for Interior Design Education Research v. Savannah College of Art & Design,* 244 F.3d 521, 531-32 (6th Cir.2001) (affirming dismissal of antitrust claims based on refusal to accredit college's program); *Patel v. American Bd. of Psychiatry & Neurology, Inc.,* No. 89 C 1751, 1989 WL 152816, at \*3 (N.D.Ill. Nov. 21, 1989) (granting motion to dismiss in antitrust case based on refusal to accredit psychiatrist).

B. *Denial of the "Gold Seal"*

Sanderson also alleges that defendants and others established something called the "Gold Seal Program," urging customers (and urging Better Business Bureaus to urge customers) to purchase water purification products only if the products have the WQA "Gold Seal" of approval. The WQA did not have any protocol for granting a "Gold Seal" to magnetic water treatment, so Sanderson could not obtain a "Gold Seal." There is no allegation that anyone was coerced to buy only "Gold Seal" products.

The allegations about the "Gold Seal Program" fail to state an antitrust claim for essentially the same reasons that Sanderson's allegations about competitor criticism failed. Again in *Schachar,* the Seventh Circuit addressed an essentially identical question:

*Consolidated Metal Products, Inc. v. American Petroleum Institute,* 846 F.2d 284 (5th Cir.1988), holds that when a trade association provides information (there, *gives a seal of approval* ) but does not constrain others to follow its recommendations, it does not violate the antitrust laws. See also *Clamp All Corp. v. Cast Iron Soil Pipe Institute,* 851 F.2d 478, 486-89 (1st Cir.1988). *We agree.* An organization's towering reputation does not reduce its freedom to speak out. Speech informed, hence affected, demand for radial keratotomy, but the plaintiffs had no entitlement to consumers' favor. The Academy's declaration affected only the demand side of the market, and then only by appealing to consumers' (and third-party payors') better judgment. If such statements should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech-the marketplace of ideas.

870 F.2d at 399-400 (emphasis added); accord, *Greater Rockford Energy,* 998 F.2d at 396-97 (affirming summary judgment for defendants: "the failure of a private, standard-setting body to certify a product is not, by itself, a violation of § 1").

**\*5** The Supreme Court's decision in *Hydrolevel* does not help Sanderson on this score because there is no allegation or indication that the standards of the Gold Seal program were incorporated into applicable law. See 456 U.S. at 559; *Consolidated Metal Products,* 846 F.2d at 296 n. 43 (distinguishing *Hydrolevel* on this basis). Sanderson was free to develop and use other means to reassure customers about the quality and efficacy of his products, such as publicizing the independent research he relies upon here. See *Consolidated Metal Products,* 846 F.2d at 296. The Sherman Act does not offer him relief on this theory.

C. *Lack of Access to WQA Shows*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5

Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429
**(Cite as: Not Reported in F.Supp.2d)**

Sanderson also alleges he was barred from displaying his products and processes at WQA trade shows. Unless Sanderson can meet the heavy burden of showing that such access is an "essential facility" in the industry, this allegation fails to establish an actionable restraint of trade.

The essential facility doctrine arose from a case involving a facility that was physically essential-access by railroads to limited facilities for crossing the Mississippi River at St. Louis, which new competitors could not duplicated. See *United States v. Terminal Railroad Ass'n of St. Louis,* 224 U.S. 383, 396-97 (1912). Although the concept has been broadened over the years, the courts have taken care to police a line between facilities (and channels of distribution and advertising) that are only helpful or advantageous on one side, and those that are truly essential for competition on the other side. See, *e.g., Paddock Publications, Inc. v. Chicago Tribune Co.,* 103 F.3d 42, 44-45 (7th Cir.1996) (affirming dismissal of "essential facility" claim based on exclusive terms in contracts for use of syndicated newspaper features); *Olympia Equipment Leasing Co. v. Western Union Telephone Co.,* 797 F.2d 370, 376-77 (7th Cir.1986) (defendant's sales force was not an essential facility; plaintiff not entitled to force defendant to allow plaintiff to use its sales force); accord, *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 543-45 (9th Cir.1991) (computerized reservation systems not an essential facility); *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568-69 (2d Cir.1990) (advertising channel not an essential facility).

The allegations in the complaint provide no indication that displays at WQA shows could possibly meet the standard of an essential facility.

### D. *Lobbying for Official Investigations*

Sanderson also alleges that defendants violated Section 1 of the Sherman Act by acting jointly to induce various governmental officials-state attorneys general and the FTC are mentioned-to investigate plaintiff and his products. Defendants invoke the *Noerr-Pennington* doctrine, which

recognizes that the Sherman Act does not make unlawful activity that is protected by the First Amendment right to petition the government for redress of grievances. This is true even if the petitions are motivated by a desire to harm a competitor or otherwise to gain an (unfair) competitive advantage. See *United Mine Workers v. Pennington,* 381 U.S. 657, 669-70 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136-40 (1961); see also *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 379 (1991) ("it is obviously peculiar in a democracy, and perhaps in derogation of the constitutional right 'to petition the Government for a redress of grievances,' U.S. Const., Amdt. 1, to establish a category of lawful state action that citizens are not permitted to urge").

**\*6** Asking government officials to investigate a competitor for possible violations of the law-*i.e.,* asking the executive branch to execute the laws-falls well within the scope of the *Noerr-Pennington* doctrine. Pursuant to *Noerr-Pennington,* "mere solicitation of governmental action with respect to the passage and enforcement of laws" is lawful conduct outside the scope of Sherman Act liability. *Noerr,* 365 U.S. at 138; see also *Pennington,* 381 U.S. at 670 ("*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.").

There is a "sham" exception to the *Noerr-Pennington* doctrine, and Sanderson attempts to rely on that exception to avoid dismissal of these portions of his antitrust claims. The sham exception, however, is narrow, especially outside the context of litigation in courts:

The "sham" exception to *Noerr* encompasses situations in which persons use the governmental *process*-as opposed to the *outcome* of that process-as an anticompetitive weapon. A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay. See *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508 (1972). A "sham" situation involves a defendant whose activities are "not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6

Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429
**(Cite as: Not Reported in F.Supp.2d)**

genuinely aimed at procuring favorable government action" at all, *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. [492], 500, n. 4 (1988), not one "who 'genuinely seeks to achieve his governmental result, but does so *through improper means,*' " *id.,* at 508, n. 10 (quoting *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.,* 827 F.2d 458, 465, n. 5 (CA9-1987)).

*Omni Outdoor Advertising,* 499 U.S. at 380 (emphasis in original).

The sham exception does not depend on a defendant's alleged motive to harm one competitor in particular or all competition in general. See, *e.g., King v. Idaho Funeral Service Ass'n,* 862 F.2d 744, 745-46 (9th Cir.1988) (affirming summary judgment and award of sanctions in antitrust case; defendants' actions to start official investigation of plaintiffs were protected despite "underlying anticompetitive motives").

Sanderson argues that he is entitled to develop the facts to show that the repeated investigations of his products required him to devote "precious resources to the responses, regardless of the eventual outcome. " Pl. Br. at 11. If allegations or evidence of the plaintiff's own expenses and distractions were enough to establish the sham exception, then the exception would swallow the *Noerr-Pennington* doctrine nearly whole. Sanderson has not alleged facts that would support application of the "sham" exception to the *Noerr-Pennington* doctrine. He does not allege or contend that defendants did not want the investigations to go forward or to succeed.

**\*7** As the Seventh Circuit explained in the gasohol case: "Here, the plaintiffs do not allege that the lobbying efforts were not intended to get legislative results. In fact, the plaintiffs assert that the efforts achieved their desired legislative effect. Hence, these activities are protected and do not violate the Sherman Act." *Greater Rockford Energy,* 998 F.2d at 397 (affirming summary judgment for defendants). Similarly here, Sanderson cannot rely on the sham exception to avoid dismissal of his antitrust claims. See *A & M Records, Inc. v. A.L.W., Ltd.,* 855 F.2d 368, 370-71 (7th Cir.1988) (antitrust allegations based on testifying before and lobbying

Congress failed to state a claim); *Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220, 228-33 (7th Cir.1975) (affirming dismissal of antitrust claim based on *Noerr-Pennington* doctrine); accord, *Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital,* 185 F.3d 154, 158-60 (3d Cir.1999) (same, despite plaintiff's attempt to invoke "sham" exception); *Kottle v. Northwest Kidney Centers,* 146 F.3d 1056, 1063-64 (9th Cir.1998) (same, despite plaintiff's attempt to invoke "sham" exception, and applying heightened pleading standard in light of First Amendment concerns). [FN3]

> FN3. The court also agrees with defendants that Sanderson has failed to allege antitrust injury in this case. See generally *Banks v. NCAA,* 977 F.2d at 1087-89 & n. 9. The court has not relied on defendants' argument that the complaint should be dismissed for failure to allege defendants' market share.

Thus, Sanderson has failed to allege a viable Sherman Act claim under any of the theories he has embraced. The Sherman Act count is dismissed for failure to state a claim upon which relief can be granted.

### IV. *Lanham Act Claim*

Section 43(a) of the Lanham Act provides in relevant part:
(1) Any person who, on or in connection with any goods or services, ... uses in commerce ... any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

* * *

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7

Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429
**(Cite as: Not Reported in F.Supp.2d)**

by such act.

15 U.S.C. § 1125(a). The language regarding false or misleading statements about another person's goods, services, or commercial activities was enacted in 1988. Since that amendment took effect, this provision of the Lanham Act has become the principal legal vehicle for one competitor to challenge another's advertising as false, misleading, and/or deceptive.

For some reason, Sanderson's First Amended Complaint does not mention the Lanham Act by name but cites it only in the jurisdictional allegations. Nevertheless, defendants anticipated the argument, and Sanderson's brief makes clear that he contends the alleged activities of defendants are actionable under 15 U.S.C. § 1125(a). Because legal labels are not required in pleadings, the argument in the brief to the effect that the complaint's allegations support relief under the Lanham Act is sufficient to present the issue.

**\*8** Defendants argue that the Lanham Act claims should be dismissed for failure to state a claim because Sanderson has failed to identify any specific false or misleading statements in particular advertisements, essentially applying to the Lanham Act claim the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure that requires claims for fraud or mistake to be pled "with particularity." See *Max Daetwyler Corp. v. Input Graphics Inc.,* 608 F.Supp. 1549, 1556 (E.D.Pa.1985) (applying such standard to limit scope of Lanham Act complaint); accord, *In re Century 21-RE/MAX Real Estate Advertising Claims Litigation,* 882 F.Supp. 915, 927 (C.D.Cal.1994) (same); *Barr Laboratories, Inc. v. Quantum Pharmics, Inc.,* 827 F.Supp. 111, 117-18 (E.D.N.Y.1993) (requiring plaintiff to state the content of the alleged misrepresentations, but granting plaintiff leave to replead to specify alleged falsehoods or misrepresentations); *Sanderson v. Spectrum Labs, Inc .,* No. 1:99cv371, slip op. at 8-10 (N.D.Ind. Jan. 12, 2000) (dismissing Sanderson's similar Lanham Act claims against another competitor), *aff'd mem.,* 2000 WL 1909678 (7th Cir. Dec. 29, 2000).

Application of the Rule 9(b) particularity standard to claims of false or deceptive statements about a competitor's products is a reasonable interpretation of the term "fraud" in Rule 9(b), and specification of the allegedly false or misleading communications is important in such cases. Section 43(a) is not so broad as to include "all statements made by one competitor about its or another competitor's product. " *Gillette Co. v. Norelco Consumer Products Co.,* 946 F.Supp. 115, 134 (D.Mass.1996); accord, *Garland Co. v. Ecology Roof Systems Corp.,* 895 F.Supp. 274, 279 (D.Kan.1995) ("[T]his court has found no indication that Congress, through its use of the language 'commercial advertising or promotion,' intended to extend Lanham Act coverage to every isolated alleged misrepresentation made to a potential customer by a business competitor."); *American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.,* 820 F.Supp. 1072, 1078 (N.D.Ill.1993) (refusing to read § 43(a) so broadly so as to "sweep within the ambit of the Act any disparaging comment made in the context of a commercial transaction"). In other words, Section 43(a) did not wholly federalize the common law of commercial slander and libel. In addition, since this complaint's allegations cover more than twenty years, it is necessary to identify specific communications to determine whether the applicable statute of limitations has passed.

Accordingly, plaintiff Sanderson needs to identify in the complaint any specific false or deceptive communications in "commercial advertising or promotion" that he claims are actionable. The First Amended Complaint does not do so. Because Lanham Act claims do not fall squarely within the language of Rule 9(b), however, the court concludes that Sanderson is entitled to an opportunity to identify such communications if he is able to do so. The Lanham Act claims are dismissed without prejudice to repleading within 30 days.

### V. *State Law Claims*

**\*9** Whether the court will exercise supplemental jurisdiction over any state law claims will be decided once a final resolution is reached on the federal claims. Plaintiff suggests that the complaint

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8

Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429
**(Cite as: Not Reported in F.Supp.2d)**

alleges sufficient damages to invoke the court's diversity jurisdiction. See Pl. Br. at 13. The suggestion misses the mark. The First Amended Complaint identifies plaintiff Sanderson as an Indiana resident (and presumably citizen) and at least two defendants as Indiana citizens. Diversity jurisdiction is not available.

## VI. *Conclusion*

Defendants' motions to dismiss are granted with respect to plaintiff's Sherman Act claims without leave to replead, and granted with respect to plaintiff's Lanham Act claims with leave to replead no later than June 28, 2001, consistent with this entry. The court takes no action at this time on the motions to dismiss as applied to plaintiff's state law claims. Plaintiff's motion for leave to file his second amended complaint is hereby granted. The Second Amended Complaint shall be deemed filed this date, and dismissed this date for the reasons set forth above. Discovery has been stayed pending resolution of the motion to dismiss and the related appeal before the Seventh Circuit in *Sanderson v. Spectrum Labs, Inc.,* 2000 WL 1909678 (7th Cir. Dec. 29, 2000). Plaintiff has moved to resume discovery and to establish a trial date and case management schedule. The motion is denied without prejudice to renewal in the event that plaintiff sufficiently repleads his Lanham Act claims so as to specify the advertising and promotional statements in question.

So ordered.

S.D.Ind.,2001.
Sanderson v. Brugman
Not Reported in F.Supp.2d, 2001 WL 699876 (S.D.Ind.), 2001-2 Trade Cases P 73,429

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.